1 | **FOLEY & LARDNER LLP**
ONE MARITIME PLAZA, SIXTH FLOOR
2 | SAN FRANCISCO, CA 94111-3409
TELEPHONE:    415.434.4484
FACSIMILE:    415.434.4507

3 | LAURENCE R. ARNOLD, CA BAR NO. 133715
SCOTT P. INCIARDI, CA BAR NO. 228814
4 | Attorneys for Petitioner Stanford Hospital & Clinics

ORIGINAL
FILED

OCT - 9 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8 | ### UNITED STATES DISTRICT COURT

9 | ### NORTHERN DISTRICT OF CALIFORNIA

11 | **STANFORD HOSPITAL & CLINICS and**
12 | **LUCILE PACKARD CHILDREN'S**
**HOSPITAL**

Case No. 07 5158

13 | **Petitioners,**

**PETITION TO VACATE**
**ARBITRATION AWARD MMC**

14 |

15 | **v.**

**[§ 301 OF THE LABOR MANAGEMENT**
**RELATIONS ACT, 29 U.S.C. § 185]**

16 | **SERVICE EMPLOYEES**
**INTERNATIONAL UNION, LOCAL 715**

17 | **Respondent.**

Petitioners Stanford Hospital & Clinics and Lucile Packard Children's Hospital

(collectively the "Hospitals") hereby petition this Court for an order vacating the Opinion And

Decision (the "Award") of arbitrator Paul D. Staudohar (the "Arbitrator") issued in the

arbitration between the Hospitals and respondent Service Employees International Union, Local

715 (the "Union") on July 2, 2007. By this Petition, the Hospitals allege:

### I.    JURISDICTION

1.    This Petition arises under, and jurisdiction is conferred on this Court by virtue of,

Section 301 of the Labor-Management Relations Act of 1947 (hereinafter "Section 301"). 29

U.S.C. § 185. Section 301 provides that "[s]uits for violation of contracts between an employer

and a labor organization representing employees in an industry affecting commerce as defined in

1  this chapter . . . may be brought in any district court of the United States having jurisdiction of

2  the parties, without respect to the amount in controversy or without regard to the citizenship of

3  the parties." 29 U.S.C. § 185(a) (bracketed material supplied).

4

5      2.      The Hospitals are California non-profit, public benefit corporations, having their

6  principal offices and places of business in Stanford, California within the territorial jurisdiction

7  of this Court, and are employers in an industry affecting commerce within the meaning of

8  Section 301.

9      3.      The Union is a labor organization representing employees in an industry affecting

10 commerce within the territorial jurisdiction of this Court within the meaning of Section 301.

11

**II.     INTRADISTRICT ASSIGNMENT**

12

13     4.      Pursuant to Civil Local Rule 3-2(a)-(e), intradistrict venue in the San Jose

14 Division of this Court, as assigned by the Clerk, is appropriate, as a substantial part of the events

15 or omissions which give rise to this Petition occurred in Santa Clara County.

16 **III.    THE COLLECTIVE BARGAINING AGREEMENT**

17     5.      On June 15, 2006, the Hospitals and the Union (hereinafter sometimes

18 collectively, the "Parties") executed a collective bargaining agreement (the "Agreement"), a true

19 and correct copy of which is attached hereto as Exhibit A and made a part of this Petition.

20

21     6.      The Agreement is effective between January 20, 2006 through November 4, 2008

22 and covers certain classifications of the Hospitals' employees, as stated in Article 1.3 and

23 Appendix A of the Agreement, including the job classification known as "Anesthesia

24 Technician," which is also known as "Anesthesia Tech."

25     7.      Article 26 of the Agreement sets forth a procedure for processing and adjusting

26 grievances culminating in arbitration. Article 26.1.1 defines a "grievance" as "a claim during the

27 term of this Agreement that the Employer has violated this Agreement . . ." Article 26.7.3 of the

28 Agreement provides that, in the event that a grievance is taken to arbitration, "[t]he arbitrator's

2

1 authority will be limited to interpreting the specific provisions of this Agreement and will have

2 no power to add to, subtract from, or to change any part of the terms or conditions of this

3 Agreement." Article 26.7.10 further provides that "[t]he arbitrator's authority will be limited to

4 determining whether the Employer has violated the provision(s) of this Agreement. The

5 arbitrator will not have jurisdiction or authority to add to, amend, modify, nullify, or ignore in

6 any way the provisions of this Agreement, and will not make any award that would, in effect,

7 grant the Union or the employee(s) any matters that were not obtained in the negotiation

8 process."

9

10 8.    Article 2 of the Agreement sets forth certain "management rights" reserved to the

11 Hospitals under the Agreement. Among the rights specifically reserved to the Hospitals by

12 Article 2 are the rights to "direct and assign the work force," "to abolish, create, alter or combine

13 job classifications," "to introduce new or improved equipment, facilities or operations," and "to

14 determine whether employees, both within and without the bargaining unit, will or will not

15 perform certain functions, duties or tasks." Article 2 further states that the Hospitals "may, in its

16 discretion, continue any current policies and practices which do not conflict with express written

17 provisions of this Agreement."

18 9.    Article 18 of the Agreement sets forth provisions governing "work rules" and

19 states, in part, that "[t]he Employer has the right at its discretion to promulgate, alter, modify,

20 amend, rescind, and enforce work rules which are not inconsistent with this Agreement." Article

21 18 defines "work rules" as "rules promulgated by the Employer, or a particular department or

22 departments thereof, within its discretion, that regulate employees relative to and affecting their

23 employment."

24

25 10.    Article 28 of the Agreement is titled "waiver" and states in relevant part that

26 "[t]he Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly

27 waives the right, and each agrees that the other will not be obligated to bargain collectively with

28 respect to any subject or matter referred to, or covered in this Agreement, or with respect to any

3
PETITION TO VACATE ARBITRATION AWARD

1  subject or matter not specifically referred to or covered by this Agreement, even though such

2  subject or matter may not have been within the knowledge or contemplation of either or both of

3  the parties at the time they negotiated or signed the Agreement."

4

5      11.     Article 9 of the Agreement, titled "temporary assignment," governs the conditions

6  under which employees covered by the Agreement may become entitled to premium payments

7  known as "relief in higher classification" or "RHC" pay. Article 9 states in relevant part:

8              An employee temporarily assigned by the Employer to
               perform the typical duties of a position in a higher pay grade
9              for four (4) consecutive hours or more will receive a
               differential of five percent (5%) for each grade above the
10             grade of the employee's regular classification for all hours
               during which the employee is so assigned (e.g., if an
11             employee in Grade SEIU0006 is assigned to a position in
               SEIU0008 the employee will receive a differential of ten
12             percent (10%)). As an exception if an employee is assigned
               by the Employer to a position in a lead classification listed in
13             Appendix A and to perform all of the duties thereof, the
               employee will be paid a lead premium of five percent (5%)
14             for the actual hours worked in the lead position provided the
               lead position is in a classification in a higher wage range than
15             the employee's regular classification or position.

16

17 **IV.    THE ARBITRATION PROCEEDINGS**

18     12.     On or around April 25, 2006, the Union filed a grievance pursuant to Article 26 of

19 the Agreement (the "Grievance"). In the Grievance, the Union alleged that the Hospitals

20 violated Article 9 of the Agreement by refusing to pay RHC to those Anesthesia Techs who

21 carried a device known as a "Spectralink," a portable telephone akin to a cellular telephone. The

22 Union subsequently clarified that the Grievance was limited to those anesthesia techs who

23 carried a Spectralink in an area known as the "Main Operating Room," which is also known as

24 the "Main O.R."

25

26     13.     When the Parties were unable to resolve the Grievance, it was submitted to

27 arbitration pursuant to Article 26 of the Agreement. The Parties selected Paul D. Staudohar (the

28 "Arbitrator") to arbitrate the matter.

1    14.    A hearing was held on April 26, 2007 in Palo Alto, California, during which the

2    Arbitrator heard the testimony of witnesses and received documentary evidence, including a

3    complete copy of the Agreement. The Parties submitted post-hearing briefs.

5    15.    On July 2, 2007, the Arbitrator issued the Award, a true and correct copy of which

6    is attached hereto as Exhibit B and made a part of this Petition. In the Award, the Arbitrator

7    found that there existed for some period of time a "past practice" of paying a five percent

8    "differential wage" to anesthesia techs who carried a Spectralink, but that in early 2006, Stanford

9    determined that such payments were not authorized by the Agreement, and, without securing the

10    Union's "consent or approval," announced that it was discontinuing such payments in February,

11    2006. The Arbitrator concluded that, "the Employer violated Article 9 of the collective

12    bargaining agreement when it terminated the five percent differential to Anesthesia Techs who

13    were assigned to carry the Spectralink telephone on shifts in the Main Operating Room. The

14    remedy is restoration of the five percent differential and making whole of [anesthesia techs] in

15    the Main Operating Room for lost wages. The differential will remain in effect unless and until

16    altered by mutual agreement of the Parties."

17    **V.    GROUNDS FOR VACATUR**

18    16.    Pursuant to Section 301 of the Labor-Management Relations Act, the Court

19    should vacate the Award on the following grounds:

21    17.    The Arbitrator ignored and/or nullified the express terms of Article 9 of the

22    Agreement, and added to, amended, changed, and modified the existing terms of Article 9 of the

23    Agreement. Specifically, the Arbitrator disregarded the existing language of Article 9, which set

24    forth the two (2) exclusive methods by which employees could become entitled to RHC pay, and

25    changed that language to create a third method for earning RHC pay, which is not included in the

26    language of Article 9 or any other provision of the Agreement. Indeed, the Arbitrator's decision

27    is contrary to multiple provisions of the Agreement.

28    ///

SFCA_474710.2

1    18.    The Arbitrator ignored and/or nullified Article 2 of the Agreement, and added to,

2    amended, changed, and modified its terms. Specifically, Article 2 expressly and unequivocally

3    vested in the Hospitals sole discretion as to whether to continue existing practices not embodied

4    in the written terms of the Agreement, and therefore, necessarily, whether not to continue such

5    practices. Disregarding the plain language of the Agreement, the Arbitrator ordered that the

6    Hospitals must continue any unwritten practice in effect, and cannot discontinue that practice

7    without first securing the "consent or approval" of the Union. The Arbitrator further ordered the

8    Hospitals to pay monetary damages based on their discontinuation of that unwritten practice.

9

10    19.    The Arbitrator further ignored and/or nullified Article 2 of the Agreement, and

11    added to, amended, changed, and modified its terms. Article 2 gives the Hospitals the right,

12    except as limited by the express provisions of the agreement, to "direct and assign the work

13    force," "to abolish, create, alter or combine job classifications," "to introduce new or improved

14    equipment, facilities or operations," and "to determine whether employees, both within and

15    without the bargaining unit, will or will not perform certain functions, duties or tasks." Despite

16    this language, the Arbitrator gave effect to a "past practice" – one that is not reflected in the

17    express provisions of the Agreement, thereby placing limits on the exercise of the rights set forth

18    in Article 2.

19    20.    The Arbitrator further ignored and/or nullified Article 18 of the Agreement, and

20    added to, amended, changed, and modified its terms in that, although Article 18 gives the

21    Hospitals the right to "promulgate, supplement, alter, modify, amend, rescind, and enforce work

22    rules," which are any rules that regulate employees relative to and affecting their employment,

23    provided only that such work rules are "not inconsistent with this Agreement," the Arbitrator

24    gave effect to a "past practice" that places limits on the exercise of the rights set forth in Article

25    18, although that practice is not reflected in the express provisions of the Agreement.

26    ///

27    ///

28

6
PETITION TO VACATE ARBITRATION AWARD

SFCA_474710.2

21.     The Arbitrator ignored and/or nullified Article 28 of the Agreement, and added to, amended, changed, and modified its terms. Specifically, Article 28 reflects the Parties' agreement that neither party will be obligated for the life of the Agreement to bargain with the other regarding any subject or matter referred to or covered in the Agreement, or with respect to any matter not referred to or covered in the Agreement, regardless of whether the subject was or was not within the knowledge or contemplation of either or both parties at the time the Agreement was negotiated. In direct contravention of Article 28, the Arbitrator's Award stated that the Hospitals were, and would be, required to bargain with the Union prior to discontinuing the payment of RHC to anesthesia techs carrying Spectralinks in the Main O.R.

22.     The Arbitrator exceeded his jurisdiction and authority to interpret and enforce the Agreement as defined and delimited in Article 26 of the Agreement. Article 26 states that the Arbitrator's authority is "limited to interpreting the specific provisions of this Agreement," that he "will have no power to add to, subtract from, or to change any part of the terms or conditions of this Agreement," and that he is without jurisdiction to "add to, amend, modify, nullify, or ignore in any way the provisions of this Agreement . . ." By ignoring, nullifying, modifying, changing, and adding to the provisions of the Agreement, including, but not limited to, Articles 2, 9, 18, and 28, as described above, the Arbitrator exceeded the authority vested in him by the Agreement, and acted outside his jurisdiction, rendering his Award void.

23.     The Arbitrator further exceeded his jurisdiction and authority to interpret and enforce the Agreement as defined and delimited in Article 26 of the Agreement in that, while Article 26 states that the Arbitrator was without jurisdiction to "make any award that would, in effect, grant the Union or the employee(s) any matters that were not obtained in the negotiation process," the Arbitrator's award vests in the Union and certain bargaining unit employees a right to RHC pay based on the carrying of Spectralinks, which right was not obtained through the negotiation process. In so doing, the Arbitrator exceeded the authority vested in him by the Agreement, and acted outside his jurisdiction, rendering his Award void.

7
PETITION TO VACATE ARBITRATION AWARD

SFCA_474710.2

1    24.    The Arbitrator issued an award that exceeded the scope of the issues submitted to

2  him by the Parties, thereby exceeding the scope of his authority to interpret and enforce the

3  Agreement. The issue presented to the Arbitrator by the Grievance was whether the Hospitals

4  violated Article 9 of the Agreement by refusing to pay RHC to certain anesthesia techs who

5  carried a Spectralink. The Arbitrator, however, found and issued an award based on an unwritten

6  past practice not contained in or consistent with Article 9.

7

8    25.    The Arbitrator further issued an award that exceeded the scope of the issues

9  submitted to him by the Parties. The issue presented to the Arbitrator by the Grievance was

10  whether the Hospitals violated Article 9 of the Agreement by refusing to pay RHC to certain

11  anesthesia techs who carried a Spectralink. Nevertheless, the Arbitrator imposed a bargaining

12  duty on the Hospitals, although the issue of whether the Hospitals were required to bargain with

13  the Union was not presented to him.

14    26.    For any and all of the foregoing reasons, the Arbitrator's Award failed to draw its

15  essence from the Agreement, and did not represent a plausible interpretation of the Agreement.

16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28

8
PETITION TO VACATE ARBITRATION AWARD

**VI.    PRAYER FOR RELIEF**

27.    WHEREFORE, the Hospitals pray that this Court issue an order vacating the Award rendered by the Arbitrator in favor of the Union on July 2, 2007, and directing the submission of the Grievance to a new arbitrator to be selected by the Parties pursuant to the grievance and arbitration provisions of the Agreement, that this Court award the Hospitals their costs incurred in this proceeding, and that this Court award such other and further relief that this Court deems proper.

Dated: October 8, 2007

FOLEY & LARDNER LLP
LAURENCE R. ARNOLD
SCOTT P. INCIARDI

By: _____
LAURENCE R. ARNOLD
Attorneys for Petitioners
Stanford Hospital & Clinics and Lucile
Packard Children's Hospital

PETITION TO VACATE ARBITRATION AWARD

SFCA_474710.2

# United States District Court
## NORTHERN DISTRICT OF CALIFORNIA

STANFORD HOSPITAL & CLINICS and
LUCILE PACKARD CHILDREN'S
HOSPITAL

### SUMMONS IN A CIVIL CASE

CASE NUMBER:

**V.**

SERVICE EMPLOYEES INTERNATIONAL
UNION, LOCAL 715 

C 07 5158

TO: (Name and address of defendant)

Service Employees International Union, Local 715

2302 Zanker Road

San Jose, CA 95131-1115

**MMC**

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Laurence R. Arnold

Scott P. Inciardi

Foley & Lardner LLP

One Maritime Plaza, Sixth Floor

San Francisco, CA 94111-3409

an answer to the complaint which is herewith served upon you, within  20   days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in
the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Richard W. Wieking
CLERK

DATE_____

____MARY ANN BUCKLEY____
(BY) DEPUTY CLERK

American LegalNet, Inc.
www.USCourtForms.com

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me [1] | |

| Name of SERVER | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐     Served Personally upon the Defendant. Place where served:

☐     Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left:

☐     Returned unexecuted:

☐     Other *(specify):*

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |
| | | $0.00 |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____
               *Date*

*Signature of Server*

_____
*Address of Server*

(1)  As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure

✎ JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Stanford Hospital & Clinics and Lucile Packard Children's Hospital

## DEFENDANTS

Service Employees International Union, Local 715

**(b)** County of Residence of First Listed Plaintiff  Santa Clara, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Santa Clara, CA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address and Telephone Number)

Foley & Lardner LLP
One Maritime Plaza, Sixth Floor
San Francisco, CA  94111-3409
Telephone: 415-434-4484

Attorneys (If Known)

Alshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA  94108
Telephone: 415.421.7151

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to vacate Sentence
HABEAS CORPUS:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R. R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☑ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☑ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS - Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. Section 185
Brief description of cause:
Petition to Vacate Arbitration Award

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☑ No

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE                            DOCKET NUMBER

DATE
October 9, 2007

SIGNATURE OF ATTORNEY OF RECORD
*Laurence R. Cis4*

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

American LegalNet, Inc. | www.USCourtForms.com

**Exhibit A**



STANFORD
HOSPITAL & CLINICS

*Stanford Medical Center*

*Agreement Between*

**Stanford Hospital and Clinics**

*and*

**Lucile Packard Children's Hospital**

*and*

**Service Employees International Union**

January 20, 2006
*through*
November 4, 2008





Lucile Salter Packard
Children's Hospital

STANFORD UNIVERSITY MEDICAL CENTER

**AGREEMENT BETWEEN**

**STANFORD HOSPITAL AND CLINICS**

**AND**

**LUCILE PACKARD CHILDREN'S HOSPITAL**

**AND**
**SERVICE EMPLOYEES INTERNATIONAL UNION,**
**LOCAL 715**

**January 20, 2006**

**through**

**November 4, 2008**

## TABLE OF CONTENTS

**ARTICLE 1 Agreement**.................................................................................................1
  1.1      AGREEMENT..............................................................................................1
  1.2      PURPOSE OF AGREEMENT .....................................................................1
  1.3      RECOGNITION ..........................................................................................1
  1.4      NEW POSITIONS ......................................................................................2
  1.5      RECLASSIFICATION FROM BARGAINING UNIT TO NON-UNIT POSITIONS .........2
  1.6      WORK ACROSS BARGAINING UNIT LINES...............................................3
**ARTICLE 2 Management Rights** .................................................................................4
**ARTICLE 3 Agency Shop and Voluntary Dues Deduction** .....................................5
  3.1      DUES, SERVICE FEE, CHARITABLE CONTRIBUTION OBLIGATION....................5
  3.2      DUES DEDUCTION....................................................................................5
  3.3      INDEMNIFICATION ...................................................................................6
**ARTICLE 4 Nondiscrimination in Employment** ........................................................7
**ARTICLE 5 Wages**......................................................................................................8
  5.1      DEFINITION...............................................................................................8
  5.2      OTHER INCREASES ...............................................................................10
  5.3      NEW HIRES AND PROMOTIONS.............................................................10
  5.4      DATE OF RATIFICATION.........................................................................11
  5.5      EFFECTIVE DATE OF INCREASES ..........................................................11
  5.6      REIMBURSEMENTS ................................................................................11
**ARTICLE 6 Employment Categories** .......................................................................12
  6.1      REGULAR  EMPLOYEES..........................................................................12
  6.2      RELIEF EMPLOYEES...............................................................................12
  6.3      FIXED TERM EMPLOYEES ......................................................................12
  6.4      COVERAGE OF RELIEF AND FIXED TERM EMPLOYEES.....................................12
**ARTICLE 7 Hours of Work**........................................................................................14
  7.1      WORKDAY................................................................................................14
  7.2      WORKWEEK.............................................................................................14
  7.3      STANDARD WORK SCHEDULE ...............................................................14
  7.4      ALTERNATE WORK SCHEDULES ...........................................................15
  7.5      MEAL PERIODS ......................................................................................15
  7.6      REST PERIODS.......................................................................................15
  7.7      SHIFT DIFFERENTIAL .............................................................................16
  7.8      OVERTIME...............................................................................................16
  7.9      CALLBACK................................................................................................17
  7.10    EARLY REPORT TO WORK .....................................................................17
  7.11    ON-CALL..................................................................................................17
  7.12    PYRAMIDING OR COMPOUNDING OF OVERTIME AND OTHER PREMIUMS
           PROHIBITED ...........................................................................................18
  7.13    NO GUARANTEE.....................................................................................18
**ARTICLE 8 Trial Period**............................................................................................19
**ARTICLE 9 Temporary Assignment** .......................................................................20
**ARTICLE 10 Seniority** ..............................................................................................21
**ARTICLE 11 Transfer, Promotion and Demotion** ...................................................22
  11.1    DEFINITIONS...........................................................................................22
  11.2    TRANSFER/PROMOTION OF EMPLOYEES.............................................22
  11.3    SELECTION FOR PROMOTION/TRANSFER............................................22
  11.4    SHIFT ASSIGNMENT ..............................................................................23
**ARTICLE 12 Layoff and Reduction in Time** ............................................................24

| | | |
|---|---|---|
| 12.1 | DEFINITIONS | 24 |
| 12.2 | DAILY CANCELLATION | 24 |
| 12.3 | TEMPORARY LAYOFFS | 24 |
| 12.4 | INDEFINITE LAYOFFS | 25 |
| 12.5 | SEVERANCE PAY | 28 |
| 12.6 | SUBCONTRACTING | 30 |
| 12.7 | TRANSFER OF WORK TO NEW LOCATIONS | 31 |
| 12.8 | VIOLATIONS | 32 |
| 12.9 | EFFECTS OF LAYOFFS | 32 |
| 12.10 | CONTINUATION OF BENEFITS | 32 |
| 12.11 | PREFERENCE DURING NOTICE PERIOD | 33 |
| **ARTICLE 13 Benefits** | | 34 |
| 13.1 | ELIGIBILITY | 34 |
| 13.2 | PLAN RATES | 34 |
| 13.3 | MODIFICATION TO BENEFITS | 34 |
| 13.4 | ENUMERATION OF EMPLOYER BENEFITS | 34 |
| **ARTICLE 14 Paid Time Off** | | 37 |
| 14.1 | PURPOSE AND RATE OF PAY | 37 |
| 14.2 | ELIGIBILITY | 37 |
| 14.3 | ACCRUAL | 37 |
| 14.4 | HOLIDAYS | 38 |
| 14.5 | TRANSFER OF PTO CREDIT | 39 |
| 14.6 | INTEGRATION OF PTO | 39 |
| **ARTICLE 15 Leaves of Absences** | | 40 |
| 15.1 | ELIGIBILITY | 40 |
| 15.2 | LEAVE CATEGORIES | 40 |
| 15.3 | DURATION OF LEAVE | 41 |
| 15.4 | COMBINATIONS OF LEAVES OF ABSENCES | 41 |
| 15.5 | REINSTATEMENT RIGHTS | 42 |
| 15.6 | PROCEDURES | 42 |
| 15.7 | RETURN FROM LEAVE | 43 |
| **ARTICLE 16 Educational Assistance** | | 44 |
| **ARTICLE 17 Jury Duty** | | 46 |
| **ARTICLE 18 Work Rules** | | 47 |
| **ARTICLE 19 Resignation** | | 48 |
| **ARTICLE 20 Discipline and Dismissal** | | 49 |
| 20.1 | DISCHARGE | 49 |
| 20.2 | INVESTIGATORY INTERVIEWS | 49 |
| 20.3 | NOTICE OF DISCHARGE | 49 |
| 20.4 | NOTICE | 49 |
| 20.5 | APPEAL | 49 |
| 20.6 | TIME IN FILE | 50 |
| **ARTICLE 21 Personnel Files** | | 51 |
| **ARTICLE 22 Joint Management and Labor Committee** | | 52 |
| **ARTICLE 23 Stewards** | | 54 |
| **ARTICLE 24 Union Access, Bulletin Boards, Information Requests** | | 56 |
| 24.1 | ACCESS | 56 |
| 24.2 | BULLETIN BOARDS | 58 |
| 24.3 | TELEPHONE, FACSIMILE AND ELECTRONIC MAIL | 59 |
| 24.4 | USE OF THE SHC/LPCH FACILITIES | 59 |
| 24.5 | PRINTING OF AGREEMENT | 59 |

| 24.6 | INFORMATION PROVIDED TO UNION | 59 |
|------|-------------------------------|----|
| **ARTICLE 25 Health and Safety** | | 61 |
| **ARTICLE 26 Grievance and Arbitration Procedure** | | 62 |
| 26.1 | DEFINITION | 62 |
| 26.2 | REPRESENTATION RIGHTS | 62 |
| 26.3 | STEP 1. INFORMAL REVIEW | 63 |
| 26.4 | STEP 2. FORMAL REVIEW | 64 |
| 26.5 | CONSOLIDATION OF GRIEVANCES | 64 |
| 26.6 | TIME LIMITS FOR FILING | 64 |
| 26.7 | ARBITRATION | 65 |
| 26.8 | PAY STATUS | 68 |
| 26.9 | EXCLUSION OF RELIEF, FIXED TERM AND TRIAL PERIOD EMPLOYEES | 68 |
| **ARTICLE 27 No Strikes** | | 70 |
| **ARTICLE 28 Waiver** | | 71 |
| **ARTICLE 29 Severability** | | 72 |
| **ARTICLE 30 Merger** | | 73 |
| **ARTICLE 31 Amendments and Term or Agreement** | | 74 |
| **APPENDIX A** | | A-1 |
| INCLUDED JOB CLASSIFICATIONS | | A-1 |
| EXCLUDED JOB CLASSIFICATIONS | | A-4 |
| CLASSIFICATION PAY GRADES/JOB CODES | | A-5 |
| **APPENDIX B Pay Ranges** | | B-1 |
| INITIAL WAGE RANGE TO WAGE SCALE CONVERSION CHART | | B-1 |
| EFFECTIVE THE PAY PERIOD NEXT FOLLOWING JANUARY 20, 2006 | | B-2 |
| EFFECTIVE THE PAY PERIOD NEXT FOLLOWING NOVEMBER 4, 2006 | | B-3 |
| EFFECTIVE THE PAY PERIOD NEXT FOLLOWING NOVEMBER 4, 2007 | | B-4 |
| **APPENDIX C Units of Layoff** | | C-1 |
| STANFORD HOSPITAL | | C-1 |
| LUCILE PACKARD CHILDREN'S HOSPITAL | | C-2 |
| **Parking Side Letter** | | D-1 |
| **Union Access Side Letter** | | E-1 |
| **North Campus Side Letter** | | F-1 |

## ARTICLE 1
## AGREEMENT

1.1    AGREEMENT

This Agreement is made and entered into between Stanford Hospital and Clinics (SHC) and Lucile Packard Children's Hospital (LPCH), both non-profit public benefit corporations, hereinafter sometimes referred to as "SHC/LPCH", Employer, or "management" and the Service Employees International Union, Local 715, AFL-CIO, CLC (hereinafter referred to as "Union").

1.2    PURPOSE OF AGREEMENT

1.2.1    It is the intent and purpose of the parties hereto that this Agreement constitutes an implementation of the provisions of the National Labor Relations Act, as amended, with respect to collective bargaining, and provides for orderly and constructive employment relations in the public interest, in the interest of Stanford Hospital and Clinics and Lucile Packard Children's Hospital, and the interests of the employees represented by the Union.

1.2.2    The parties hereby acknowledge that this Agreement represents the understanding reached by the parties as a result of the unlimited right and opportunity of the parties to make any and all demands with respect to the employer-employee relationship that exists between them relative to the scope of bargaining.

1.3    RECOGNITION

1.3.1    Pursuant to the Certification of Representation issued by the National Labor Relations Board (NLRB) in Case No. 32-RC-4504, as modified in Case No. 32-UC-363, the Employer recognizes the Union, as the sole and exclusive representative for the purpose of collective bargaining for all full-time, part-time, and relief non-professional employees performing service and patient care functions employed at Stanford Hospital, Lucile Packard Children's Hospital, Welch Road and Blake Wilbur Drive locations in positions or classifications listed as included in Appendix A, excluding those positions or classifications listed as excluded in Appendix A, excluding all employees represented by any other labor organization, excluding all managerial, supervisory or confidential employees within the meaning of the NLRA, and excluding all other employees.

1.3.2    Unless expressly indicated otherwise, the term "employee" or "employees" as used in this Agreement will refer to employees of Stanford Hospital and Clinics and Lucile Packard Children's Hospital employed in the positions or classifications listed as included in Appendix A and covered by this Agreement. Similarly, unless expressly indicated otherwise, "classification" or "classifications" refers to classifications listed in Appendix A as covered in their entirety, and "position" or "positions" refers to a specific job position or job positions listed in Appendix A, where the classification under which it falls is not included in the bargaining unit in its entirety (e.g., there are positions in the classification that are also listed in Appendix A as excluded).

1

1.4    NEW POSITIONS

1.4.1    When the Employer creates a new position and title which it believes is within a classification that is included in the bargaining unit, the Employer will notify the Union in writing of the bargaining unit assignment, if any, of such position. The Union will have fourteen (14) calendar days from the date the notice is mailed to contest the Employer's assignment. If the Union contests the assignment, the Employer will meet with the Union in an attempt to reach agreement on the bargaining unit assignment. If the parties are unable to reach agreement, the dispute will be submitted to arbitration for resolution. If the Union does not contest the bargaining unit assignment within the fourteen (14) calendar day notice period, the unit assignment of the new position will be deemed agreeable to the parties. Bargaining unit assignments made by the Employer which are contested by the Union will remain as originally assigned by the Employer unless and until such time as the parties are in mutual agreement as to a different assignment or, if such assignment is referred to arbitration within the appeal period stated above, until resolution of the matter by arbitration. Any change in assignment by agreement of the parties or by an arbitrator's decision will be prospective only.

1.4.2    If the inclusion of a new position within the bargaining unit covered by this Agreement is agreed to by the parties or found appropriate in arbitration, the Employer will assign a pay rate to the position. Within fifteen (15) calendar days of the assignment of the pay rate, the Union may request, in writing, that the Employer meet to discuss the pay rate for the classification. If such a request is made, the parties will meet within thirty (30) calendar days of the request and discuss the pay rate for the classification. If the Employer agrees to make a change to the rate the change will be prospective only.

1.5    RECLASSIFICATION FROM BARGAINING UNIT TO NON-UNIT POSITIONS

The Employer will not change the title of an existing classification or create a new classification with the same duties but a different title in order to remove the classification from the bargaining unit or to avoid its placement in the bargaining unit. This limitation is not, however, intended to apply to the creation of new positions in a classification where only specific positions in the classification are listed as included in Appendix A. In the event the Employer determines that a position or classification should be reclassified with the result that the position or classification would be removed from the bargaining unit, it will notify the Union in writing. If the Union believes that the reclassification or designation is inconsistent with this Agreement, it may appeal the designation to arbitration within fourteen (14) calendar days of the date the notice is sent in accordance with the following procedures.

1.5.1    An arbitrator will be selected and the arbitration will be conducted in accordance with the Arbitration provisions of this Agreement.

1.5.2    The Union will have the burden of proof and of proceeding in arbitration under this Article.

2

1.5.3    The arbitrator's decision will be limited to only the issue of whether the position or classification in dispute should remain within or be removed from the bargaining unit, and the arbitrator's decision will be final and binding.

1.5.4    Standards to be used by the arbitrator in reaching a decision will include: that all managerial, supervisory, and confidential employees within the meaning of the NLRA are excluded; that employees who hold any managerial, supervisory, or confidential position, regardless of the percentage of time worked in such position, are excluded; and that all the Employer student employees whose employment is contingent upon their status as students are excluded.

1.6    WORK ACROSS BARGAINING UNIT LINES

1.6.1    The Employer may assign employees covered by this Agreement for full or partial shifts on a temporary or sporadic basis to perform services in a position not covered by this Agreement due to a temporary or unforeseen need, or to avoid a cancellation of the employee for the day, provided the employees are presently qualified to perform the work in question. Such an assignment will not affect the employee's pay, benefit accruals, seniority, or other benefits or status as an employee covered by this Agreement. The Union will not have any claim that the work or position to which the employee is assigned under this provision is covered by this Agreement. If an employee is utilized to fill a position not covered by this Agreement for more than five (5) consecutive work days, the Union will be provided with written notification. An employee will not be required to work involuntarily in a position not covered by this Agreement for more than five (5) consecutive work days.

1.6.2    The Employer may assign employees not covered by this Agreement for full or partial shifts on a temporary or sporadic basis to perform services in a position covered by this Agreement due to a temporary or unforeseen need to provide services, or in lieu of: the use of covered employees who are not in an on-call status under the callback provisions of this Agreement; the use of covered employees to work double shifts or "double backs"; or the use of registry or temporary agency personnel. Such assignments will not be made, if an employee in the classification and department/unit has been cancelled for the shift in question, provided the cancelled employee is available to return within the time needed. Employees not covered by this Agreement who are assigned to perform services under this provision are not subject to this Agreement during such assignment. Whenever an employee is utilized in a position covered by this Agreement for more than five (5) consecutive work days, the Union will be provided with written notification.

3

## ARTICLE 2
## MANAGEMENT RIGHTS

***Except only as limited by express provisions of this Agreement***, all of an employer's rights and prerogatives, whether previously exercised or unexercised and whether implied or expressed, will be retained and reserved by the Employer, and will remain within its exclusive direction and control. For purposes of illustration only and not to limit the foregoing in any way, management will have the right, ***subject only to said express limiting provisions of this Agreement***:

a) to manage the hospitals, laboratories, clinics, offices, warehouses and other facilities and operations in which employees covered by this Agreement work;

b) to direct and assign the work force;

c) to transfer, reassign, promote and demote employees;

d) to establish standards of performance, health and safety, and quality of service, and to evaluate employee performance;

e) to maintain discipline, order and efficiency;

f) to determine medical, patient care and operational standards, procedures and methods; to schedule work;

g) to abolish, create, alter or combine job classifications;

h) to introduce new or improved methods, equipment, facilities or operations;

i) to determine efficient and effective staffing requirements;

j) to determine the number and location of facilities and operations;

k) to determine whether the whole or any part of an operation will continue to operate;

l) to determine whether a vacancy exists and whether and when it will be filled;

m) to require overtime work, when needed, consistent with employee health and safety;

n) to transfer or subcontract work for legitimate business reasons but, except in emergencies, only after affording the Union a reasonable opportunity to meet and discuss with management effects of the proposed transfer or subcontracting;

o) to select and hire employees;

p) to determine qualifications for positions;

q) to demote, suspend, warn, discharge or otherwise discipline employees;

r) to lay off or relieve employees from duty for lack of work or other legitimate reasons;

s) to rehire employees;

t) to determine whether employees, both within and without the bargaining unit, will or will not perform certain functions, duties or tasks;

u) to promulgate, eliminate or revise reasonable rules and regulations relating to the terms and conditions of employment and the manner of operations, provided only that they do not conflict with the express provisions of this Agreement.

The Employer may, in its discretion, continue any current policies and practices ***which do not conflict with express written provisions of this Agreement***.

4

**ARTICLE 3**
**AGENCY SHOP AND VOLUNTARY DUES DEDUCTION**

3.1    DUES, SERVICE FEE, CHARITABLE CONTRIBUTION OBLIGATION

All employees, within 31 days of the effective date of this Agreement, or within 31 days of their hire date, whichever comes later, will be required as a condition of continued employment to choose one of the following options:

3.1.1    Join and maintain membership in the Union;

3.1.2    Choose not to join the Union but pay to the Union a monthly service fee charge equivalent to his/her share of the costs incurred by the Union related to collective bargaining, contract administration and grievance adjustment, as determined under applicable law. The Union will advise the Employer and the employees of the amount annually, or upon request.

3.1.3    Employees who hold good faith religious beliefs which oppose membership in and contributions to a labor organization may choose instead to contribute a monthly sum equal to the regular monthly service fee amount to one of the following three nonprofit charitable organizations, exempt from taxation under Section 501 (c)(3) of the Internal Revenue Code: 1) the Lucile Packard Children's Foundation; 2) the United Way; or 3) the American Cancer Society. Such employees will be required to verify to the Union their payments to the charitable organization.

3.1.4    Any employee covered by this Agreement who fails to comply with the provisions of this Article will, upon notice of such failure in writing from the Union to the Employer and after counseling of such employee by SEIU, be discharged or allowed to resign no later than fifteen (15) days following receipt of written request from SEIU to terminate such employee. However, SEIU will not request the termination of any employee whose failure to pay periodic dues, service fee or charitable contribution is attributable to pay periods in which the employee's paycheck, after all mandatory deductions and benefits contributions, is less than the sum of the dues or service fee. For purposes of this provision an employee will be deemed to be in compliance if the employee has duly tendered the specified monthly service fee, dues or charitable contribution.

3.1.5    This section (3.1) will not take effect until ninety (90) days after the effective date of this Agreement.

3.2    DUES DEDUCTION

3.2.1    Upon receipt of a written authorization by a Employee using a form which has been mutually agreed to by the parties, the Employer will deduct and remit to the Union no less frequently than once a month the periodic dues of the Union or service fees until such time as the Employee submits written notification to the Employer to discontinue the Employee's authorization. The Employer will not be responsible for deduction in any pay period in which the Employee's net earnings are insufficient to cover the deduction. The

5

Employer will also remit an alphabetical list showing the names of payees and the amounts deducted and remitted. Upon request of the Union, the Employer will meet to determine the appropriate mechanics for providing such information.

3.2.2    The Employer agrees to use its best efforts to administer this provision in an accurate and timely fashion. The Union will inform the Employer once a year of the amount of the monthly dues and the service fee under this provision. Such notice will be sent sufficiently in advance of any change in the amount(s) to allow for payroll programming of the monthly dues and service fee change. It will also be the Union's responsibility to notify the Employees of any change in the amounts the Employees are required to pay to the Union under this provision. If, through inadvertence or error, the Employer fails to make authorized deductions, or any part thereof, the Employer will, upon receipt of written notice thereof correct such omission or error retroactively to a maximum of one (1) month's dues or fees, as applicable. Once the funds are remitted to the designated representatives of the Union, their disposition thereafter will be the sole and exclusive responsibility of the Union. It is expressly understood and agreed that the Union will refund to the Employee any deductions erroneously withheld from an Employee's wages by the Employer and paid to the Union.

## 3.3    INDEMNIFICATION

It is specifically agreed that the Employer assumes no obligation other than that specified above, nor does it assume any liability, financial or otherwise, arising out of the provisions of this Article. To ensure this result, the Union agrees that the provisions of 3.1.4 notwithstanding, the Employer will not be obligated to terminate an employee whom the Union claims is not in compliance with financial or other requirements of Article 3.1, unless the Union agrees at the time of its request for the employee's termination that it will also indemnify the Employer for all reasonable attorney's fees and costs of its defense in any administrative and/or judicial proceedings that might arise out of such termination of employment, whether brought by the employee or former employee, governmental agency, or any other entity on the employee's behalf. The Union further agrees to indemnify and hold the Employer harmless for any and all claims asserted by an employee, former employee, or any other entity on the employee's or former employee's behalf, arising out of deductions made pursuant to this Article.

6

## ARTICLE 4
## NONDISCRIMINATION IN EMPLOYMENT

4.1    The Employer and the Union will not discriminate against employees in violation of applicable federal, state or local law on the basis of race, color, religion, marital status, national origin, ancestry, sex, sexual orientation, physical or mental disability, medical condition (within the meaning of the California Fair Employment and Housing Act), status as a Vietnam-era veteran or special disabled veteran, age, citizenship, a political affiliation, or legal immigration status.

4.2    Neither the Employer nor the Union will discriminate in the application of the provisions of this Agreement based on Union or non-Union affiliation, or in any other manner which violates the National Labor Relations Act.

4.3    Any settlement, remedy or decision made pursuant to a grievance which alleges a violation of this Article will be limited to enforcement of, or compliance with, the express terms and conditions of this Agreement which, in and of themselves, are eligible for review under the Grievance Procedure of this Agreement.

4.4    No settlement, remedy or decision regarding an alleged violation of this Article will require a punitive action, monetary or otherwise, or the imposition of discipline upon any employee of the Employer, whether or not such employee is a member of the bargaining unit covered by this Agreement.

7

## ARTICLE 5
## WAGES

5.1    DEFINITION

The wage rates for the classifications and job titles covered by this Agreement will be as set forth in Appendix B.

5.1.1    Before making the adjustments described below, the following classifications will be deleted: Central Services Assistant I, Central Services Assistant II, Lab Assistant Specialist, Lead Central Services Assistant, Lead Instrument Assistant, Medical Records Assistant I, Medical Records Assistant II, Operating Room Assistant, Operating Room Instrument Assistant, and Operating Room Supply Technician. In determining the appropriate placement of the current incumbents of these deleted classifications pursuant to 1.a., below, the incumbents will first be moved to the same step on the scale for the following classifications: Central Services Assistant I to Sterile Processing Tech I, Central Processing Services Assistant II to Sterile Processing Tech II, Lead Central Services Assistant to Lead Sterile Processing Tech, Lead Instrument Assistant to Lead Sterile Processing Tech, Medical Records Assistant I to Health Information Associate II, Medical Records Assistant II to Health Information Associate III, Operating Room Assistant to Sterile Processing Tech I, Operating Room Instrument Assistant to Sterile Processing Tech II, and Operating Room Supply Technician to Sterile Processing Tech I.

5.1.2    Effective the pay period following November 4, 2005 or the pay period beginning after ratification of the Agreement by the Union:

a.    Grades SEIU001 – SEIU004 are eliminated.

b.    Step 1 and Step 2 of each remaining grade from the 2002-2005 Agreement ("former step") are eliminated.
- Former Step 3 in each grade becomes new Step 1
- Former Step 4 becomes the new Step 2
- Former Step 5 becomes the new Step 3
- Former Step 6 becomes the new Step 4
- Former Step 7 becomes the new Step 5
- Former Step 8 becomes the new Step 6
- Former Step 9 becomes the new Step 7
- Former Step 10 becomes the new Step 8
- Former Step 11 becomes the new Step 9
- Former Step 12 becomes the new Step 10
- Former Step 13 becomes the new Step 11
- Former Step 14 becomes the new Step 12
- Former Step 15 becomes the new Step 13

8

c.

- Employees in former Steps 1 and 2 move to new Step 1
- Employees in former Step 3 move to new Step 1
- Employees in former Step 4 move to new Step 2
- Employees in former Step 5 move to new Step 3
- Employees in former Step 6 move to new Step 4
- Employees in former Step 7 move to new Step 5
- Employees in former Step 8 move to new Step 6
- Employees in former Step 9 move to new Step 7
- Employees in former Step 10 move to new Step 8
- Employees in former Step 11 move to new Step 9
- Employees in former Step 12 move to new Step 10
- Employees in former Step 13 move to new Step 11
- Employees in former Step 14 move to new Step 12
  Employees in former Step 15 move to new Step 13

Employees will have no change in their anniversary date for wage progression purposes.

d.    The following classifications will be reclassified on the wage ranges as follows:

- Lead Transporter from SEIU006 to SEIU008
- Cook from SEIU007 to SEIU008
- Dietetic Assistant from SEIU007 to SEIU008
- Sterile Processing Tech I (previously Central Service Asst I) from SEIU008 to SEIU009
- Sterile Processing Tech II (previously Central Service Asst II Operating Room Supply Tech, and Operating Room Instrument Asst) from SEIU009 to SEIU010
- Cardiology Technician I from SEIU009 to SEIU010
- Lead Sterile Processing Tech (previously Lead Operating Room Supply Tech and Lead Instrument Asst [currently SEIU010] and Lead Central Service Asst [currently SEIU009]) to SEIU011

e.    Utilizing these new wage scale structures, effective the date of ratification, each new scale will be increased across the board as follows:

SEIU0005 and SEIU006 by 6.5%

All other grades by 4.0%

[See Appendix B for wage grades and scales.]

5.1.3

Future Wage Increases:

a. Effective April 1, 2006:

9

A new classification for "certified" Phlebotomists will be created and designated "Lab Asst III-P." Effective the beginning of the pay period next following April 1, 2006 the Lab Asst III-P will be reclassified from SEIU009 to SEIU010. Effective the same date, a new classification will be created and designated "Lead Lab Asst III-P," and effective the beginning the pay period next following April 1, 2006, the Lead Lab Asst III-P will be placed on grade SEIU011.

b. Effective the beginning of the pay period next following November 4, 2006:

All grades increased across the board by 4.0%.

c. Effective the beginning of the pay period next following November 4, 2007:

All grades increased across the board by 4.0%.

5.1.4    Unless an employee's performance has been rated "unsatisfactory" during the preceding year, (s)he will be eligible to progress to the next step on his/her wage scale on the employee's seniority anniversary date, as it may be adjusted as provided in Article 10, and as limited in the case of promotion by Article 5.3.2.

## 5.2    OTHER INCREASES

5.2.1    The Employer may increase wages and/or wage scales of individual classifications and selected classifications or job during the term of this Agreement.

5.2.2    The Employer will inform the Union at least thirty (30) calendar days prior to implementing the increases for classifications or job titles referenced in section 5.2.1, above. Upon written request by the Union, the Employer will meet to bargain over such increases during the thirty (30) calendar day period.

5.2.3    Wage scale adjustments made pursuant to this Article, if any, will not be subject to the Grievance and Arbitration Procedure of this Agreement.

## 5.3    NEW HIRES AND PROMOTIONS

5.3.1    New employees hired into one of the "included" classifications denoted with an asterisk (*) in Appendix A will, for wage scale placement and progression purposes only, be credited with service credit for each full year of prior employment experience in a similar position, as set forth below. To receive such credit, the prior employment must have been in the equivalent of a regular status and must have been in a JCAHO accredited acute care

hospital, a U.S. military hospital, or in another setting determined by the Employer to be relevant and appropriate for the position.

| Prior Experience | Credit | Step |
|---|---|---|
| 3 yrs. in the preceding 5 yrs. | 3 yrs. | 2 |
| 4 yrs. in the preceding 7 yrs. | 4 yrs. | 3 |
| 5 yrs. in the preceding 8 yrs. | 5 yrs. | 4 |
| 6 yrs. in the preceding 9 yrs. | 6 yrs. | 5 |
| 7 yrs. in the preceding 10 yrs. | 7 yrs. | 6 |
| 8 yrs. in the preceding 12 yrs. | 8 yrs. | 7 |

New employees hired into all other classifications will, for wage scale placement and progression purposes only, be credited for service credit purposes, for prior work experience as defined in 5.3.1., above, on the following basis.

| Prior Experience | Credit | Step |
|---|---|---|
| 6 yrs. in the preceding 9 yrs. | 3 yrs. | 2 |
| 8 yrs. in the preceding 12 yrs. | 4 yrs. | 3 |

5.3.2    To be eligible for the wage increases provided in Appendix B, a newly hired employee or an employee promoted to a higher pay range must have completed 6-months of employment in the new or higher pay range.

5.4    DATE OF RATIFICATION

Date of ratification means the date when SEIU has communicated to the Employer that employees have ratified the Agreement.

5.5    EFFECTIVE DATE OF INCREASES

Except as may be otherwise provided in this Agreement, if the scheduled date for a wage increase (scales, across-the-board, contractual and promotion) occurs in the first week of the bi-weekly pay period the increase will be effective on the first day of the pay period. If the scheduled date for an increase occurs in the second week of the bi-weekly pay period the increase will be effective on the first day of the next pay period.

5.6    REIMBURSEMENTS

5.6.1    Mileage Reimbursement.   In the event an employee is required by the Employer to use his/her personal vehicle in the performance of the employee's job duties, the employee will be reimbursed for actual mileage at the IRS mileage reimbursement rate.

5.6.2    Business Reimbursement.   Reimbursement for business related expenses incurred by an employee in the performance of his/her duties will be in accordance with the Employer's then current policy.

11

**ARTICLE 6**
**EMPLOYMENT CATEGORIES**

6.1    REGULAR EMPLOYEES

"Regular employees" are employees who are regularly scheduled to work forty (40) hours or more per fourteen (14) calendar day pay period, or twenty (20) hours or more per workweek for employees working alternate work schedules.

6.2    RELIEF EMPLOYEES

6.2.1    "Relief employees" are employees who work on an intermittent basis, on as needed basis, or on a prescheduled basis, not to exceed 1,000 hours in a calendar year.

6.2.2    Relief employees may be released or have their time reduced at the sole discretion of the Employer, without recourse to the Grievance and Arbitration Procedure of this Agreement.

6.2.3    Relief employees are not eligible for any of the benefits provided under this Agreement (e.g., health insurance, paid time off, etc.), except that eligibility for participation in the Employer's Retirement Plan will be determined in accordance with the provisions of the plan document.

6.3    FIXED TERM EMPLOYEES

6.3.1    "Fixed Term employees" are employees who are employed in positions expected to last at least six (6) months, but less than two (2) years, to work a regular schedule of forty (40) hours or more per fourteen (14) calendar day pay period, or twenty (20) hours or more per workweek for employees working alternate work schedules.

6.3.2    Fixed Term employees will be eligible for the benefits provided by this Agreement except that eligibility for participation in the Employer's Retirement Plan will be determined in accordance with the provisions of the plan document.

6.3.3    Fixed Term employees may be released or have their time reduced at the sole discretion of the Employer, without recourse to the Grievance and Arbitration Procedure, and their employment will terminate automatically upon the expiration of the fixed term unless formally extended by the Employer prior thereto.

6.4    COVERAGE OF RELIEF AND FIXED TERM EMPLOYEES

6.4.1    Premium Pay for Work on Specified Holidays. Relief employees who work on Thanksgiving Day, Christmas Day, New Years Day, Fourth of July, Labor Day, Memorial Day, and Martin Luther King, Jr. Day, will be paid at the rate of time and one-half (1½x) the regular rate of pay for the hours actually worked.

12

6.4.2    Reassignment. The involuntary reassignment of a Regular employee to a Relief position will be carried out in accordance with the provisions of the Layoff and Reduction in Time article.

6.4.3    Hours. For Relief and Fixed Term employees there is no guarantee of or limitation on the number of hours per work day, per fourteen (14) calendar day pay period, or per workweek.

6.4.4    Relief and Fixed Term employees may use the Grievance and Arbitration Procedures of this Agreement only with respect to alleged violations of those Articles or portions of Articles under which they are covered. Relief and Fixed Term employees are covered by the following Articles of the Agreement.

| | |
|---|---|
| Article 1 | Recognition |
| Article 2 | Management Rights |
| Article 3 | Agency Shop and Voluntary Dues Deduction |
| Article 4 | Nondiscrimination in Employment |
| Article 5 | Wages |
| Article 6 | Employment Categories |
| Article 7 | Hours of Work (except 7.7.6) |
| Article 9 | Temporary Assignments |
| Article 13 | Benefits (Fixed Term only) |
| Article 18 | Work Rules |
| Article 20 | Discipline & Dismissal (no access to grievance and arbitration procedure) |
| Article 21 | Personnel Files |
| Article 23 | Stewards |
| Article 24 | Union Access, Bulletin Boards, Information |
| Article 25 | Health and Safety |
| Article 26.9 | Grievance and Arbitration Procedure – Exclusion of Relief, Fixed Term and Trial Period Employees |
| Article 27 | No Strikes |
| Article 28 | Waiver |
| Article 29 | Severability |
| Article 30 | Merger |
| Article 31 | Amendments and Term of Agreement |
| Appendix A | |
| Appendix B | |

13

## ARTICLE 7
## HOURS OF WORK

7.1    WORKDAY

7.1.1.    For departments with twenty-four (24) hour and/or seven (7) day per week operations, the employees work day will be twenty-four (24) consecutive hour periods which begin as of the beginning of the normal shift for which the employee is regularly scheduled to work in the fourteen (14) calendar day pay period (See Section 7.3, below), or in the workweek if the employee is working an alternate work schedule (See Section 7.4, below). Alternatively, the Employer may elect to utilize a work day beginning at 12:01 a.m.

7.1.2    For employees working in departments with scheduled daytime operations only, the work day will normally be the twenty-four (24) consecutive hour period beginning at 12:01 a.m.

7.1.3    Nothing in this Section will require that the Employer revise or discontinue any work day being utilized for any portion of the bargaining unit as of the date of ratification of this Agreement, notwithstanding the fact that such work day does not conform to the provisions of this Section.

7.2    WORKWEEK

A workweek is a period of time consisting of seven (7) consecutive days. A standard workweek is from Sunday morning (12:01 a.m.) to midnight the following Saturday. Alternate workweeks (beginning and ending on a day other than the above) may be scheduled by the Employer.

7.3    STANDARD WORK SCHEDULE

7.3.1    A work schedule is the normal hours of work for an employee within a consecutive fourteen (14) calendar day pay period. The fourteen (14) calendar day pay period will consist of two (2) consecutive workweeks. The standard work schedule for full time employees will be eight (8) hours per day, excluding meal periods, and eighty (80) hours per fourteen (14) calendar day pay period ("8/80 schedule").

7.3.2    An employee may make a written request to his/her immediate supervisor for a particular shift (i.e., day shift, evening shift, or night shift). However, shift assignments and changes thereto will be at the discretion of the Employer consistent with Article 11.4.

7.3.3    The Employer will post the schedule of work – i.e., days of work and shifts (e.g., day, evening, or night) for Regular employees at least fourteen (14) calendar days prior to the start of the schedule.

7.3.4    When feasible, the Employer will provide a twenty-one (21) calendar days notice of an indefinite involuntary change in the employee's regular scheduled shifts, including a change in start time that is 30 minutes or more and/or days off in the case of an employee with fixed days off. The twenty-

14

one (21) calendar days notice will not apply if the employee's schedule change is temporary and is due to a shift assignment in accordance with Section 11.4 of this Agreement  The employee may waive the twenty-one (21) calendar day notice.

7.4    ALTERNATE WORK SCHEDULES

7.4.1    The Employer may establish alternate work schedules.  An alternate work schedule will involve shift lengths of greater than eight (8) hours, and up to twelve (12) hours, excluding meal periods.  Such alternate work schedules will be on a scheduled workweek basis.  To be considered full-time, an employee working an alternate work schedule must be regularly scheduled for forty (40) hours per workweek.

7.4.2    Employees may request alternate work schedules.  The Employer will review the feasibility of implementing alternate work schedules in those work units for which the employees indicate there is an interest in, and suitability for, such schedules.  However, the Employer will decide in its discretion whether to create new alternate work schedules.

7.4.3    When feasible, the Employer will provide fourteen (14) calendar days' notice to affected employees when establishing or changing alternate work schedules.  Upon written request of the Union, the parties will meet to discuss the schedule changes.

7.5    MEAL PERIODS

A meal period of at least thirty (30) minutes is provided for any work period of six (6) continuous hours or more. Meal periods are neither time worked nor time on pay status, unless an employee is required by the Employer to remain working during that time. Such an arrangement must be approved in advance by the Employer. Whenever an employee is required to perform work during a meal period, the meal period will also be considered time worked.  For the purpose of state wage and hour rules, an employee working a 12-hour shift waives the second meal period.  If a position is, by its very nature, one for which a meal period free from all duty cannot be granted, the job description and posting will so note and, as a condition for being awarded and retaining the position, the employee must be willing to execute and work pursuant to an "on duty meal period agreement" as specified by state law.

7.6    REST PERIODS

7.6.1    Two rest periods of not more than fifteen (15) minutes will normally be granted during an 8-hour or a 10-hour shift. Three (3) rest periods of not more than fifteen (15) minutes may be granted during a 12-hour shift. An employee working less than a full-time schedule will normally be granted one fifteen (15) minute rest period for each work period of three (3) continuous hours or more, not to exceed two (2) rest periods per eight (8) hour day, or three (3) rest periods per twelve (12) hour day.

7.6.2    Rest periods will not be taken at the beginning or end of a work period or accumulated for use at a later time. The combining of rest periods with meal

periods for some, any or all employees of a department will be at the sole, non-grievable discretion of the department manager or director.

## 7.7.    SHIFT DIFFERENTIAL

7.7.1    Eligible employees assigned to an evening or night shift will be paid a shift differential. Work which is scheduled during the evening or night hours on the basis of convenience to the employee (i.e., the employee is permitted, at the employee's request, to perform his/her duties other than the usual hours during which such work is performed) will not be considered an assigned evening or night shift for the purpose of this provision.

7.7.2    An evening shift differential will be paid for any shift in which the majority of the hours are worked after 5:00 p.m. and before 2:00 a.m. The evening shift differential will be 10% of the employee's base hourly wage rate.

7.7.3    Night shift differential will be paid for any shift in which the majority of the hours are worked after 11:00 p.m. and before 8:00 a.m. The night shift differential will be 16% of the employee's base hourly wage rate.

7.7.4    An employee working additional hours immediately preceding or following a regular shift will receive the shift differential applicable to that regular shift if the additional hours worked are for a period of less than three (3) hours. If the additional hours are for three (3) hours or more, it will be considered a separate shift and shift differential will be paid at the rate which is applicable to the shift in which the additional hours are worked, except that an employee working hours immediately preceding or following a regular night shift will receive the night shift differential for all hours worked which are contiguous to the night shift.

7.7.5    An employee working overtime hours which are not immediately preceding or following a regular shift will be paid at the rate applicable to the shift in which the overtime hours are worked.

7.7.6    The applicable shift differential will be included in payments for PTO hours used if the employee is regularly assigned to the night and/or evening shift for at least six (6) months in a calendar year. Shift differential is not paid when PTO is cashed out upon termination of regular employment.

## 7.8    OVERTIME

7.8.1    Overtime is compensated at one and one half (1½) times the employee's regular rate.

7.8.2    Employees on the standard 8/80 schedule will be paid overtime for hours worked in excess of eight (8) hours in a workday, or in excess of eighty (80) hours in a fourteen (14) calendar day pay period. Employees employed on an alternate work schedule will be paid overtime for hours worked in a day in excess of their normal work schedule (e.g., 8 hours, 10 hours, 12 hours, etc.) or for hours worked in excess of forty (40) in the workweek.

16



7.8.3    Employees who work in excess of twelve (12) hours in a work day will receive two times (2X) their hourly rate of pay.

7.8.4    Overtime hours do not count toward accumulation of Paid Time Off ("PTO").

7.8.5    When an employee is employed at more than one rate of pay, overtime earned at the time and one half rate will be calculated based on the employee's average hourly rate.

7.8.6    "Actual work" and "time worked" does not include paid leave for purposes of this Article.

7.8.7    The Employer will decide when overtime is needed and which employees will be assigned overtime. Overtime must be approved in advance by the Employer. The Employer will notify the employee that overtime must be worked as soon as practicable after the need for overtime is determined. Employees are expected to work overtime when such work is assigned. The Employer will assign overtime in excess of 12 consecutive hours only when it determines that circumstances warrant such an assignment.

7.8.8    When practicable, the Employer will assign overtime work by rotation based on seniority among those employees on the same shift who normally perform the work involved. For purposes of this Article, "rotation based on seniority" will mean that when there are employees requesting to work the overtime, assignment of that overtime will be based on greatest seniority; when no employee requests to work the overtime, assignment of that overtime will be based on inverse order of seniority, provided the employee has the necessary skills, abilities and competency to perform the work. This provision will not apply when the overtime is due to an extension of an employee's shift to complete work normally performed by the employee.

## 7.9    CALLBACK

When an employee is called back to work after completing a shift and leaving the premises, the employee will be paid for the time actually worked upon return or a minimum of four (4) hours, whichever is greater. Callback time, whether worked or not, is considered time worked for the purpose of calculating hours of overtime.

## 7.10    EARLY REPORT TO WORK

An employee requested to report to work prior to the normal starting time of the employee's assigned shift will be paid time and one half for all early hours worked. Once the employee's regular shift begins the regular hourly rate of pay will apply.

## 7.11    ON-CALL

7.11.1    On-call is time during which an employee is required to be available for return to work. An employee is not considered to be in on-call status unless the Employer has previously informed the employee of the assignment. The Employer reserves the right to determine the need for, and the assignment of, on-call time. For all EEG Techs, Anesthesia Techs, and Lab Techs, who are

17

used on an on-call basis on a regular and recurring basis, on-call pay shall be one half (1/2) of their base rate of pay (excluding all differential) per hour of on-call. For all other classifications, in the event they are used on an on-call basis for a particular assignment but not on a recurring basis, on-call pay shall be $2.25 per hour. On-call pay will not be paid for any hours for which the employee receives pay for being called in pursuant to 7.11.2.Time spent in on-call status, but not actually worked, is not considered as time worked or time on pay status. If during the life of this Agreement the Employer begins to utilize other classifications for on-call on a regular recurring basis, the Employer will meet with the Union to bargain over whether they should be included in the classifications receiving the higher on-call pay.

7.11.2    If called into work from on-call status, the employee will be paid for the time actually worked or a minimum of two (2) hours, whichever is greater. If called into work from on-call status, all hours worked will be compensated at one and one half (1½) times the regular rate. Employees receiving a minimum of three (3) hours pay or work on the date of ratification of this Agreement will continue to receive such minimum guarantee during the term hereof.

## 7.12    PYRAMIDING OR COMPOUNDING OF OVERTIME AND OTHER PREMIUMS PROHIBITED

There will be no duplication, compounding or pyramiding of overtime pay or other premium pay called for under this Agreement.

## 7.13    NO GUARANTEE

This Article will not be construed as a guarantee of, or limitation on, the number of hours per workday or workweek, nor will it infringe upon, interfere with or diminish in any way the Employer's right to ensure appropriate staffing and coverage to meet operational requirements and necessities in an efficient and orderly manner.

## ARTICLE 8
## TRIAL PERIOD

8.1     Employees will serve a trial period during the first six (6) months of continuous service in Regular status without a break in service. Time on leave with or without pay is not qualifying service for the completion of the trial period. Employees who are rehired following a break in service will serve a new trial period whether or not they previously completed a trial period. Trial employees, Fixed Term employees and Relief employees may be terminated or released without cause at the sole discretion of the Employer. A Relief employee terminated for failure to maintain commitment will be notified of termination by letter sent to the employee's address on file with the Employer.

8.2     A Relief employee or a Fixed Term employee appointed, transferred or promoted to a Regular position within the bargaining unit will serve a trial period commencing with placement in the Regular position.

8.3     An employee's trial period may be extended for a period of up to three (3) months at the sole discretion of the Employer. The Employer will inform an employee of such trial period extension. Management will send notice to the Union of any trial period extensions and, upon written request of the Union, will meet to explain the extension.

8.4     The discipline, retention or release of a Trial Period employee will not be subject to the Grievance & Arbitration Procedures, as provided in Article 26.9. Failure to send a termination letter to a Relief employee for failing to maintain commitment will be subject to grievance and arbitration, but an arbitrator may not overturn the termination because of the failure to send the letter. Failure to provide notice of extension of an employee's trial period to the Union will also be subject to grievance and arbitration, but an arbitrator may not overturn or alter the discipline or release of a Trial Period employee for failure to provide notice where the trial period has otherwise been extended for up to three (3) months.

## ARTICLE 9
## TEMPORARY ASSIGNMENT

9.1    An employee temporarily assigned by the Employer to perform the typical duties of a position in a higher pay grade for four (4) consecutive hours or more will receive a differential of five percent (5%) for each grade above the grade of the employee's regular classification for all hours during which the employee is so assigned (e.g., if an employee in Grade SEIU0006 is assigned to a position in SEIU0008 the employee will receive a differential of ten percent (10%)). As an exception, if an employee is assigned by the Employer to a position in a lead classification listed in Appendix A and to perform all of the duties thereof, the employee will be paid a lead premium of five percent (5%) for the actual hours worked in the lead position provided the lead position is in a classification in a higher wage range than the employee's regular classification or position.

9.2    An employee temporarily assigned to perform the duties of a position in a lower pay range will continue to receive the employee's regular rate of pay, except in the event of a demotion or voluntary reassignment to a position in a lower pay range.

20

## ARTICLE 10
## SENIORITY

10.1    Definition. For the purposes of this Agreement, seniority will be defined as the period of continuous employment following employment in a regular position at the Employer. Seniority includes prior service with any entity that was part of the Employer merger, to the extent recognized by the Employer on November 1, 1997 (merger date), provided there has been no break in service since the merger date. In the event of a tie, the order of seniority will be determined by lot.

10.2    Break in Seniority. A break in service or seniority will occur upon:

a.    Resignation;
b.    Failure to return to work at the end of an approved leave;
c.    Termination for just cause, or, in the case of a Trial employee, Relief employee and a Fixed Term employee, for any cause;
d.    Layoff for twelve (12) months or more.

10.3    Adjustments in Seniority. Seniority for an employee re-hired within twelve (12) months of resignation, layoff or termination for failure to return upon expiration of an approved leave will be restored, but will be adjusted for the period of resignation, layoff or termination. Subject to any statutory exceptions, seniority will also be adjusted for the period of any layoff and for the period of any leave of absence in excess of six (6) months. There will be no adjustment for the first six (6) months of any such leave.

21

## ARTICLE 11
## TRANSFER, PROMOTION AND DEMOTION

11.1   DEFINITIONS

11.1.1    A transfer is the change of an employee from one position to another position within the same classification or to a position in another classification having the same salary range.

11.1.2    A promotion is the change of an employee from one position to a position in another classification having a higher salary range.

11.1.3    A demotion is a change of an employee from one position to another position in another classification having a lower salary range.

11.2   TRANSFER/PROMOTION OF EMPLOYEES

11.2.1    Whenever it is determined by the Employer that a vacancy in a Regular position within the bargaining unit is to be filled, a notice of the vacant position will be posted for at least seven (7) calendar days.

11.2.2    The Employer may, in its sole discretion, restrict a posting to fill a vacant position to qualified employee applicants from the bargaining unit.

11.2.3    Upon promotion, an employee will be placed at a step on the new scale which provides the employee with at least a five percent (5%) increase.

11.2.4    Upon demotion, an employee's wage rate will be set at a comparable level within the new salary scale. However, if the employee is demoted into the position the employee held prior to assuming the position from which the employee is now being demoted, the employee will be placed at the same level in the scale as that in which the employee was previously employed, if higher.

11.2.5    An employee who promotes or transfers to a position in a different classification or to a similar position in a different unit, may return to the position the employee formerly held within six (6) months of the promotion or transfer if that position is vacant; and if the employee's most recent performance evaluation in the former position "meets" or "exceeds" standards. In order to return to the position the employee must provide a written letter stating the reasons for the return to the Manager of the employee's former position. Under this provision, the employee would be returned to the employee's salary level in the former position. This limited right of return may only be exercised by the employee once in any twelve (12) month period.

11.3   SELECTION FOR PROMOTION/TRANSFER

11.3.1    The Employer will determine the relative qualifications, including education, skills, abilities, performance and experience (collectively referred to as "qualifications") of all candidates or applicants for a vacancy. Employees who

22

apply for a vacancy in accordance with applicable procedures will be given preference over external candidates if equally qualified as determined by the Employer provided that the Employer has the right to select the best qualified candidate to fill a position.

11.3.2   Should the Employer decide that the vacancy will be filled from current employees, and should it determine that the qualifications of two (2) or more employees are in its judgment substantially equal, the Employer will make the selection based upon seniority.

## 11.4   SHIFT ASSIGNMENT

11.4.1   When it is determined by the Employer that a vacancy exists, employees employed in the unit of the vacancy, and in a position with the same job title as the vacant position, will be provided an opportunity to request the shift assignment of the vacant position.  The Employer will make such assignments based upon considerations of seniority, skills and competency.

11.4.2   When needed, the Employer may, in its discretion, assign an employee to another schedule (shifts, starting time and/or days off) on a temporary basis to provide needed staffing coverage, and such assignment will be to the most senior volunteer, or if no employee volunteers by inverse seniority, provided the employee has the necessary skills to perform the job.  The Employer will provide as much advance notice as is reasonably feasible to the employee assigned on a temporary basis to provide needed staffing coverage.

11.4.3   Nothing in this section 11.4 will prevent the Employer from assigning an employee to a shift or unit in a specific case, where determined appropriate or necessary by the Employer for training or supervision purposes.

11.4.4   Nothing in this Article will prevent the Employer from immediately posting the vacancy in accordance with the terms of this Agreement.

## ARTICLE 12
## LAYOFF AND REDUCTION IN TIME

12.1    DEFINITIONS

12.1.1    Layoff.  Layoff is an involuntary separation from employment.

12.1.2    Daily Cancellation.  A daily cancellation is a reduction of hours or a reduction in force carried out on a daily basis on a particular work unit and shift due to a reduction in the census or work requirements or for such other reason as the Employer determines to be appropriate.

12.1.3    Temporary Layoff.  A temporary layoff is a reduction in hours or a reduction in force which is expected at the time it is implemented to last for sixty (60) calendar days or less.

12.1.4    Indefinite Layoff.  An indefinite layoff is a reduction in hours or a reduction in force which is expected at the time it is implemented to last for in excess of sixty (60) calendar days.

12.1.5    Work Unit.  For purposes of this Article each cost center will be a work unit.

12.1.6    Units of Layoff.  Units of layoff on the effective date of this Agreement will be as set forth in Appendix C.  If units of layoff are added or eliminated, the Employer will notify the Union prior to any reduction in force or hours under this Article.  If the Employer intends to change existing units of layoff (apart from adding or eliminating units of layoff) it will notify the Union. Units of layoff will apply only to indefinite layoffs.

12.2    DAILY CANCELLATION

The Employer will determine whether a daily cancellation is necessary on a work unit and on a particular shift, and, if so, the job classifications/titles and number of hours or employees to be cancelled.  Cancellations will be carried out in accordance with each work unit's then current policies, procedures and practices.  The Employer will accept volunteers from the work unit, shift and job classification/title in which cancellations are to occur, provided the volunteer's schedule reflects the number of hours to be cancelled, and that the remaining employees possess the qualifications, skills, abilities and competencies needed on the work unit or shift.  Regular employees, who are cancelled, whether voluntarily or involuntarily, may elect to utilize accrued Paid Time Off.  At the Employer's discretion an employee may be floated or assigned to another unit in lieu of canceling the employee.

12.3    TEMPORARY LAYOFFS

If the Employer determines that a temporary layoff is necessary, it will determine the classifications, work units, shift(s) and number of hours and/or employees to be affected. Employees who are or may be affected will be given fourteen (14) calendar days notice, to the extent practicable, with a copy to the Union.  Temporary layoffs will be carried out within each job classification/title and work unit in the following manner.

24

12.3.1    The use of registry/temporary agency employees will be discontinued.

12.3.2    Trial Period and Fixed Term employees will be laid off, if practicable, provided the remaining employees possess the necessary qualifications, skills, abilities and competency to perform the work satisfactorily in the reasonable judgment of the Employer, and are willing to accept the hours and shifts of the Trial Period and Fixed Term employees laid off.

12.3.3    Regular employees will be laid off by inverse seniority order, provided the remaining employees possess the qualifications, skills, abilities and competency to perform the work satisfactorily in the reasonable judgment of the Employer, and are willing to accept assignments to schedules consisting of the hours and shifts deemed necessary by the Employer. If work hours are to be reduced, the reductions will occur by inverse seniority order within each shift, provided the other employees possess the qualifications, skills, abilities and competency to perform the work satisfactorily in the judgment of the Employer.

12.3.4    Regular employees who have been temporarily laid off will be returned as vacancies occur in the affected work unit from which the employee was laid off and within the same job classification/title the employee held prior to the temporary layoff in order of their seniority. Failure to return to a Regular position in the classification from which the employee was temporarily laid off will be considered to be a resignation and will constitute a break in service.

12.4    INDEFINITE LAYOFFS

The parties acknowledge a common goal and intent to provide ongoing employment to employees who are meeting the performance standards and expectations of their position, and to avoid displacement of such employees, but recognize that there are circumstances where displacements cannot be avoided. Through the provisions of this and other Articles of the Agreement the parties have provided for educational and training opportunities, for priority considerations for obtaining other vacant positions, and for recognizing seniority, consistent with qualifications, skills, abilities and competencies, when displacements do occur.

If the Employer determines that indefinite layoffs are necessary, it will determine the classification(s), work unit(s), units of layoff(s) and shift(s) to be affected, and the number of hours or employees to be reduced. The Employer will provide the union notice of its intention to lay off employees indefinitely forty-five (45) calendar days in advance of the expected effective date of the layoff. The notice will specify work unit, units of layoff, shifts and full-time equivalents to be affected. The Employer will, upon the request of the Union, meet to discuss alternatives to the layoff during the following ten (10) day period. The Employer will simultaneously solicit volunteers for layoff from the work unit(s) to be affected. If no alternative is agreed upon during the ten (10) day period, Employees will be given notice of layoff thirty (30) calendar days prior to the effective date of the layoff, and notice of the names and positions will be provided to the Union. The Employer may elect to pay an employee in lieu of part or all of the required notice period in its sole discretion, based upon the employee's normal schedule covering that period. Indefinite layoffs will be carried out within a job classification/title and units of layoff as follows.

25

12.4.1    The use of registry/temporary agency employees will be discontinued, if practicable, or the hours of such personnel reduced, as applicable, provided the remaining employees have the necessary qualifications, skills, abilities and competency to perform the work satisfactorily in the judgment of the Employer.

12.4.2    Trial Period and Fixed Term employees will be laid off, or their hours reduced, as applicable, provided the remaining employees possess the necessary qualifications, skills, abilities and competency to perform the work satisfactorily in the reasonable judgment of the Employer, and are willing to accept the hours and shifts of such employees, and the Fixed Term status of laid off Fixed Term employees, if applicable.

12.4.3    <u>Indefinite Layoff of Regular Employees</u>

    a.    Regular full-time employees who are laid off in a reduction in force or whose positions are eliminated, in lieu of layoff, shall in order of seniority (most senior first) first apply for any vacancy for which (s)he is qualified in his/her classification, shift and unit of layoff with at least equivalent scheduled hours, and may apply for any such vacant position with fewer scheduled hours. If there is no vacant position for which the employee must (or does) apply as described above, the employee will be offered the position not being eliminated held by the most junior Regular full-time employee in his/her classification, shift and unit of layoff, provided there is such a more junior Regular full-time employee, and if there is no such position held by a more junior Regular full-time employee, or the employee declines the position offered, (s)he will be laid off.

    b.    Regular part-time employees who are laid off in a reduction in force or whose positions are eliminated, in lieu of layoff, shall in order of seniority (most senior first) first apply for any vacant position for which (s)he is qualified in his/her classification, shift and unit of layoff with at least equivalent scheduled hours, and may apply for any other such vacant position with fewer scheduled hours. If there is no such position for which the employee must (or does) apply, the employee will be offered the position that is not being eliminated held by the most junior regular part-time employee in his/her classification, shift and unit of layoff with at least equivalent scheduled hours. If there is no such position held by a more junior employee, or if the employee declines the position offered, the employee will be laid off.

    c.    Such displacements as are described in 12.4.3.a and 12.4.3.b. may occur only if the employee displacing another employee is qualified for the position, and if remaining employees possess the qualifications, skills, abilities and competency to perform the work satisfactorily in the reasonable judgment of the Employer, and are willing to accept assignments to schedules consisting of the hours and shifts deemed necessary.

12.4.4    A Regular employee who is to be laid off indefinitely under this Section will be given priority in selection for any vacant position in the employee's classification in another unit or department for which the employee applies provided the employee possesses the skills, abilities, qualifications and competencies for the position as listed in the job description, or could gain such skills, abilities, qualifications and competencies through an orientation and familiarization period of up to fourteen (14) calendar days. If there is no such vacant position in the employee's classification, the employee will be given priority in selection for any vacant position for which the employee applies in a classification in which the employee was previously employed by the Employer, provided the employee possesses or could gain the skills, abilities, qualifications and competencies through the customary and usual orientation and familiarization period provided to an employee hired into the position with prior experience working in a comparable job. Should the employee fail to acquire the necessary skills, abilities, qualifications and competencies during such period in the reasonable judgment of the Employer, the employee will be placed in layoff status.

12.4.5    The Employer will honor requests to volunteer for layoff prior to laying off regular employees involuntarily, provided the following conditions are satisfied:

a.    the volunteer(s) is/are from the same work unit and represent the same full time equivalent(s) as the Employer has determined that it will lay off; and

b.    the remaining employees possess the appropriate skills, abilities, qualifications and competencies, or could gain such skills, abilities, qualifications and competencies with the usual and customary orientation and familiarization period provided to an employee hired with prior orientation and familiarization period provided to an employee hired with the prior experience working in a comparable job; and

c.    the Employer determines that the employee(s) who would otherwise be laid off, or other employees in the same work unit, from the shift to be affected and in the appropriate full-time equivalent status, who meet the description in b., above, are willing to accept assignments to schedules consisting of the days, hours and shifts that would be vacated by the volunteer(s), or such other schedules as deemed necessary by the Employer after the layoffs occur.

12.4.6  Upon the request of an employee who faces displacement after the procedures described in 12.4.1 through 12.4.5 have been followed, the Employer will assist in identifying other job opportunities outside of the bargaining unit for which the employee may apply consistent with the Employer's policies for filling non-bargaining unit positions, provided, however, that the non-selection of an employee for a non-bargaining unit position shall not be subject to the grievance and arbitration provisions of this Agreement.

12.5  SEVERANCE PAY

12.5.1  Definition.  For purposes of severance pay eligibility, layoff will mean a reduction in force resulting in the involuntary separation of a Regular employee or a reduction in hours resulting in a change to Relief status from Regular status.  If the indefinite reduction in the workforce is due to the Employer being acquired or merged with another organization, entering a joint venture or forming a new organization, an employee who is offered a position at the new organization at a comparable base wage is not considered to have been laid off.  The Employer will be the sole judge of whether an indefinite reduction in force or hours is necessary due to operational, fiscal or other reasons it deems relevant and appropriate in making such a determination.

12.5.2  Notice of Layoff.  In the event that circumstances change, an indefinite lay off notice may be rescinded and reissued, or a notice may be rescinded and the employee retained or reassigned.  If a Regular employee is offered another Regular position at a comparable base hourly wage but refuses that position, the employee will be indefinitely laid off but will not be eligible for severance pay.  If a Regular employee resigns after being given written notice of indefinite layoff, the balance of the notice period will not be converted to pay, but the employee will be eligible for severance pay.  A Regular employee terminated for cause during the notice period will not be eligible for severance pay.

12.5.3  Eligibility.  A Regular employee with at least one year of regular employment at the Employer without a break in service, is eligible for severance pay unless the employee has refused an offer of a comparable position subsequent to notice of layoff.  Periods of employment in a fixed term or relief position are not considered breaks in service, but periods on fixed term or relief status will not be counted in determining eligibility or in the calculation of severance pay.

12.5.4  Calculation.  Severance pay is based on years of Regular employment at the Employer without a break in employment as described in Article 10.  Severance pay is calculated using the base monthly pay at time of indefinite layoff.  Base monthly pay is obtained by multiplying the base hourly wage by 173.33 hours by the employee's percent of full-time commitment and does not include shift differential, overtime or other premium pay.

12.5.5  Schedule.  Severance allowance is payable on the employee's last day of work in accordance with the following schedule:

| Years of Continuous Employment | Severance Pay Eligibility In Months of Base Pay |
|---|---|
| 1 year but less than 4 | 1 |
| 4 years but less than 7 | 2 |
| 7 years but less than 10 | 3 |
| 10 years but less than 12 | 4 |
| 12 years but less than 14 | 5 |
| 14 years but less than 16 | 6 |
| 16 years but less than 18 | 7 |
| 18 years but less than 20 | 8 |
| 20 years but less than 22 | 9 |
| 22 years but less than 24 | 10 |
| 24 years but less than 26 | 11 |
| 26 years or more | 12 |

12.5.6   Repayment of Severance Pay. Prior to receiving severance pay, an employee must sign an agreement to repay severance to the Employer if reemployed by the Employer in a regular position within one year of the effective date of indefinite layoff. In that event, the employee may retain that portion of the severance pay equal to the base pay s/he would have earned if not indefinitely laid off. The balance is to be repaid either in full at the time of reemployment or by payroll deduction. An employee may request other arrangements and, if approved, the schedule of repayment will be established by written agreement between the employee and the Director of Employee and Labor Relations or designee.

12.5.7   Preferential Reemployment.

      a.   During the first one hundred twenty (120) days following lay-off, employees who have been laid off will be notified of all vacancies in the classification from which the employee is laid off. Employees who thereafter notify Human Resources of their availability within ten (10) days of the Employer's notification will be recalled to the vacancy(ies) based upon seniority, provided they have sufficient skills and abilities to perform the duties of the position, meet the criteria for the job, and their most recent evaluation was "meets" or "exceeds" standards.

      b.   Employees who have been indefinitely laid off for more than one hundred twenty (120) days will have preference for reemployment for a total of twelve (12) months from the date of indefinite layoff for employment to any active available vacant regular position for which the employee applies, if in the judgment of the Employer the employee possesses sufficient skill and ability to perform the duties of the position and unless another applicant for the position is better

29

qualified. Preferential employment status will apply only if the vacant position is at the same or lesser percentage of time and is in a job classification/title with the same or lower salary range as the job classification/title from which the employee was laid off.

c.    Employees laid off for more than one hundred twenty (120) days and who apply within the posting period for reemployment within twelve (12) months from the date of indefinite layoff for a specific active available vacant regular position in the same job title and classification as the employee held at the time of layoff will be considered for reemployment in that position as if the laid off employee were employed, provided the laid off employee's most recent performance evaluation in the position was "meets" or "exceeds" standards, and provided, further, that the laid off employee meets all current criteria.

d.    For purposes of the Employer's recall obligations, the Employer's obligation will be satisfied by sending a notification letter to the employee by certified mail, and notice will be considered to have been given, and the ten (10) day period will begin to run, on the date of mailing.

## 12.6    SUBCONTRACTING

12.6.1    Except where exigent circumstances make it infeasible to do so, the Employer will, at least forty-five (45) calendar days in advance, inform the Union of its intent to begin contracting or subcontracting any part or all of its operations in which bargaining unit employees are employed. The Employer will meet to bargain over the decision and/or the effects of contracting or subcontracting on the operations, if and as required under the circumstances by the National Labor Relations Act, provided that the effects on employees to be laid off, or whose positions are to be eliminated as a result of contracting or subcontracting, have been addressed in 12.6.2 through 12.6.6, below.

12.6.2    An employee who is displaced and subject to layoff as a direct result of the contracting or subcontracting of a service or operation will receive preference over other employee and non-employee applicants in filling vacant bargaining unit positions for which the employee specifically applies, and will be selected to fill the position (by seniority if two or more such employees apply for the same vacancy) provided the employee possesses the necessary minimum qualifications and skills for the position as posted.

12.6.3    If no employee meeting the requirements described in 12.6.2, above, applies for a vacant bargaining unit position, an employee displaced as described in 12.6.2, but who does not have the necessary minimum qualifications and skills as posted for the position, will receive preference over other employee and non-employee applicants for the filling of a vacant position for which the employee specifically applies, if the employee could reasonably gain the necessary minimum qualifications and skills as posted for the vacant position within a six (6) week period of on the job training. If two or more such

employees apply for the same vacant position, the selection will be by seniority.

12.6.4    An employee who is displaced as a direct result of the contracting or subcontracting of a service or operation and who does not obtain a vacant position pursuant to 12.6.2 or 12.6.3, above, at the time the subcontracting becomes effective, will continue to have priority, as described above, for selection for a vacant position for which the employee applies, for a period of one hundred twenty (120) calendar days after the effective date of the employee's lay-off. Thereafter, the employee will have the re-employment rights specified in 12.5.7, above, for-the remainder of the twelve (12) month period following the employee's lay-off.

12.6.5    An employee who obtains a position through the procedures described in 12.6.3 through 12.6.4, above, will be placed at the step on the wage scale for that position that represents the employee's continuous employment without a break in service at Stanford Hospital & Clinics and/or Lucile Packard Children's Hospital, unless the employee can demonstrate his/her entitlement to credit for prior experience in the position as set forth in Article 5.3.1.

12.6.6    Upon the request of an employee who faces displacement after the procedures described in 12.6.2 through 12.6.4 have been followed, the Employer will assist in identifying other job opportunities outside of the bargaining unit for which the employee may apply consistent with the Employer's policies for filling non-bargaining unit positions, provided, however, that the non-selection of an employee for a non-bargaining unit position shall not be subject to the grievance and arbitration provisions of this Agreement.

12.6.7    Nothing in this Section represents a guarantee of employment or a guarantee of employment in a particular position or classification, nor does it represent a guarantee of particular hours, shifts and/or days off.

## 12.7    TRANSFER OF WORK TO NEW LOCATIONS

The Employer agrees that no employee will be transferred involuntarily to a position outside of the bargaining unit. Should bargaining unit positions be eliminated in connection with a transfer of work to a new location not covered by this Agreement, and the employee declines to take a position offered to him/her at the new location, or if no position is offered, the employee will be treated as laid off and will be entitled to the special preference or priority for taking a vacant bargaining unit position as is described in 12.6 above.

Should the employee elect to take a position outside of the bargaining unit in connection with the transfer of work, and should the employee thereafter decide within the twelve (12) month period following the transfer that (s)he no longer wishes to work at that location, the employee shall notify the Director of Employee and Labor Relations or designee in writing, and (s)he will be permitted to elect lay-off, and thereafter will be entitled to the special preference or priority described in 12.6., above, for taking a vacant bargaining unit position. Alternatively, the employee can notify the Director of Employee and Labor Relations or designee in writing of his/her desire to return to a bargaining unit

31

position and may state in such written notice that (s)he is electing to remain in the position at the new location (provided it continues to exist and provided the employee continues to perform satisfactorily) while awaiting a vacant bargaining unit position. In such a case, the employee shall be given the priority or preference for taking such vacant position as is described in 12.6, above, until such time as a vacant position is available for which the employee is qualified. However, if the employee exercises the option of seeking to return to a bargaining unit position, should the employee decline a vacant bargaining position with equivalent or greater hours for which (s)he is qualified, the employee will no longer be eligible for the priority or preference described in 12.6.

Upon the return to the bargaining unit of an employee who was laid off in connection with the transfer of work outside of the bargaining unit, or who accepted a position at the new location and subsequently exercised the right to return to the bargaining unit as provided in this section (provided the return to the bargaining unit is with twelve (12) months of layoff in the case of an employee who is laid off, or who elects layoff under this section), the employee's seniority date will not be adjusted for the period of layoff or the period of time during which the employee was employed in the position outside of the bargaining unit.

Prior to his/her return to a bargaining unit position, the grievance and arbitration procedures in Article 26 may be utilized for an employee who has elected to take a position outside of the bargaining unit and subsequently notified the Director of Employee and Labor Relations or designee of his/her desire to return to the bargaining unit as provided as provided herein, only for claims that the provisions of this section regarding the employee's return rights (and those set forth in Section 12.6 where and to the extent its terms are made applicable under this section) have been violated.

## 12.8 VIOLATIONS

In the event an alleged violation of this Article with regard to notice is grieved, any remedy, settlement or arbitrator's award or decision acknowledging improper notice will be limited to an amount of pay and/or reinstatement of benefits which would make the employee whole for the number of days the notice was deficient. In no case will such amount be calculated for a period of more than fourteen (14) calendar days, or thirty (30) calendar days, as applicable.

## 12.9 EFFECTS OF LAYOFFS

The preceding procedure, severance benefits and preferential rehire provisions, together with the payments of accrued but unused paid time off in the event of separation of employment as provided for elsewhere in this Agreement, are intended to address the effects of layoffs, reductions in force or hours, etc., that occur during the life of this Agreement as a result of layoffs or reductions due to economic reasons, subcontracting, or reductions, eliminations or transfers of services for any reason. Agreement upon these procedures does not affect the obligation under the National Labor Relations Act, if any, to bargain during the life of this Agreement over a particular decision to subcontract or transfer work before implementing that decision nor will it prevent the Employer from voluntarily agreeing to meet with the Union to discuss providing additional or different benefits in a given case.

## 12.10 CONTINUATION OF BENEFITS

Subject to the terms and conditions of the Employer's insurance plans, employees may elect to continue insurance coverage by following the procedures established by the Employer for such continued coverage and in compliance with applicable laws.

## 12.11  PREFERENCE DURING NOTICE PERIOD

An employee who has received written notice of indefinite layoff will be eligible for preferential employment in accordance with the provisions of section 12.5.7 during the notice period.

33

## ARTICLE 13
## BENEFITS

### 13.1   ELIGIBILITY

Regular and Fixed Term employees are eligible to participate in the benefit programs enumerated in this Article, subject to the terms and eligibility requirements for each plan.

### 13.2   PLAN RATES

For the life of this Agreement, the maximum monthly contribution amounts payable by employees who elect coverage under the Employer group plans will be the same as the maximum rates for unrepresented employees. Employee contributions will be through payroll deductions. The Employer's maximum rates of contributions will be communicated to the Union each year prior to open enrollment. As an exception to this provision, effective no more than 120 days following ratification, Regular employees who are otherwise eligible for health insurance benefits, and whose wage rate on December 31, 2005 when annualized (2080 X employee's wage rate) is equal to an amount less than $50,000.00 per year, will be eligible to receive employee and all dependent coverage under the Kaiser HMO or the Blue Cross HMO (or their replacement HMO plans) for the following calendar year at no monthly premium contribution cost to the employee. Effective at the time of the open enrollment for each year of the Agreement the annual salary amount will be adjusted by the increase in the Consumer Price Index, for All Consumers for the period from September of the preceding year through August of the current year. The Employee's annualized salary for purposes of this provision for each subsequent year of the Agreement will be determined as of December 31st of the preceding year.

### 13.3   MODIFICATION TO BENEFITS

Except as stated otherwise in this section, the Employer may alter the coverage, rate of contribution, or the carrier of these plans. At least thirty (30) calendar days before implementing any such changes, the Employer will notify the union in writing and, upon request, will bargain with the union.

### 13.4   ENUMERATION OF EMPLOYER BENEFITS

This subsection lists, for information purposes, the available types of benefit programs to be offered as of the effective date of this Agreement. The eligibility, coverage and other details of each replacement plan, if any, during the life of this Agreement, are and will be as contained in the applicable Plan Documents, which will control should there be any conflict with this subsection.

13.4.1   Medical Plan. The Employer will offer eligible employees those medical insurance plans covering employees on the day preceding the execution date of this Agreement.

13.4.2   Dental Plan. The Employer will offer eligible employees those dental plans covering employees on the day preceding the execution date of this Agreement.

13.4.3    Vision Plan.  A vision plan is available to eligible employees who are members of a medical plan to which the Employer contributes.

13.4.4    Life Insurance.

    a.    Basic Life Insurance.  Eligible employees will be provided coverage under the Employer's Basic Life Insurance Plan.

    b.    Supplemental Group Life Insurance.  Eligible employees may purchase supplemental group life insurance in accordance with the applicable plan provisions.

13.4.5    Accidental Death & Dismemberment Insurance. Eligible employees may purchase employee-only Accidental Death and Dismemberment Insurance in accordance with the applicable plan provisions.

13.4.6    Basic Long Term Disability Insurance.  Eligible employees will be under the Employer's Basic Long Term Disability Insurance Plan in accordance with the applicable plan provisions.

13.4.7    Supplemental Long Term Disability Insurance.  Eligible employees may purchase supplemental long-term disability insurance in accordance with the applicable plan provisions.

13.4.8    Supplemental Short Term Disability Insurance.  Eligible employees may purchase supplemental short-term disability insurance in accordance with the applicable plan provisions.

13.4.9    Legal Care Plan.  Eligible employees may purchase a legal care plan in accordance with the applicable plan provisions.

13.4.10    Flexible Spending Program.  Eligible employees may place pre-tax earnings into the following types of flexible spending programs in accordance with the Employer's Flexible Spending Program:

    a.    Premiums for health benefits;
    b.    Dependent care expenses;
    c.    IRS allowed medical spending account.

13.4.11    Malpractice and General Liability Insurance.  The Employer pays the total cost of a group General Liability insurance policy which automatically covers all employees who are acting within the scope of their professional duties.

13.4.12    Retirement Benefits.  Benefit eligible employees will able to participate in the Employer's Retirement Plans and Retiree Health benefits in accordance with and subject to the terms of the plan documents.

During the life of this Agreement, the Employer agrees that it will retain the current Retiree Health benefits plan, and further agrees that should it enhance those benefits, such enhancements will be extended to eligible employees in the bargaining unit.

35

The Employer further agrees that, effective the beginning of the pay period next following ratification, and on a prospective basis only, the Employer will match the voluntary contributions of an employee with fifteen (15) years of retirement eligible service up to five percent (5%) of the employee's pension eligible earnings. Eligibility will begin the beginning of the pay period next following the date upon which the employee reaches fifteen (15) years of retirement eligible service.

## ARTICLE 14
## PAID TIME OFF

14.1    PURPOSE AND RATE OF PAY

Paid Time Off (PTO) compensates Regular employees at their base hourly wage rate of pay when they are absent from work for such purposes as vacation, illness, holiday, family emergencies, bereavement leave, religious observances, preventive health and dental care, and other excused elective absences. Except as otherwise expressly provided in this Article, or elsewhere in this Agreement, an employee may not take unpaid time off if the employee has accrued PTO available. Employees with anticipated or realized six (6) months of assignment to an evening or night shift in a calendar year will receive shift differential for PTO hours used when the employee is scheduled to work a shift for which a differential is paid at the time the PTO hours are used.

14.2    ELIGIBILITY

All regular employees are eligible for PTO.

14.3    ACCRUAL

14.3.1    PTO is accrued on the basis of productive hours worked, including overtime, at established accrual rates on a maximum of eighty (80) hours in a biweekly pay period.

14.3.2    PTO accrual will continue for all hours off on approved jury duty for hours the employee would normally have been scheduled to work.

14.3.3    The following accrual rates are derived from the assumption that an employee working full time will take off the PTO days (s)he earns in a year. The PTO days per year are listed for illustrative purposes only to show the PTO days which will accrue each year if all permissible PTO is used in such year.

| Years of Service | Time Accrued Per Hour Worked | Projected Annual Hours Full-Time Employee | Projected Annual Days For Full-Time Employee |
|---|---|---|---|
| First Year of Employment | .1111 | 208 | 26 |
| 2nd through 4th year | .1354 | 248 | 31 |
| 5th through 9th year | .1607 | 288 | 36 |
| 10th and subsequent years | .1764 | 312 | 39 |

14.3.4    Use Of PTO. PTO may be used in the next pay period after it is earned. PTO may not be used in advance of accrual and may not be used on regularly scheduled days off. PTO hours for a full day off will be taken in the same manner as the employee is normally scheduled to work: (e.g., in 8 hour increments for 8 hour shifts, or in 12 hour increments for 12 hour shifts).

37

14.3.5    PTO, as with all other unpaid time off such as a leave of absence, must be
          requested in writing in advance of the time off desired, and approved in
          writing by the Supervisor, except for an emergency or illness. The Employer
          will provide a response to an employee's request for PTO as soon as
          practical, but no later than fourteen (14) calendar days after receiving the
          request. Approval will be based upon the Employer's determination of its
          staffing needs. When time off is requested without prior approval due to an
          emergency or illness, a specific reason for the request is to be given and
          accrued PTO time must be used. In the event of an emergency or illness, the
          employee will be responsible for providing as much advance notice as is
          reasonably possible to the employee's supervisor.

14.3.6    Accrued PTO may be used during any waiting period for State Disability
          Insurance or Workers' Compensation and to supplement any such disability
          payments during a period of disability.

14.3.7    Employees will accrue PTO hours up to five hundred twenty (520) and all
          hours in excess thereof shall automatically be cashed out on the last payday
          of August each year provided, however, that for employees who have an
          accrued balance that is in excess of five hundred twenty (520) hours as of the
          date of ratification, the Employer will cash out up to two hundred fifty (250)
          hours on the last payday of August of each year until the employee's PTO
          balance is reduced to five hundred twenty (520) hours.

14.3.8    An employee changing status from regular to relief status will receive an
          immediate cash-out of all PTO hours accrued at the employee's hourly base
          wage rate, not including any shift differential rate.

14.3.9    Upon termination from the Employer, an employee will receive a cash-out of
          all PTO hours accrued at the employee's current base hourly wage rate, not
          including any shift differential rate.

14.4    HOLIDAYS

The following holidays are built-in components of the PTO accrual rates. An employee
is required to use PTO when one of the following holidays falls on a day the employee is
regularly scheduled to work and is scheduled off due to the holiday.

>           New Year's Day
>           Martin Luther King Jr. Day
>           Memorial Day
>           Independence Day
>           Labor Day
>           Thanksgiving Day
>           Christmas Day

An employee required to work on any actual holiday listed above will be paid one and
one-half (1½) times the regular hourly rate of pay including any applicable shift
differential. In addition to the one and one-half (1½) times pay, the employee may claim
hours of accrued PTO in the same manner as the employee is regularly scheduled to

work (e.g., in 8 hour increments for 8 hour shifts, or in 12 hour increments for 12 hour shifts), to be paid at the hourly base wage rate plus shift differential, if applicable.

14.5    TRANSFER OF PTO CREDIT

An employee transferred, promoted, or demoted to another position at the Employer in which PTO can be accumulated will have any accumulated PTO transferred.

14.6    INTEGRATION OF PTO

In cases where an employee is receiving disability benefit payments, PTO may be integrated (SDI Workers' Compensation, or Supplemental Short Term Disability). To the extent disability payments do not equal the employee's regular wages, PTO will be used in an amount equal to, but not exceeding, the employee's scheduled hours at the employee's straight time hourly rate and any shift differential to which they would be entitled under Section 14.1.

**ARTICLE 15**
**LEAVES OF ABSENCE**

15.1   ELIGIBILITY

15.1.1   Employees will be eligible for leaves of absence for such purposes as are provided in, and in accordance with the specific terms and conditions set forth in the Employer's then current policies for leaves of absence, unless specifically modified in this Agreement.

15.1.2   With the exception of Workers Compensation, military and pregnancy disability leaves of absence, or where otherwise required by law, employees eligible for leaves of absence are Regular employees covered by this Agreement who have successfully completed the trial period. A leave of absence is for an extended period of time off of 15 calendar days or more, paid or unpaid, which are not considered to be scheduled vacation time.

15.1.3   Unless otherwise required by law, the Employer, in its sole discretion may grant requests for leaves from employees within their trial period and such decisions are not subject to grievance/arbitration. If granted, such leaves will automatically extend the trial period for the period of leave granted.

15.2   LEAVE CATEGORIES

15.2.1   <u>Family and Medical Leave</u>

a.   The Employer will grant Family/Medical Leave to the extent required by, and pursuant to the Employer policies implemented in accordance with, State and Federal laws.

b.   Employees who have been employed by the Employer for at least twelve (12) months and have worked at least 1,250 hours during the previous twelve (12) months are entitled to leave for the following reasons:

- Birth of the employee's child;
- Placement of a child with the employee as a result of adoption or foster care;
- Care of a spouse, domestic partner, child or parent with a serious health condition;
- A serious health condition that makes the employee unable to perform his/her job.

This section 15.2.1(b) is included for information purposes only and does not, and is not intended to, replace 15.2.1(a).

15.2.2   <u>Medical Leave</u> (excluding pregnancy related disability). Regular employees who have passed the trial period who are not eligible for State and Federal Family and Medical Leave are eligible to apply for medical leaves.

40

15.2.3    Pregnancy Related Disability Leave. Such leaves are granted to an employee who is unable to work because of pregnancy or childbirth, to the extent required under and pursuant to the Employer policies implemented in accordance with State and Federal law.

15.2.4    Personal Leave of Absence. A personal leave of absence may be granted at the sole discretion of the Employer. An employee may not accept other compensated employment during a personal leave of absence, unless specifically agreed to in writing by the Employer, except that if the personal leave is for Union business, the employee may accept compensation from the Union. Personal leave for Union business will not be unreasonably denied.

15.2.5    Military Leave. The Employer will grant military leaves of absence to the extent required by, and pursuant to the Employer policies implemented in accordance with, Federal law.

15.2.6    Educational Leave. Employees will be eligible for educational leave for such purposes as are provided in, and in accordance with the terms and conditions set forth in the Employer's then current policies for educational leave.

15.3    DURATION OF LEAVE

Leaves of absence may be granted for up to the following maximum time periods:

15.3.1    Personal Leave. One hundred eighty (180) calendar days, but may be extended at the sole non-grievable discretion of the Employer for up to a combined total, together with all other leaves, of three hundred sixty-five (365) calendar days.

15.3.2    State and Federal Family and Medical Leave. Consistent with State/Federal law (generally 12 weeks).

15.3.3    Medical Leave (including pregnancy related disability). Up to one hundred eighty (180) calendar days.

15.3.4    Leave for Child Care. Following the birth or adoption, up to one hundred eighty (180) calendar days inclusive of state and federal family and pregnancy disability leave, and personal leave.

15.3.5    Educational Leave. Up to three hundred sixty five (365) calendar days.

15.4    COMBINATIONS OF LEAVES OF ABSENCES

Time spent on medical, pregnancy disability, family care, and personal leaves of absence may not be combined to exceed one hundred eighty (180) calendar days of total absence in any three hundred sixty five (365) calendar day period, except as required by law, or unless a personal leave of absence is approved at the sole discretion of the Employer for a maximum combined total of three hundred sixty five (365).

41

## 15.5    REINSTATEMENT RIGHTS

15.5.1    Unless otherwise required by law or this Agreement, employees returning from a leave or a combination of leaves of one hundred eighty (180) calendar days or less in compliance with the terms of such leave, will be offered the same position occupied at the commencement of the leave or the employee's modified position if it has been modified during the term of the leave.

15.5.2    Unless otherwise required by law, employees returning from a leave or combination of leaves of more than one hundred eighty (180) calendar days in compliance with the terms of such leave, are not guaranteed a position but may apply for and be considered for vacancies within the department.

## 15.6    PROCEDURES

15.6.1    An employee will submit a written request for a leave of absence or request for an extension of a leave of absence for the approval of the employee's supervisor on an appropriate Leave of Absence Request and Authorization Form thirty (30) calendar days in advance of the desired starting date, unless illness or other extreme circumstances prevents the employee from giving such notice, in which case the employee must give as much notice as possible. The request will state the specific reason for the leave and the dates of the requested leave. As a condition to granting, continuing or extending a leave the Employer may require verification of the reasons given for the leave including, in the case of Medical Leaves and Federal and State Family/Medical Leaves, signed certifications from a physician, and may periodically request updated information and/or documentation regarding the continued existence of reasons requiring a leave as, and to the extent, permitted by law. The employee is to follow the specific procedures and utilize the specific form(s) provided for under the Employer's policies at the time of the leave request.

15.6.2    PTO may be used during a leave at 100% of the employee's commitment or in the case of medical, pregnancy disability, or family leave due to the employee's own serious health condition, coordinated with short term disability and/or state disability insurance not to exceed the employee's normal pay.

15.6.3    Except as required by law, an employee will neither forfeit nor accrue any benefits during an authorized leave of absence.

15.6.4    Employees may elect to continue insurance coverage subject to terms and conditions of the Employer insurance plans while on an unpaid leave of absence by following the procedures established by the Employer for such continued coverage. Employees on a leave in compliance with Federal and/or State family/medical statutes will have their insurance continued as and to the extent required by such laws.

15.7   RETURN FROM LEAVE

   15.7.1    Return Date.  Regular employees on an approved leave of absence
              (including an approved extension) are expected to return to work on the first
              scheduled workday following the expiration date of the leave.

   15.7.2    Failure to Return.  If a Regular employee fails to return to work at the
              expiration of a leave of absence, the employee will be deemed to have
              resigned from employment with the Employer.

43

## ARTICLE 16
## EDUCATIONAL ASSISTANCE

16.1    The Employer will provide tuition reimbursement to eligible employees up to a maximum of $1,000 per employee, appropriately prorated for less than full-time eligible employees (based on the employee's commitment), per fiscal year in accordance with terms and conditions established under the Employer policies regarding tuition reimbursement. Tuition reimbursement will be paid, when the employee has complied with the applicable application and approval procedures, for the following activities:

   a.    Formally organized courses related to the employee's current job or jobs to which the employee can expect to transfer or be promoted in the usual course of eligibility or, if mutually agreed, in another appropriate job field;

   b.    Formally organized seminars and symposia dealing with contemporary practices in the employee's current job or jobs to which the employee can expect to transfer or be promoted in the usual course of eligibility or, if mutually agreed upon, in another appropriate job field;

   c.    Formally organized courses in related subjects leading to a degree in the employee's current job or jobs to which the employee can expect to transfer or be promoted in the usual course of eligibility or, if mutually agreed upon, in another appropriate job field;

   d.    Formally organized specialized courses relating to the employee's current job field;

   e.    Training and education for another position with the Employer for which the employee possesses the prerequisite qualifications when the employee has been displaced due to indefininte subcontracting or work transfer.

16.2    The Employer may modify its Tuition Reimbursement Policy provided it first notifies the Union, and upon written request, meets with the Union to discuss the changes prior to implementation. If the Employer proposes to change reimbursement amounts or eligibility requirements, it will, upon request, bargain with the Union. Eligible employees for the purpose of this subsection are regular employees who have completed the trial period.

16.3    The parties agree to form a Tuition and Reimbursement Committee, comprising two Union and two Employer representatives. The purpose of the committee shall be:
   a.  To identify ways to communicate the availability of education and training assistance and the types of education of training that are available to employees which meet the criteria set forth above;
   b.  To review the denial of an employee's request for assistance by the Employer, should the employee request such review in writing within ten (10) days of the denial;
   c.  To consider educational or training requests not meeting the criteria described above, but related to other positions at the Hospitals in the case of employees laid off indefinitely due to subcontracting or a transfer of work.

d. To serve as the body for bargaining as may be required under 16.2 above.

The Committee shall meet no more often than monthly and all actions shall be by a majority of the entire Committee.

Claims that the Hospital has failed to follow these procedures shall be subject to the Grievance and Arbitration procedures but the decisions of the Committee, or failure to reach a majority decision, shall not.

16.4 Employees indefinitely laid off due to subcontracting or a transfer of work will be eligible for an additional Five Hundred Dollars ($500) (a total of $1500 for the fiscal year), prorated for Regular part-time employees. The Employer will pay the necessary amounts by check, made payable directly to the provider, upon a showing that the employee is eligible and has completed any necessary enrollment or registration forms, or reimburse the employee upon proof of enrollment and payment by the employee for qualified training, up to the maximum amount available to the employee based upon the employee's scheduled status, reduced by any amounts previously utilized by the employee during the fiscal year.

16.5 If the Employer requires an employee to attend a particular course, the hours spent in the class will be considered as time worked and the employee will be compensated accordingly.

## ARTICLE 17
## JURY DUTY

17.1   Employees in a regular position who are called to jury duty are eligible to receive benefits in accordance with this article. An employee in his/her trial period who is called to jury duty will be subject to the provisions of Article 8 regarding extension of the trial period.

17.2   Jury duty is defined as the time an eligible employee is required to spend sitting on a jury, or physically waiting at the courthouse in anticipation of being called to sit on a jury. Jury duty does not include time spent away from the courthouse on "telephone alert" or other forms of standby service not requiring the employee's physical presence at the courthouse.

17.3   An employee will notify the supervisor upon receipt of a summons so arrangements may be made for the employee's absence.

17.4   Employees working a day or evening shift will be excused from the entire regularly scheduled shift on the day(s) they are required to report for jury duty. Employees scheduled to work the night shift immediately preceding the day(s) they are required to report for jury duty will be excused from working that shift.

17.5   Employees on jury duty will be paid at straight time rates including the shift differential the employee would have normally received for the number of hours they would have been scheduled to work. Time spent on jury duty will not count toward the calculation of overtime. PTO accrual will continue for hours spent on jury duty which would have been regularly scheduled work hours. Wage payments will not be made for jury duty on any day on which an employee would not have been scheduled to work, including holidays, or on a day the employee is claiming PTO or is on a Leave of Absence or other excused absence.

17.6   If practical, an employee assigned to the day shift may be required to return to work on any day in which s/he is released from jury duty obligations in sufficient time to return to work for a minimum of one-half (1/2) of the scheduled shift.

17.7   Upon request, an employee will provide documentary proof relating to her/his reporting for jury duty.

17.8   An employee volunteering his/her services to be a juror will not be eligible for jury duty pay.

17.9   Payments from the Federal, State or County government will be retained by the employee to assist in defraying expenses.

## ARTICLE 18
## WORK RULES

18.1   The Employer has the right at its discretion to promulgate, supplement, alter, modify, amend, rescind, and enforce work rules which are not inconsistent with this Agreement. This right includes the Employer's authority to formulate and enforce work rules as an ordinary and proper means of maintaining discipline and efficiency, of directing the conduct, appearance and actions of the employees and of ensuring the health and safety of employees and others.

18.2   For purposes of this Article, work rules are defined as rules promulgated by the Employer, or a particular department or departments thereof, within its discretion, that regulate employees relative to and affecting their employment. The Employer may enforce these work rules while employees are on the premises of the Employer and/or while working for the Employer and/or outside the employee's working hours when the violation of the work rule would prejudice the interests of the Employer.

18.3   At least fourteen (14) calendar days prior to the implementation of new or changed work rules, the Employer will inform the Union of the new or changed rule(s). Upon request from the Union, the Employer will meet and discuss proposed work rules. If the Union requests to meet and discuss proposed work rules, the parties will meet within fourteen (14) calendar days of the date of the notice sent to the Union. The Employer will consider issues and concerns raised by the Union regarding the rule prior to its implementation.

47

## ARTICLE 19
## RESIGNATION

19.1   Employees who voluntarily separate from employment are considered to have resigned their employment with the Employer. An employee who retires or otherwise voluntarily terminates from a position with the Employer should submit a letter of retirement or resignation at least fourteen (14) calendar days prior to the effective date of such retirement or resignation.

19.2   After three (3) calendar days from the date of notice of resignation, there will be no withdrawal, cancellation, rescission, or other stopping of the resignation, except with the written consent of the Employer.

19.3   If a regular employee fails to report to work as scheduled or directed by his/her immediate supervisor for a minimum of three (3) consecutive scheduled or directed days, barring extreme circumstances justifying such failure, the Employer may consider the employee to have abandoned his/her position and treat the employee as having resigned, effective as of the end of the last day worked. The Employer will notify the employee in writing at the employee's last known mailing address of any such determination.

## ARTICLE 20
## DISCIPLINE AND DISMISSAL

### 20.1    DISCHARGE

The Employer may discharge or take other disciplinary action for just cause, against a non-trial Regular employee. The Employer may discharge or take other disciplinary action against Trial employees, Relief employees and Fixed Term employees for any reason it deems appropriate in its discretion.

### 20.2    INVESTIGATORY INTERVIEWS

If the Employer requires an employee to participate in an investigatory interview or meeting which the employee reasonably believes will result in disciplinary action, the employee will be entitled, upon request, to have a Union representative or steward present, provided that the investigatory interview will not be delayed by more than twenty-four (24) hours by the inability to have a Union representative or steward present, unless the Employer agrees to waive the time limit. It is understood that the role of the Union representative or steward will be in accord with *NLRB v. Weingarten*, unless the Employer representative agrees to some other role. If there is more than one (1) Union representative or steward and/or the Employer representative present, there will only be one (1) spokesperson for each party.

### 20.3    NOTICE OF DISCHARGE

Except in serious cases warranting immediate discharge an employee discharged during the trial period of employment who has completed the first ninety (90) calendar days of the trial period will receive a one week notice of separation. The employee may be required to work as usual during the period, or may be given pay in lieu of notice, or may be required to work part of the notice period and be paid in lieu of working the remainder of the period.

### 20.4    NOTICE

Regular employees who have completed the trial period will be provided a written notice of termination, suspension or disciplinary demotion. The notice will contain the type of, reason for, and effective date of the disciplinary action. The notice will be provided in person or by mailing it to the employee's address on file with the Employer. Except in serious cases warranting immediate discharge, an employee who has completed the trial period will receive a two week notice or pay in lieu of notice or a combination of both.

### 20.5    APPEAL

A regular employee who has completed the trial period and who has been terminated or otherwise disciplined has the right to file a grievance in accordance with Article 26.

49

20.6    TIME IN FILE

With the exception of final warnings and suspensions, verbal and written discipline, including any attachments, not involving criminal violations, substance abuse, unlawful harassment, or other willful acts, such as insubordination, etc., will not be considered in determining the severity of discipline for a subsequent occurrence, if a period of twenty-four (24) calendar months passes immediately after their issuance during which the employee receives no other warnings or disciplinary action, whether similar or not, except that they may be considered in connection with disciplinary action being considered at the time the twenty-four (24) calendar month expires.

## ARTICLE 21
## PERSONNEL FILES

21.1    An employee will, upon request to the Employer, have the opportunity to review his/her personnel file(s) within a reasonable time and during the normal business hours of the Human Resources Department in the presence of a representative of the Employer.

21.2    Copies of letters of warning and/or disciplinary action will, upon being placed in the employee's personnel file(s), be provided to the employee. Employees' written comments, if any, regarding such letters will be placed in their personnel file(s). Such comments will not require the Employer to change or alter the letters or the actions indicated by the letters.

21.3    Records protected by recognized legal privilege and records excepted from disclosure by law may be withheld from the employee and the employee's representative. An employee will not be entitled to review confidential pre-employment information.

21.4    Notwithstanding the above restrictions, upon the written authorization of the employee, the Union may, in the presence of the Employer representative, review those documents of an employee's personnel file upon which the Employer intends to rely in a grievance or arbitration proceeding involving the employee provided however, that the Employer may protect or remove any privileged information and/or any confidential information such as medical information and/or patient identifiers, except to the extent that such medical information relates to the employee and provided further that the Employer may condition the review of documents concerning or relating to patient care and treatment issues upon execution by the Union of a confidentiality agreement.

21.5    The Employer may charge reasonable fees for making copies of personnel file information or extracts thereof; however, there is no charge for the first copy of the individual employee's own records.

21.6    Union requests for information not contained in the personnel files of employees will be subject to Article 24 – Union Access, Bulletin Boards, Information Requests.

51

## ARTICLE 22
## JOINT MANAGEMENT AND LABOR COMMITTEE

22.1    A Joint Management and Labor Committee will be established consisting of up to five (5) management members selected by the Employer, and up to five (5) members selected by the Union, one of which may be a Union representative, and the other four (4) being current regular employees employed in the bargaining unit.

22.2    At the request of either party the Committee will be convened up to once each calendar quarter for the purpose of discussing areas of concern and/or proposed methods of fostering better cooperation and communication. The Committee may be convened more often upon agreement of the parties. Each party will present to the other an agenda of the items it proposes to discuss at least fourteen (14) calendar days in advance of the meeting. The parties agree, however, that the Committee will not have the authority to add to, subtract from, or in any way alter the terms and conditions set forth in this Agreement nor will it have any authority to make decisions which are binding on the parties.

22.3    Employees selected to participate on the Committee will be compensated for the time spent in meetings for up to two (2) hours at their straight time rate.

    22.4.1    In addition to issues concerning cooperation and communication, at the request of either party, issues concerning staffing or work process/patient care improvement may be brought to the Committee provided the matter has first been taken to the manager for the unit/department involved. To address such issues, the Committee will appoint a subcommittee consisting of: one (1) employee Committee member selected by the Union, one (1) Committee member selected by the Employer, two (2) employee members appointed by the Union Committee members who will be from the unit or department involved, and two (2) members of management appointed by the Employer, at least one of whom will have responsibilities for the unit/department involved. The subcommittee will meet to discuss the issues in an attempt to reach agreement regarding whether recommended changes are appropriate under all of the relevant circumstances, and if so, what those recommendations should be. If a majority of the six (6) members reach agreement, the recommendations, if any, together with the facts and other bases for the recommendation and the projected costs and benefits of the recommendation, will be submitted to the administrative official with oversight for the unit/department in question. If no majority agreement is reached, either party may submit its position, including the facts and other bases for the position together with its projections of its costs and benefits, in writing, to the administrative official with oversight for the unit/department in question. The other party may then submit its position in writing, in similar fashion. In either case, the administrative official or his/her designee will review, consider, and analyze the recommendation(s) or positions of the parties, and will provide a response within sixty (60) days. If more time is needed, the administrative official will so inform the Committee members sitting on the subcommittee, and will advise of the amount of additional time needed, and establish a date on which (s)he will provide his/her response.

22.4.2    There will be no more than one subcommittee in place at a time, and the
         subcommittee may meet once per month for up to three (3) months, if
         necessary, to reach agreement on deadlock. An employee Committee
         member sitting on the subcommittee will be compensated at his/her straight
         time rate, for one (1) hour for each subcommittee meeting in which (s)he
         participates.

22.4.3    If the Union's committee members are not satisfied with the decision of the
         administrative official or designee made pursuant to 22.4.1., they may make a
         request to the administrative official in writing for the services of a mediator of
         the Federal Mediation and Conciliation Service. The mediator assigned by
         the Federal Mediation and Conciliation Service will meet with the
         administrative official or designee and a Union selected Committee member,
         who will be one of the employee members, to attempt to facilitate consensus.

22.4.4    Notwithstanding the provisions of this Section 22.4., it is understood that the
         Employer retains final discretion and authority for determining staffing and
         work process/patient care improvement issues.

22.4.5    Disputes over compliance with the procedures set forth in this Article, but not
         a final decision of the Employer, will be subject to the grievance and
         arbitration procedures of Article 26.

53

## ARTICLE 23
## STEWARDS

23.1    The Employer will recognize stewards designated by the Union, including up to two chief stewards (one for Stanford Hospital and one for Lucile Packard Children's Hospital). The Union will notify the Employer, in writing, of the names of all stewards, and of the stewards designated as chief stewards. The Employer will not recognize any employee as a steward unless the employee's name is included on the most recent list provided by the Union.

23.2    The duties of the stewards designated by the Union as described in 23.1, above, and recognized by the Employer include:

   a.    Participation, as provided in *NLRB v. Weingarten* and subsequent cases, on behalf of an employee who has requested the presence of a steward in investigatory interviews that the employee reasonably believes may result in disciplinary action;

   b.    Representation of a grievant or grievants employed in the steward's area, or in other areas where there is no steward designated, or no steward available, in meetings with the Employer's designated representative(s) in accordance with the grievance procedure; and

   c.    Participating in meetings with the Employer's designated representative in such other meetings as the parties mutually convene.

   Nothing in this provision is intended to limit the other duties which may be assigned to the steward by the Union and which are not recognized by the Employer under this Agreement, provided such duties do not violate the policies or rules of conduct established by the Employer, and do not interfere with the Employer's operations or the work of the steward or any other employee.

23.3    The Employer will not be obligated to deal with more than one steward at a time. Any resolution reached regarding an issue or grievance will be binding upon the employee(s) involved, the Union, and the Employer provided such resolution does not conflict with the terms of this Agreement.

23.4    Stewards will advise employees with grievances that they are to perform their duties and follow the instructions while the grievance is pursued, and will not interfere with operations of the Employer or the instructions of the supervisor.

23.5    Stewards will perform their duties on their own time unless the presence and participation of a particular steward during his/her scheduled work time is requested by, or agreed to by, the Employer. For purposes of conducting legitimate union business under this Agreement, stewards may use the Employer's telephones in non-clinical, non-patient care areas to converse with Union representatives during non-work time, provided such use is minimal, does not involve toll charges, and does not interfere with the normal operations of the Employer or the work of any employee. If the Employer determines that a steward has inappropriately used the Employer telephones, upon notice to the Union and the steward permission for such usage may be revoked.

23.6  Upon advance request by the steward and approval by the Employer, a steward may be relieved from work and pay status to participate in a meeting held pursuant to the Grievance and Arbitration Procedure of this Agreement during his/her regularly scheduled work hours subject to the provisions of Article 26. Factors to be considered by the Employer in exercising its discretion to approve or deny the release time request include but are not limited to projected release time needed, patient care and operational concerns, and frequency of such requests.

## ARTICLE 24
## UNION ACCESS, BULLETIN BOARDS, INFORMATION REQUESTS

24.1   ACCESS

24.1.1   The Union will be permitted access to the Employer premises under the terms set forth in, and for the purposes described in, this Article. The access applies only to employees covered by this Agreement.

24.1.2.1   Representatives of the Union will be granted reasonable access to the Employer's facilities where the Union represents employees for the purpose of ascertaining whether the terms and conditions of the Agreement are being met and for activities specified by the Grievance and Arbitration Procedure, provided they do not interfere with the work activities of any employee, whether or not covered by this Agreement, or otherwise interfere with the Employer's operations. The Union representative will first check in at the Employer's Security Dispatch Center located in H0258A in Stanford Hospital, and identify himself/herself and advise the Security Staff of the facility(ies) and location(s) in the facility(ies) where (s)he would like to go. Security will contact the manager or appropriate administrative official of the department(s)/unit(s) to which access is being requested to determine whether authorization will be given to issue a pass for that visit. The pass will be valid only for the facility(ies) and area(s) for which authorization is granted and listed on the pass, and for a two (2) hour time period from the time it is issued. Exceptions may be made to the two (2) hour limit where the circumstances warrant. The Employer agrees that there will be a standing authorization for the issuance of a pass to the locations where the Union Representatives may meet with individual employees designated in and pursuant to 24.1.3, below, and the pass may be for a time period of up to eight (8) hours, provided that if the Union representative fails to adhere to the requirements of this Article, this exception to the approval and time limits provisions will be revoked as to that Union representative. When a meeting with Human Resources or other Administrative Officials is pre-scheduled through the Human Resources Department, that Department will notify the Security Dispatch Center of the date and time of the meeting and the Union representative(s) involved, as identified by the Union, and the Security Dispatch Center will arrange to have the appropriate passes ready when the Union representative(s) arrive. When a Union representative seeks to gain access after 10:00 PM and before 5:00 AM, the Nursing Supervisor from the respective hospital will be notified prior to the pass being issued. At the completion of the visit, the Union representative will check out at the Security Dispatch Center and turn in the pass.

24.1.2.2   A Union representative may also call the Security Dispatch Center a reasonable time in advance on the day the

representative intends to visit a facility to identify himself/herself, the facility(ies) and department(s)/unit(s) (s)he would like to visit, and the time of his/her visit. The Security Dispatch Center will, consistent with its other responsibilities and activities, begin to obtain approvals from the appropriate individuals prior to the Union representative's arrival at the Security Dispatch Center to check in, with the goal of limiting delays in the issuance of a pass to areas where authorization is given.

24.1.2.3    Under no circumstances, even when authorization is erroneously granted by a manager or other administrative official, will Union representatives be allowed in patient rooms, nursing stations, exam rooms, or treatment rooms. The Employer retains the right to refuse Union representatives access described in this Article to a facility(ies) due to medical or other emergencies, and/or the implementation of the Employer's disaster plan. Failure of a Union representative to follow all access procedures will result in his/her immediate removal from the Employer's facilities and premises.

24.1.2.4    These procedures are not intended for the purpose of unduly delaying reasonable and appropriate access.

24.1.3    Union representatives may meet with employees that it represents in Room HO141 for as long as it remains a lunch/break room (if the lunch/break room is moved to another location the access will continue at the new location), the cafeteria and third floor patio at SH&C and the cafeteria and cafeteria patio at LPCH, if available. The Employer may designate other meeting locations between employees and the Union for purposes allowed under this Agreement. The Employer may also require a representative to accompany the Union representative to, into and from areas where operational requirements or other restrictions do not permit unlimited access. Nothing in this subsection, or this Article is to be construed to permit the Union to hold group meetings except as provided under 24.4.

24.1.4    The Union will furnish the Employer with a written list of all designated non-employee officers and representatives designated and authorized to conduct Union business. This list will be maintained by the Union and any changes, additions or deletions will be submitted in a timely manner in writing to the Director of Employee and Labor Relations, or designee, at the Employer. Any non-employee union representative not on the current written list provided to the Employer by the Union will have no right of access except as a patient seeking treatment or as a visitor to a patient admitted to the hospital.

24.1.5    The Union officers and representatives and bargaining unit employees, including local union officers and representatives, will not conduct any union activity or union business on the Employer premises unless such activity is specifically authorized by the provisions of this Agreement and is conducted in accordance and conformance with the Employer procedures. This section 21.1.5 is not intended to prevent employees from engaging in legitimate

57

union business in accordance with the Employer procedures while on a paid break or during unpaid non-work time.

24.1.6  The Employer retains the right to enforce access rules and regulations in accordance with applicable procedures.  If the Employer determines that an access rule or regulation is being violated it may deny access rights to non-employee Union officer(s) and/or representative(s) determined to have violated these provisions or the access policy on more than one occasion, for a specified period of time not to exceed one (1) year.

24.1.7  When the Employer determines that a violation of the access rules and regulations has occurred, it will notify the Union of the violation before taking the actions described in 24.1.6 above.

24.1.8  If the Union disputes the Employer's assertion that the non-employee Union officer(s) and/or representative(s) to whom it has denied access violated the provisions of this Article or the Employer rules and regulations on more than one occasion, it may file a grievance pursuant to Article 26, and at the Union's option the matter may proceed directly to arbitration.  The arbitrator will render a bench decision, and thereafter confirm the decision in writing.  If the arbitrator finds that repeated violations did occur, the arbitrator will have no authority to overturn the Employer's decision.

## 24.2  BULLETIN BOARDS

24.2.1  Bulletin board availability for display of appropriate materials related to the bargaining unit will be provided on the following basis:

a.  The Employer will designate a bulletin board on each floor of Stanford Hospital and Lucile Packard Children's Hospital, which may at the Employer's option, be a locking glass enclosed bulletin board.  The Union may use such bulletin boards to post materials related to Union business. The Employer will retain a key to each such bulletin board.

b.  A copy of all union postings will be provided to the Director of Human Resources or designee at the time of posting.

c.  Posted materials will be limited to notices of Union meetings, elections and other similar general Union matters.

d.  The Union agrees that it will post nothing of a libelous, obscene, defamatory or partisan political nature, nor will it post literature or material detrimental to or derogatory of the Employer, its agents or officials.

e.  In the event a dispute arises concerning appropriateness of the material posted, the Director of Employee and Labor Relations or designee will remove the material in question and then notify the designated union representative as to the nature of the dispute.

f.       Bulletin board space available to the Union will be maintained by the Local 715 designated union representative.

g.       No union-related literature of any kind will be posted by the Union or the employees at any other location on the Employer premises.

24.2.2   The Union agrees to indemnify, defend and hold the Employer harmless against any claims made of any nature and against any suit instituted against the Employer arising from the bulletin board privileges provided in this Article.

24.3   TELEPHONE, FACSIMILE AND ELECTRONIC MAIL

Neither the Union nor employees will use the Employer telephones, facsimile machines, or the electronic mail system for conducting union business or disseminating union information, except as provided in 23.5. Employees' work telephone numbers will not be listed on union literature or in any union publication.

24.4   USE OF THE SHC/LPCH FACILITIES

Subject to the applicable policies, rules and requirements in effect at the time of a Union request for use of facilities, and subject to availability, the Employer will permit use of its facilities for Union meetings for the purpose of selecting its negotiating committee or stewards. Written requests for use of such the Employer facilities will be made in advance to the Director of Employee and Labor Relations or designee, and will specify the purpose for the meeting.

24.5   PRINTING OF AGREEMENT

Both parties will share equally in the cost of the printing and distribution of the Agreement, based on a reasonable estimate of the number of copies the respective parties need. The Employer will provide cost estimates from Union printers and estimated printing timelines. The Employer will provide the Union with the number of copies which the Union has requested for its own purposes.

24.6   INFORMATION PROVIDED TO UNION

24.6.1   The Employer will provide the Union upon request, but no more frequently than quarterly, with the following information for each employee covered by this Agreement:

a.   Name
b.   Home mailing address
c.   Date of hire or adjusted date of hire, if any
d.   Home telephone number (if not unlisted)

24.6.2   The Employer will provide the Union on a monthly basis the names, dates of employment, including the hire date or adjusted hire date if any, classification and department of all newly hired employees covered by this Agreement and of all employees who transfer into positions covered by this Agreement and the names of employees covered by this Agreement who have resigned or

59

been terminated, or who have transferred to positions in classifications not covered by this Agreement.

24.6.3    All other requests for information by the Union will be made by the local designated union representative to the Director of Employee and Labor Relations or designee. Where such request is for information or data which is necessary to the performance of the Union's representational responsibilities, it will be provided by the Employer subject to the following:

    a.    The information must be information that is presently maintained by the Employer and in its possession. The Employer is not required to develop new information or data or to modify existing information or data.

    b.    The gathering, copying and/or other preparation of the requested information must not be unduly burdensome and time consuming.

    c.    Where the information or data can be provided by the Employer at *de minimis* expense, the Employer will use its best efforts to provide such information within thirty (30) calendar days of such request.

    d.    Where the estimated expenses associated with providing such information or data (e.g., including the costs of labor, copying, sorting, redaction, etc.) are greater than *de minimis*, the Employer will advise the Union of the estimated cost of providing the information. Upon payment by the Union, the Employer will commence the gathering of such information and use its best efforts to provide such information to the Union within thirty (30) calendar days of such payment.

    e.    If, for any reason, the Union declines to pay the Employer the estimated cost under the preceding subparagraph, the parties will discuss possible alternatives to providing the requested information including, but not limited to, modifying and/or limiting the type or form of the information requested. If no alternative involving *de minimis* costs is identified and agreed upon, and if the Union continues to refuse to pay the costs of providing the information it has requested, the Employer will not be obligated to provide the requested information, unless the requested information is otherwise required by law to be provided at no charge. If any of the information requested is deemed proprietary or confidential by the Employer, the parties will meet to discuss and agree upon ways to safeguard the confidentiality of such information. Prior to reaching such agreement, however, the Employer will not be obligated to provide the information that it deems proprietary or confidential.

**ARTICLE 25**
**HEALTH AND SAFETY**

25.1    The Employer is committed to furnishing and maintaining safe working conditions in the
        workplace and will develop and implement health and safety, training and orientation
        policies as it deems appropriate. SEIU recognizes the duty of employees to cooperate
        with the Employer by complying with health and safety policies and to utilize personal
        efforts for the prevention of accidents and illnesses to employees. SEIU will encourage
        employees to cooperate with the Employer in such efforts. An employee's complaints or
        safety and health concerns should be taken to the employee's supervisor, and SEIU
        may place health and safety issues on the agenda for Joint Management and Labor
        Committee meetings held pursuant to Article 22. If either party places a health or safety
        issue on the agenda, the Employer will appoint a member of the Hospitals' Safety
        Committee to serve as a management member of the Joint Management and Labor
        Committee and as its liaison with the Safety Committee.

25.2    The Employer will endeavor to provide orientation to employees who are floated to a unit
        other than the one to which they are regularly assigned, as the Employer deems
        appropriate, and as circumstances permit.

25.3    This Article will not be subject to the grievance and arbitration provisions of this Contract,
        except that the failure to appoint a member of the Hospital's Safety Committee
        consistent with section 25.1 will be grievable.

61

## ARTICLE 26
## GRIEVANCE AND ARBITRATION PROCEDURE

26.1   DEFINITION

26.1.1   "Grievance" means a claim during the term of this Agreement that the Employer has violated this Agreement and, except as expressly provided otherwise in this Agreement, will be the exclusive remedy for all asserted violations of this Agreement.

26.1.2   Only one transaction or occurrence, or series of closely related transactions or occurrences, will be covered in any one grievance.

26.1.3   Group grievances are defined as, and limited to, those grievances which cover more than one employee, and which involve like circumstances and facts for the grievance involved.  Grievances which are group grievances must be so designated on the grievance form at Step 2, and the Union will identify to the extent possible all employees covered by the grievance on the grievance form, or an attachment to the grievance form.

26.1.4   Alleged violations of a specific provision of this Agreement may be grieved by the Union and will be so identified as a Union grievance on the grievance form.  Such Union grievances will be signed by the President of the Union or designee and will contain all information as specified above for any other grievance.

26.1.5   Except as otherwise provided in this Agreement, an individual employee, a group of employees, and the Union will have the right to use the Grievance Procedure.

26.2   REPRESENTATION RIGHTS

26.2.1   The Union will have the right to present grievances under this procedure on behalf of an individual employee, on behalf of a group of employees or on behalf of itself as a Union grievance, as defined above.  It will be the Union's responsibility to inform an employee that it is bringing a grievance on behalf of said employee (including an employee named in a group grievance). In the event an employee named on a group or individual grievance which has been submitted to the Employer wishes to withdraw from the grievance, the employee will so notify the Employer in writing, and upon such written request the named employee will be withdrawn as a party to the grievance.  The Employer will promptly provide the Union with a copy of the employee's written request to withdraw.  Employees who voluntarily terminate their employment with the Employer will have their pending grievances immediately withdrawn and will not benefit from any subsequent settlement or disposition of any individual or group grievance, unless the grievance involves the claim alleging unpaid wages or differentials required under Article 7.



26.2.2    An employee or group of employees will have the right to be represented at all steps of the Grievance Procedure by one Union representative or one steward.

26.2.3    An employee or group of employees may also choose a representative other than a Union representative for purposes of grievance representation and adjustment, so long as the representative is not a managerial or supervisory employee. In the event the Employer is involved in the adjustment and/or resolution of a grievance from an employee representing himself/herself, a group of employees who are represented by one of the group, or a single grievant or group of grievants represented by someone other than a Union representative:

    a.    The Employer will provide the Union with a copy of the grievance and the proposed resolution thereto indicating the employee or employees have chosen a representative other than one from the Union.

    b.    The Union will have ten (10) calendar days from the date of issuance of such copy within which to comment in writing on the proposed resolution.

    c.    The Employer will not implement the proposed resolution of the grievance until timely receipt and review of the Union's written comments, if any.

    d.    The adjustment and/or resolution of grievances presented absent Union representation will not be inconsistent with the terms of this Agreement.

    e.    Only the Union may appeal a grievance to arbitration.

26.3    STEP 1. INFORMAL REVIEW

26.3.1    An employee alleging a violation of this Agreement other than discharge without cause will discuss the alleged violation with the employee's immediate supervisor within five (5) calendar days of the date of the alleged violation or the date the grievant knew or should have reasonably known of the alleged violation.

26.3.2    If the grievance is resolved by the immediate supervisor at step 1, the resolution will not be precedent setting. Attempts at resolving the grievance at step 1 will not extend the time limits for filing a formal grievance at step 2, as described below, unless an exception is granted in writing by the Director of Employee and Labor Relations or designee.

26.3.3    If the employee's grievance is not satisfactorily resolved at step 1, the grievance may be appealed to step 2.

63

26.4    STEP 2.  FORMAL REVIEW

26.4.1    An employee grievance may be appealed to step 2, and a grievance by the
Union will be filed initially at step 2, within thirty (30) calendar days of the date
of the alleged violation or the date the grievant knew or should have
reasonably known of the alleged violation of this Agreement.  However, any
grievance alleging the discharge of an employee without cause or otherwise
in violation of this Agreement will be filed initially at step 2 within seven (7)
calendar days of the discharge.

26.4.2    Such appeal or filing must be in writing on a form mutually agreeable to the
parties, from the employee or a designated Union representative to the
Director of Human Resources or designee, and must contain a clear and
concise statement of the grievance by indicating the issue involved, the relief
sought, the date the incident or alleged violation took place and the specific
Article(s) and section(s) of the Agreement alleged to have been violated
and/or involved, and the remedy sought.

26.4.3    Within twenty-one (21) calendar days of receipt of the written grievance, the
Director of Employee Relations or designee will either provide a written
response to the grievant with a copy to the Union or will schedule and
convene a meeting to discuss the alleged violation with the appropriate
Employer representatives, the grievant and one union representative, unless
the employee has opted to have other representation.

26.4.4    The Employer representative will provide a written response to the grievant
with a copy to the Union within twenty-one (21) calendar days of receipt of
the written grievance, or fourteen (14) calendar days of the review meeting.  If
a written response is not provided within the specified time period, the
grievance will be considered denied.

26.4.5    If the grievance is not satisfactorily resolved at step 2, the Union may appeal
the grievance to arbitration within fourteen (14) calendar days of the date of
the written response, or of the date the written response should have been
received.

26.5    CONSOLIDATION OF GRIEVANCES

Grievances of two or more employees, as well as multiple grievances by or related to the
same employee or which relate to the same incident, issue or course of conduct, may be
consolidated for purposes of the Grievance Procedure by mutual agreement of the
Employer and the Union.

26.6    TIME LIMITS FOR FILING

26.6.1    All grievances (individual, group, Union) must be presented promptly in
compliance with the timelines established under this Article.  Grievances not
presented within these time periods will be considered untimely and ineligible
for processing through the Grievance Procedure.  Disputes over timeliness
may be submitted to arbitration pursuant to Section 26.7.7.

26.6.2    Grievances not appealed within the designated time limits in any step of the Grievance Procedure will be considered resolved on the basis of the last preceding response. Grievances not answered within the designated time limits of any step of the Grievance Procedure may be appealed to the next step of the Grievance Procedure by giving written notice of the appeal within the specified time period. The parties may, however, mutually agree in writing to extend the time limits in any step of the Grievance Procedure. Such written extension by mutual agreement must be accomplished in advance of the expiration of the time limit being waived. Deadlines that fall on a day that is not a business day (i.e., Saturday, Sunday or recognized holiday) will automatically be extended to the next business day. The mailing or faxing of the grievance appeal form will constitute a timely appeal if it is postmarked, or there is a confirmation of successful send or an acknowledgment of receipt of the fax, within the appeal period. Likewise, the mailing or faxing of the answer will constitute a timely response if it is postmarked, or there is a confirmation of successful send or an acknowledgement of receipt of the fax, within the answer period.

26.7    ARBITRATION

26.7.1    If the parties do not agree on an arbitrator within fourteen (14) calendar days of the date on the appeal to arbitration, the Union must request a panel of seven (7) arbitrators from the Federal Mediation and Conciliation Service within fourteen (14) calendar days, specifying arbitrators who reside in Northern California and who have experience in the health care industry. Upon receipt of the list, the Union will contact the Director of Employee and Labor Relations or his/her designee to select an arbitrator by alternately striking a name from the list. The arbitrator must be selected within twenty-one (21) calendar days of receipt of the panel of arbitrators; provided that if the Director or designee is not available and ready within the twenty-one (21) calendar day period the time will be extended until the Director or designee is available, and provided further that the parties may agree in writing to extend the time.

26.7.2    If the grievance is not filed, appealed and processed within the time limits established under this Article, it will be deemed to have been waived by the Union. The arbitrator will have no authority to hear a grievance that has not been filed or appealed and processed in accordance with the time limits and procedures set forth in this Article.

26.7.3    The arbitrator's authority will be limited to interpreting the specific provisions of this Agreement and will have no power to add to, subtract from, or to change any part of the terms or conditions of this Agreement. If the grievance is sustained in whole or in part, the remedy will not exceed restoring to the employee the pay, benefits, or rights lost as a result of a violation of the Agreement, less any compensation from any source, including, but not limited to, Workers' Compensation and Unemployment insurance benefits. The decision of the arbitrator, within the limits described herein, will be final and binding upon the parties and will be the exclusive remedy for the subject matter of the grievance.

65

26.7.4    Arbitration expenses will be shared equally by the Employer and the Union, including the cost of facilities if there are such costs, and the costs of the court reporter and the arbitrator's transcript. However, each party will bear its own expenses of representation and presentation of its case, including all costs or expenses associated with the appearance of witnesses, and the cost of any transcript for the party's own use.

26.7.5    Upon receiving no less than thirty (30) days prior notice, the Employer will release the grievant (or one grievant in the case of a group grievance) to attend the arbitration proceedings. Upon receipt of such notice, the Employer will also make reasonable efforts to release employees whom the Union identifies as witnesses it intends to call, for the time reasonably required for such testimony, provided staffing needs permit. The grievant and witnesses may elect to take the time off on an unpaid basis, or to utilize accrued but unused paid time off.

26.7.6    Settlement offers made during attempts at informal resolution or during the steps of the Grievance Procedure will not be introduced as evidence in subsequent steps of the Procedure.

26.7.7    When the Employer has the information upon which to base a challenge to the arbitrability of a grievance, and has such information prior to the selection of an arbitrator, the Employer will inform the Union in writing of the intent to raise the issue of arbitrability prior to the selection of the arbitrator. Should arbitrability of the subject matter or timeliness of the grievance be an issue, a separate arbitrator will be appointed to determine the question of arbitrability unless the parties agree otherwise.

26.7.8    Arbitration hearings conducted pursuant to this Article will be closed unless the parties mutually agree otherwise in advance and in writing.

26.7.9    The arbitrator will have the obligation of assuring that all necessary facts and considerations are brought before him or her by the representatives of the parties at the hearing. In all respects, he or she will assure that the hearing is a fair one. The arbitrator will be the sole judge of the relevancy and materiality of the evidence and testimony offered. The arbitrator may receive and consider evidence, but will give appropriate weight to any objections made. All documents to be considered by the arbitrator will be filed at the hearing.

26.7.10   The decision of the arbitrator on any issue properly before the arbitrator will be final and binding upon the Employer, the Union and all employees. The arbitrator's authority will be limited to determining whether the Employer has violated the provision(s) of this Agreement. The arbitrator will not have jurisdiction or authority to add to, amend, modify, nullify or ignore in any way the provisions of this Agreement, and will not make any award that would, in effect, grant the Union or the employee(s) any matters that were not obtained in the negotiation process.

26.7.11    The arbitrator will have the authority to subpoena and require the attendance of witnesses upon the reasonable request of either party, but not upon the arbitrator's own motion. The arbitrator will have no authority to subpoena documents, except that the arbitrator may issue a subpoena at the request of the other party for documents within the custody or control of the Employer or the Union, if, and only if, (a) the documents sought are specifically and narrowly described, and (b) the arbitrator determines that such documents are essential to a determination of a material issue in the arbitration, and are not confidential patient records, financial documents, or documents subject to an applicable privilege. The arbitrator will, in advance of the hearing date, inform each party of the identity of witnesses subpoenaed by the other party. The expense of service and appearance fees, if any, will be borne entirely by the party requesting the subpoena of witnesses.

26.7.12    Either or both parties may, at their discretion, file briefs with the arbitrator. The order and time limits of briefing will, on a case-by-case basis, be as mutually agreed upon by the parties or as specified by the arbitrator. Briefing time limits may be extended if mutually agreed upon by the parties.

26.7.13    The arbitrator will consider the evidence presented and render a written decision within thirty (30) calendar days of the close of the record of the hearing and receipt of briefs.

26.7.14    With regard to a grievance appealed to arbitration for which, in whole or in part, the remedy sought involves back wages or other monetary reimbursement, the Employer will not, in providing such remedy as a result of an arbitrator's award or a settlement, be required to make any payment of wages or any other monetary reimbursement for:

a.    Any period of time between the date a hearing was originally scheduled to be held and, due to a request from the Union (not consented to by the Employer) to postpone or change the scheduled hearing, the rescheduled date of the hearing; and

b.    The Employer will not be liable for, nor will any review or arbitration hearing concern, a claim for back wages or other financial reimbursement for any period prior to six (6) months before the filing of the formal grievance which is the subject of the claim, review or arbitration. The Employer will not be liable for any other aspect of an arbitrator's award or remedy, whether for the same or any other violation, for any period of time earlier than five (5) calendar days prior to the date of initiation of the Step 1 grievance or, if Step 1 is not used, more than thirty (30) calendar days prior to the filing of the grievance at Step 2 (nor more than seven (7) calendar days in the event of a grievance alleging a termination without cause).

26.7.15    In all cases appealed to arbitration by the Union or an employee pursuant to the terms of this Article and this Agreement, with the exception of those cases in which the issue is that of actions taken by the Employer pursuant to Article 20 - Discipline and Dismissal, the Union or the grievant will have the burden of proceeding and the burden of proof. In cases in which the issue is

67

that of actions taken by the Employer pursuant to Article 20 - Discipline and Dismissal, the Employer will have the burden of proceeding and the burden of proof.

26.7.16    Under no circumstances will any grievance involving employees engaged in the violation of Article 27 - No Strikes - be discussed or processed by the Employer to the arbitration stage or heard by an arbitrator while such violation continues. This provision will not, however, waive compliance with the time limits for filing grievances or appeals from decisions rendered with regard to grievances or appeals to the Arbitration Procedure. Any grievance settlements and arbitration awards regarding back pay and/or reinstatement of benefits for employees who engage in violations of Article 27 - No Strikes - will not be made for any period of the time during which violations of Article 27 - No Strikes - are occurring or have occurred.

26.7.17    At all steps in the Grievance Procedure and in the Arbitration Procedure, the grievant and the Union representatives will materially expedite the resolution of the grievance by disclosing to the appropriate Employer representatives a full and detailed statement of the facts relied upon, the remedies sought, and the provision(s) of the Agreement relied upon --- provided that the Union is not required to disclose information that it lacks, because the Employer has failed to provide it upon reasonable request.

26.7.18    The Union will have full authority to settle, withdraw, or otherwise dispose of any grievance brought by it on its own behalf and/or on the behalf of employees. An agreement to settle, withdraw, or otherwise dispose of a grievance appealed to arbitration reached by and between the Employer and the Union will be binding upon employees represented by the Union.

26.8    PAY STATUS

26.8.1    If the Employer convenes a meeting involving the parties to a grievance for the purposes of resolving the grievance and/or completing the steps of the Grievance Procedure enumerated above, the grievant will be in a without loss of straight time pay status during the meeting if the meeting is held during the grievant's regularly scheduled work hours. However, such time does not count as time worked for purposes of overtime compensation unless it is within the regularly scheduled hours of work of the employee.

26.8.2    Upon advance written request and approval by the Employer, a Union steward will be granted time off without loss of regular straight time pay to attend a grievance meeting convened by the Employer, if the meeting is convened during the Union steward's regular hours. Otherwise a Union steward will not be on pay status for time spent participating in meetings convened by the Employer for the purposes of grievance resolution and/or complying with the steps of the Grievance Procedure.

26.9    EXCLUSION OF RELIEF, FIXED TERM, AND TRIAL PERIOD EMPLOYEES

The discipline, retention or release of relief, fixed term, and trial period employees will not be subject to the Grievance and Arbitration Procedures of this Agreement. The

68

discipline, retention or release of relief, fixed term, and trial period employees is at the sole discretion of the Employer.

## ARTICLE 27
## NO STRIKES

27.1    During the life of this Agreement or any written extension thereof, the Union on behalf of
its officers, agents and members, agrees that there will be no strikes, slowdowns, job
actions, walkouts, work-to-rule actions, refusal to perform assigned duties, sit-downs,
sympathy strikes, sick-outs, picketing, refusal to cross picket lines, boycotts or any such
concerted activities which interfere, directly or indirectly, with the operations of the
Employer. As the sole exception to the prohibition against picketing activities, it will not
be a violation of this provision for non-employee union representatives to engage in
informational picketing adjacent to the Employer property regarding lawful subjects that
are unrelated to this Agreement and the employees covered hereunder, provided that
such informational picketing is carried out in compliance with Section 8(g) of the National
Labor Relations Act, and the signs indicate that the picketing is informational as well as
the subject matter and/or employee group that is the subject of the picketing. Any
employee who is absent from work without permission, or who abstains wholly or in part
from the full performance of his or her duties without permission, on the date or dates
when such activities indicated above occur, will be presumed to have engaged in such
activities on such date or dates. The Employer will not engage in a lockout.

27.2    The Union, its officers, agents, representatives and members and all other employees
covered by this Agreement, agree that they will not in any way, directly or indirectly,
authorize, assist, encourage, participate in, sanction, ratify, condone or lend support to
any such activities in violation of this Article.

27.3    The Employer may pursue any or all available legal recourse against the Union for
violations of this Article. The Union may be held liable and ordered to make restitution to
the Employer for all losses suffered by the Employer as a result of activity prohibited in
this Article; however, such restitution will not preclude the awarding of any other
damages to which the Employer may be entitled.

27.4    In addition to any other liability, remedy or right provided by applicable law or statute,
should any such activities in violation of this Article occur, the Union will immediately
notify employees by the best means reasonably available of its disapproval of such
action and do all within its power to require such employees to cease such action and
return to work immediately, informing them that the prohibited activity is unauthorized
and in violation of the Agreement and that their misconduct subjects them to disciplinary
action up to and including discharge.

27.5    If the Union performs in good faith and in a timely way all of the obligations of 23.4, the
Union will not be liable to the Employer for damages suffered as a result of the strike,
except for such damages as are caused by the activities of officers of the Union or with
their assistance.

70

## ARTICLE 28
## WAIVER

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and the understandings and agreements arrived at by the parties after the exercise of the right and opportunity are set forth in this Agreement. The Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other will not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered by this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

71

## ARTICLE 29
### SEVERABILITY

In the event that any provision of this Agreement is declared invalid or void by statute or judicial decision, such action will not invalidate the entire Agreement. It is the express intention of the parties that all other provisions not declared invalid or void will remain in full force and effect. In the event that any provision of this Agreement is declared invalid or void, the parties agree to meet promptly upon request of the other party in an attempt to reach an agreement on a substitute provision.

## ARTICLE 30
## MERGER

The Employer agrees to notify the Union in writing of any change in ownership, partnership or merger of the Employer or a change of the entity that operates Stanford Hospital and Clinics or Lucile Packard Children's Hospital at Stanford where work is performed by employees covered by this Agreement. If the Employer retains majority ownership and control of the new owner or such changed entity, the terms and conditions of this Agreement will be applicable to such work. In all other cases, upon the union's written request, the Employer will meet to discuss the union's recommendations and suggestions concerning the effect of the change on employees covered by this agreement. The Employer will not use any sale, transfer or other mechanism for the purpose of evading the terms of the Agreement. The Employer is obligated to notify in writing any new owner, buyer or partner of the Agreement between the Employer and SEIU, Local 715.

## ARTICLE 31
## AMENDMENTS AND TERM OF AGREEMENT

31.1    The parties may mutually agree to amend or add to any provision of this Agreement or its appendices. Any such amendment or modification must be in writing executed by the duly authorized representatives of each party, and any verbal modification or amendment will be of no force or effect.

31.2    This Agreement will be effective from January 20, 2006, and will continue in effect to and including November 4, 2008, and from year to year thereafter, unless, at least ninety (90) days prior to November 4, 2008 or at least ninety (90) days prior to any subsequent anniversary date hereafter, either party gives written notice to the other of its desire to terminate or make changes in this Agreement.

31.3    Release Time for Bargaining.  For purposes of negotiating a subsequent Agreement, paid release time will be provided for up to four (4) members of the bargaining unit for their scheduled shift to attend scheduled negotiation meetings with the Employer, provided such release time does not cause an operational hardship.  Release time will not be provided to more than one member from a particular unit.  Paid release time will include any differentials to which the employee would have been entitled and will count toward PTO accrual.

74

The foregoing Agreement between SEIU Local 715 and Stanford Hospital and Clinics and Lucile Packard Children's Hospital, having been duly approved by both parties, is hereby executed by the undersigned authorized representatives of each party this _15th_ day of _June_, 2006.

**STANFORD HOSPITAL AND CLINICS**
**AND LUCILE PACKARD CHILDREN'S HOSPITAL**

Laurence Arnold, Labor Counsel

Laurie Quintel, Manager, Employee/Labor Relations

Joan Forte, Director, Nursing Resource and Finance

Paul Watkins, Admin Director, Support Services

Madeleine Viden, Director - Finance

Deborah Zwahlen, Coordinator, Satellite Unit/Programs

Denise Lutz, Manager, Paratechnical Services

Daniel Barrio, Director, Clinical Lab Operations

**FOR SEIU LOCAL 715**

John Vellardita, Chief Negotiator, SEIU

Jesus Andrade

Mike Calderon

Jose Perez

Susan Ramirez

Cristin Thompson

Stephanie Jones

Chuck Fonseca

Rob Rutledge

Willie Vaughn

Robert Valenzuela

Jose Alavez

## APPENDIX A

### INCLUDED JOB CLASSIFICATIONS

| JOB TITLE | DEPARTMENT NAME | LOCATION |
|---|---|---|
| Anesthesia Assistant | | Stanford/Lucile Packard |
| Anesthesia Technician* | | Stanford |
| Autopsy Room Attendant II | | Stanford |
| Cardiology Technician I* | | Stanford |
| Cardiology Technician II* | | Stanford |
| Cath Angio Lab Assistant | | Stanford |
| Cook | | Stanford |
| Darkroom Technician | | Stanford |
| Data Aide III | | |
| Dialysis Aide | | Stanford |
| Dietetic Assistant | | Stanford |
| EEG Technician I* | | Stanford |
| EEG Technician II* | | Stanford |
| EEG Technician III* | | Stanford |
| Epilepsy Monitor Aide | | Stanford |
| Film Library Clerk | | Lucile Packard |
| Food Service Worker | | Stanford/Lucile Packard |
| Head Cook | | Stanford |
| Health Information Associate II | | |
| Health Information Associate III | | |
| Health Information Associate IV | | |
| Horticultural Technician | | Lucile Packard |
| Hospital Medical Transcriber | HIMS Only | Stanford |
| Hospital Technician | | |
| Housekeeping Assistant | | Stanford/Lucile Packard |
| Housekeeping Specialist | | Stanford |
| Lab Assistant II | | Stanford |
| Lab Assistant III* | | Stanford/Lucile Packard |
| Lab Asst III-P *(effective 04-01-06) | | |
| Lab Technician* | | Stanford |
| Lead Anesthesia Technician* | | |
| Lead EEG Technician* | | Stanford |
| Lead Food Service Worker | | Stanford/Lucile Packard |
| Lead Hospital Medical Transcriber | | |
| Lead Housekeeping Assistant | | Stanford/Lucile Packard |
| Lead Lab Assistant | | Lucile Packard |
| Lead Lab Assistant III-P (effective 04-01-06)* | | |
| Lead Lab Technician* | | Stanford |
| Lead Materials Assistant | Supply Distribution | Stanford |
| Lead Operating Room Assistant | | Stanford |
| Lead Operating Room Supply Technician | | Stanford |
| Lead Patient Support Assistant | | |
| Lead Radiology Scheduler | | Stanford |
| Lead Sterile Processing Tech* | | |
| Lead Support Services Assistant | | Stanford |
| Lead Transporter | | |

A-1

| | | |
|---|---|---|
| Linen Assistant | | |
| Materials Assistant I | | Stanford |
| Milieu Assistant | | Lucile Packard/El Camino |
| Milieu Counselor I* | | Lucile Packard/El Camino |
| Milieu Counselor II* | | Lucile Packard/El Camino |
| MRI Tech Aide | | |
| New Patient Coordinator | | |
| Nursing Assistant II | | |
| OA IV-Radiology Scheduler | | |
| OB Technician* | | Stanford/Lucile Packard |
| Office Assistant II-S | | |
| Office Asst. III | Warehouse | Stanford |
| Office Asst. III | Radiation Oncology – File Room | Stanford |
| Office Asst. III | Radiation Oncology – Front Desk | Stanford |
| Office Asst. III | MRI | Stanford |
| Office Asst. III | Diag. Rad. – Film Library Clerks | Stanford |
| Office Asst. III | Clin. Lab – Paratech Svcs | Stanford |
| Office Asst. III | Surgical Pathology | Stanford |
| Office Asst. III | Film Clerk – Neuro | Stanford |
| Office Asst. III | Echocardiography | Stanford |
| Office Asst. III | Rad. Onc. & BMT | Stanford |
| Office Asst. III | HIMS Information Services | Stanford |
| Office Asst. III | Diag. Rad. – Sched. Clerk | Stanford |
| Office Asst. III | Diag. Rad. – Reports Distrib. | Stanford |
| Office Asst. III | Interventional Radiology | Stanford |
| Office Asst. III | Surgical Pathology – Neuropath & Autopsy | Stanford |
| Office Asst. III | Clin Lab | Stanford |
| Office Asst. III | Periop – Statistics | Stanford |
| Office Asst. III | Emergency Services | Stanford |
| Office Asst. III-S | Lab Data Entry | Stanford |
| Office Asst. III-S | Rad. Onc. – Front Desk | Stanford |
| Office Asst. III-S | Rad. Mammo. Rad Tech Aide | Stanford |
| Office Asst. III-S | Surg. Path. – Neuro & Autopsy | Stanford |
| Office Asst. III-S | O.R. | Stanford |
| Office Asst. III-S | Rad. Onc. – File Room | Stanford |
| Office Asst. IV | Warehouse | Stanford |
| PACU Clinical Assistant | PACU | Lucile Packard |
| Patient Support Assistant I | | |
| Patient Support Assistant II | | |
| Patient Transport Technician | | Lucile Packard |
| Pediatric Clerical Lead | | |
| Pediatric EEG Technician Specialist* | | Stanford |
| Processing Equipment Technician* | | Stanford |
| Radiation Therapist Aide | | |
| Radiology Clerical Lead – LP | | Packard |
| Radiology Technician Aide | | Stanford |
| Resource Scheduler, Radiology | | |

| Respiratory Care Assistant | | |
|---|---|---|
| Scheduling Clerk | Patient Transport | Lucile Packard |
| Scheduling Clerk | Radiology Diagnostic | Lucile Packard |
| Scheduling Clerk | Ambulatory Proc. Unit | Lucile Packard |
| Sr. Food Service Worker* | | Stanford/Lucile Packard |
| Sr. Housekeeping Assistant* | | Stanford |
| Sr. Housekeeping Specialist* | | Stanford |
| Sterile Processing Tech I* | | |
| Sterile Processing Tech II* | | |
| Storekeeper | Dietary | Stanford |
| Support Services Assistant I | | Stanford/Lucile Packard |
| Support Services Assistant II | | Stanford |
| Support Services Assistant II | F2 Antepartum Postpartum Nurse | Lucile Packard |
| Transporter | | Stanford |
| Unit Facilitator | | Lucile Packard |
| Unit Secretary* | | Stanford/Lucile Packard |

A-3

**EXCLUDED JOB CLASSIFICATIONS**

| JOB TITLE | DEPARTMENT NAME |
|---|---|
| Admitting Representative | |
| All Other Clinic Assistant Is | |
| All Other Clinic Assistant IIs | |
| All Other Clinic Assistant IIIs | |
| Clinic Asst. II | HAND |
| Clinic Courier | |
| Communications Asst. | |
| Greeter | Pt. Relation/Volunteer |
| Host/Greeter | Parking Lot |
| Lab Asst. III | REI Lab |
| Lead Mail Courier | Mail Service |
| Lead Materials Assistant | Dock Services |
| Mail Courier | |
| Mail/Duplication Tech | Copy Center |
| Medical Records Asst. III | |
| Med. Transcriber | MRI |
| Med. Transcriber | Radiation Therapy |
| Med. Transcriber | Neurodiagnostics Lab |
| Med. Transcriber | Medical Oncology |
| Med. Transcriber | Surgical Specialties Clinic |
| Med. Transcriber | Diagnostic Radiology |
| Med. Transcriber | Radiation Onc-outpatient |
| Parking Assistance Officer | |
| Patient Admitting Rep | |
| Prk & CAO Coord | |
| PSCAS Attendant | |
| Rehab Services Aide | |
| Rehab Services Lead | |
| Service Host | |
| Sr. Medical Records Tech | Stanford |
| Telecommunications Operator | |
| Transportation Tech | Transportation |
| Unit Secretary II | Partial Hospitalization |
| Urology Tech Specialist | Urology Surgery |
| All Medical Records Coders | |
| All other OA-Is | |
| All other OA-IIs | |
| All other OA-IIIs | |
| All other OA-III-Specialists | |
| All other OA-IVs | |
| All Secretary-Is | |
| All Secretary-IIs | |
| All Secretary-IIIs | |

Relief job classifications/positions which correspond directly to Regular positions specifically listed in this Appendix A as included in the bargaining unit will be considered a part of the bargaining unit. Relief job classifications/positions which correspond directly to Regular positions specifically listed in this Appendix A as excluded from the bargaining unit, and all other relief positions, will not be considered a part of the bargaining unit.

A-4

CLASSIFICATION PAY GRADES/JOB CODES

| PAY GRADE | CLASSIFICATIONS | JOB CODE |
|---|---|---|
| SEIU005 | Food Service Worker | 800045 |
| | Housekeeping Assistant | 800034 |
| | Linen Assistant | 800133 |
| | Patient Support Assistant I | 800104 |
| | Support Services Assistant I | 800059 |
| | Transporter | 800092 |
| | Unit Facilitator | 800106 |
| SEIU006 | Housekeeping Specialist | 800037 |
| | MRI Technician Aide | 700006 |
| | Sr. Food Service Worker | 800048 |
| | Sr. Housekeeping Assistant | 800036 |
| SEIU007 | Darkroom Technician | 700035 |
| | Health Information Associate II | 600211 |
| | Materials Assistant I | 800071 |
| | Office Assistant II-S | 600231 |
| | Patient Support Assistant II | 800105 |
| | Patient Transport Technician | 800093 |
| | Sr. Housekeeping Specialist | 800038 |
| | Support Services Assistant II | 800060 |
| SEIU008 | Anesthesia Assistant | 700001 |
| | Cath Angio Lab Assistant | 700002 |
| | Cook | 800042 |
| | Dialysis Aide | 700003 |
| | Data Aide III | 600238 |
| | Dietetic Assistant | 800044 |
| | Epilepsy Monitor Aide | 700004 |
| | Film Library Clerk | 600043 |
| | Health Information Associate III | 600212 |
| | Lab Assistant II | 700027 |
| | Lead Food Service Worker | 800046 |
| | Lead Housekeeping Assistant | 800033 |
| | Lead Patient Support Assistant | 800131 |
| | Lead Support Services Assistant | 800108 |
| | Lead Transporter | 800013 |
| | Lift Team Member | 700015 |
| | Office Assistant III | 600232 |
| | Operating Room Assistant | 700011 |
| | Radiation Therapist Aide | 700059 |
| | Radiology Technician Aide | 700007 |

A-5

| SEIU009 | Lab Assistant III | 700029 |
|---|---|---|
| | Lead Materials Assistant | 800097 |
| | Lead Operating Room Assistant | 700014 |
| | Milieu Assistant | 700039 |
| | Nursing Assistant II | 700020 |
| | Office Assistant III-S | 600233 |
| | PACU Clinical Assistant | 500241 |
| | Respiratory Care Assistant | 700069 |
| | Scheduling Clerk | 600098 |
| | Sterile Processing Tech I | 700072 |
| | Storekeeper | 800080 |
| | Unit Secretary | 600147 |
| SEIU010 | Cardiology Technician I | 500012 |
| | Head Cook | 800043 |
| | Horticultural Technician | 800040 |
| | Hospital Technician | 700042 |
| | Lab Assistant III-P (effective 04-01-06) | TBD |
| | Lead Lab Assistant | 700032 |
| | Milieu Counselor I | 500061 |
| | New Patient Coordinator | 600254 |
| | OB Technician | 700054 |
| | Pediatric Clerical Lead | 600262 |
| | Resource Scheduler, Radiology | 600255 |
| | Sterile Processing Tech II | 700013 |
| SEIU011 | Anesthesia Tech | 500008 |
| | Cardiology Technician II | 500013 |
| | Health Information Associate IV | 600214 |
| | Hospital Medical Transcriber | 600160 |
| | Lead Lab Assistant III-P (effective 04-01-06) | TBD |
| | Lead Sterile Processing Tech | 700012 |
| | Office Assistant IV | 600234 |
| | Office Assistant IV - Radiology Scheduler | 600077 |
| | Processing Equipment Technician | 700036 |

| SEIU012 | Lab Technician | 700066 |
|---------|----------------|--------|
|         | Lead Anesthesia Technician | 500281 |
|         | Lead Radiology Scheduler | 600076 |
|         | Radiology Clerical Lead - LP | 600269 |
|         | Milieu Counselor II | 500063 |
| SEIU013 | Autopsy Room Attendant II | 700050 |
|         | Lead Hospital Medical Transcriber | 600069 |
|         | Lead Lab Technician | 700034 |
| SEIU014 | EEG Technician I | 500015 |
| SEIU015 | EEG Technician II | 500017 |
|         | Pediatric EEG Technician Specialist | 500019 |
| SEIU016 | EEG Technician III | 500018 |
| SEIU018 | Lead EEG Technician | 500016 |

**APPENDIX B-1 Pay Ranges**
**INITIAL WAGE RANGE TO WAGE SCALE CONVERSION CHART**

| GRADE | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 | Step 11 | Step 12 | Step 13 | Step 14 | Step 15 (Max.) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SEIU00 1 | $11.30 | $11.53 | $11.75 | $11.99 | $12.23 | $12.48 | $12.74 | $12.99 | $13.25 | $13.50 | $13.78 | $14.04 | $14.32 | $14.62 | $14.92 |
| SEIU00 2 | $11.87 | $12.11 | $12.34 | $12.59 | $12.84 | $13.10 | $13.37 | $13.64 | $13.91 | $14.19 | $14.47 | $14.75 | $15.05 | $15.35 | $15.66 |
| SEIU00 3 | $12.46 | $12.72 | $12.96 | $13.22 | $13.47 | $13.74 | $14.02 | $14.30 | $14.58 | $14.89 | $15.18 | $15.50 | $15.80 | $16.12 | $16.44 |
| SEIU00 4 | $13.08 | $13.35 | $13.62 | $13.89 | $14.16 | $14.45 | $14.73 | $15.03 | $15.32 | $15.62 | $15.94 | $16.26 | $16.59 | $16.93 | $17.26 |
| SEIU00 5 | $13.73 | $14.01 | $14.29 | $14.57 | $14.87 | $15.17 | $15.49 | $15.79 | $16.11 | $16.42 | $16.75 | $17.08 | $17.42 | $17.78 | $18.12 |
| SEIU00 6 | $14.44 | $14.72 | $15.02 | $15.31 | $15.61 | $15.92 | $16.23 | $16.57 | $16.91 | $17.24 | $17.58 | $17.93 | $18.29 | $18.66 | $19.04 |
| SEIU007 | $15.13 | $15.45 | $15.75 | $16.08 | $16.39 | $16.72 | $17.04 | $17.39 | $17.73 | $18.09 | $18.46 | $18.83 | $19.20 | $19.59 | $19.98 |
| SEIU00 8 | $15.89 | $16.20 | $16.54 | $16.86 | $17.21 | $17.55 | $17.90 | $18.26 | $18.63 | $19.01 | $19.37 | $19.76 | $20.16 | $20.56 | $20.99 |
| SEIU00 9 | $16.71 | $17.03 | $17.38 | $17.72 | $18.08 | $18.45 | $18.81 | $19.18 | $19.57 | $19.95 | $20.36 | $20.76 | $21.19 | $21.60 | $22.04 |
| SEIU00 10 | $17.54 | $17.89 | $18.25 | $18.62 | $18.99 | $19.36 | $19.75 | $20.15 | $20.54 | $20.96 | $21.37 | $21.81 | $22.23 | $22.68 | $23.13 |
| SEIU00 11 | $18.41 | $18.77 | $19.14 | $19.54 | $19.92 | $20.32 | $20.73 | $21.14 | $21.57 | $22.00 | $22.44 | $22.90 | $23.35 | $23.81 | $24.30 |
| SEIU00 12 | $19.33 | $19.71 | $20.12 | $20.51 | $20.93 | $21.34 | $21.78 | $22.20 | $22.65 | $23.10 | $23.56 | $24.05 | $24.52 | $25.01 | $25.50 |
| SEIU00 13 | $20.31 | $20.72 | $21.12 | $21.55 | $21.97 | $22.42 | $22.87 | $23.31 | $23.78 | $24.26 | $24.75 | $25.24 | $25.75 | $26.25 | $26.78 |
| SEIU00 14 | $21.29 | $21.74 | $22.16 | $22.61 | $23.05 | $23.52 | $23.98 | $24.47 | $24.95 | $25.45 | $25.96 | $26.48 | $27.02 | $27.56 | $28.12 |
| SEIU00 15 | $22.39 | $22.83 | $23.28 | $23.75 | $24.22 | $24.72 | $25.21 | $25.71 | $26.22 | $26.78 | $27.28 | $27.83 | $28.38 | $28.95 | $29.53 |
| SEIU00 16 | $23.50 | $23.96 | $24.44 | $24.93 | $25.43 | $25.94 | $26.46 | $27.00 | $27.54 | $28.10 | $28.65 | $29.22 | $29.80 | $30.39 | $31.01 |
| SEIU00 17 | $24.68 | $25.17 | $25.66 | $26.18 | $26.70 | $27.24 | $27.78 | $28.34 | $28.91 | $29.48 | $30.07 | $30.67 | $31.29 | $31.91 | $32.55 |
| SEIU00 18 | $25.91 | $26.44 | $26.97 | $27.51 | $28.06 | $28.61 | $29.18 | $29.76 | $30.35 | $30.94 | $31.56 | $32.19 | $32.84 | $33.51 | $34.17 |

**APPENDIX B-2 Pay Ranges**

EFFECTIVE THE PAY PERIOD NEXT FOLLOWING JANUARY 20, 2006

| GRADE | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 | Step 11 | Step 12 | Step 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SEIU005 | 15.22 | 15.52 | 15.84 | 16.16 | 16.50 | 16.82 | 17.16 | 17.49 | 17.84 | 18.19 | 18.55 | 18.94 | 19.30 |
| SEIU006 | 16.00 | 16.31 | 16.62 | 16.95 | 17.28 | 17.65 | 18.01 | 18.36 | 18.72 | 19.10 | 19.48 | 19.87 | 20.28 |
| SEIU007 | 16.38 | 16.72 | 17.05 | 17.39 | 17.72 | 18.09 | 18.44 | 18.81 | 19.20 | 19.58 | 19.97 | 20.37 | 20.78 |
| SEIU008 | 17.20 | 17.53 | 17.90 | 18.25 | 18.62 | 18.99 | 19.38 | 19.77 | 20.14 | 20.55 | 20.97 | 21.38 | 21.83 |
| SEIU009 | 18.08 | 18.43 | 18.80 | 19.19 | 19.56 | 19.95 | 20.35 | 20.75 | 21.17 | 21.59 | 22.04 | 22.46 | 22.92 |
| SEIU010 | 18.98 | 19.36 | 19.75 | 20.13 | 20.54 | 20.96 | 21.36 | 21.80 | 22.22 | 22.68 | 23.12 | 23.59 | 24.06 |
| SEIU011 | 19.91 | 20.32 | 20.72 | 21.13 | 21.56 | 21.99 | 22.43 | 22.88 | 23.34 | 23.82 | 24.28 | 24.76 | 25.27 |
| SEIU012 | 20.92 | 21.33 | 21.77 | 22.19 | 22.65 | 23.09 | 23.56 | 24.02 | 24.50 | 25.01 | 25.50 | 26.01 | 26.52 |
| SEIU013 | 21.96 | 22.41 | 22.85 | 23.32 | 23.78 | 24.24 | 24.73 | 25.23 | 25.74 | 26.25 | 26.78 | 27.30 | 27.85 |
| SEIU014 | 23.05 | 23.51 | 23.97 | 24.46 | 24.94 | 25.45 | 25.95 | 26.47 | 27.00 | 27.54 | 28.10 | 28.66 | 29.24 |
| SEIU015 | 24.21 | 24.70 | 25.19 | 25.71 | 26.22 | 26.74 | 27.27 | 27.81 | 28.37 | 28.94 | 29.52 | 30.11 | 30.71 |
| SEIU016 | 25.42 | 25.93 | 26.45 | 26.98 | 27.52 | 28.08 | 28.64 | 29.22 | 29.80 | 30.39 | 30.99 | 31.61 | 32.25 |
| SEIU017 | 26.69 | 27.23 | 27.77 | 28.33 | 28.89 | 29.47 | 30.07 | 30.66 | 31.27 | 31.90 | 32.54 | 33.19 | 33.85 |
| SEIU018 | 28.05 | 28.61 | 29.18 | 29.75 | 30.35 | 30.95 | 31.56 | 32.18 | 32.82 | 33.48 | 34.15 | 34.85 | 35.54 |

**APPENDIX B-3 Pay Ranges**

**EFFECTIVE THE PAY PERIOD NEXT FOLLOWING NOVEMBER 4, 2006**

| GRADE | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 | Step 11 | Step 12 | Step 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SEIU005 | 15.83 | 16.14 | 16.47 | 16.81 | 17.16 | 17.49 | 17.85 | 18.19 | 18.55 | 18.92 | 19.29 | 19.70 | 20.07 |
| SEIU006 | 16.64 | 16.96 | 17.28 | 17.63 | 17.97 | 18.36 | 18.73 | 19.09 | 19.47 | 19.86 | 20.26 | 20.66 | 21.09 |
| SEIU007 | 17.04 | 17.39 | 17.73 | 18.09 | 18.43 | 18.81 | 19.18 | 19.56 | 19.97 | 20.36 | 20.77 | 21.18 | 21.61 |
| SEIU008 | 17.89 | 18.23 | 18.62 | 18.98 | 19.36 | 19.75 | 20.16 | 20.56 | 20.95 | 21.37 | 21.81 | 22.24 | 22.70 |
| SEIU009 | 18.80 | 19.17 | 19.55 | 19.96 | 20.34 | 20.75 | 21.16 | 21.58 | 22.02 | 22.45 | 22.92 | 23.36 | 23.84 |
| SEIU010 | 19.74 | 20.13 | 20.54 | 20.94 | 21.36 | 21.80 | 22.21 | 22.67 | 23.11 | 23.59 | 24.04 | 24.53 | 25.02 |
| SEIU011 | 20.71 | 21.13 | 21.55 | 21.98 | 22.42 | 22.87 | 23.33 | 23.80 | 24.27 | 24.77 | 25.25 | 25.75 | 26.28 |
| SEIU012 | 21.76 | 22.18 | 22.64 | 23.08 | 23.56 | 24.01 | 24.50 | 24.98 | 25.48 | 26.01 | 26.52 | 27.05 | 27.58 |
| SEIU013 | 22.84 | 23.31 | 23.76 | 24.25 | 24.73 | 25.21 | 25.72 | 26.24 | 26.77 | 27.30 | 27.85 | 28.39 | 28.96 |
| SEIU014 | 23.97 | 24.45 | 24.93 | 25.44 | 25.94 | 26.47 | 26.99 | 27.53 | 28.08 | 28.64 | 29.22 | 29.81 | 30.41 |
| SEIU015 | 25.18 | 25.69 | 26.20 | 26.74 | 27.27 | 27.81 | 28.36 | 28.92 | 29.50 | 30.10 | 30.70 | 31.31 | 31.94 |
| SEIU016 | 26.44 | 26.97 | 27.51 | 28.06 | 28.62 | 29.20 | 29.79 | 30.39 | 30.99 | 31.61 | 32.23 | 32.87 | 33.54 |
| SEIU017 | 27.76 | 28.32 | 28.88 | 29.46 | 30.05 | 30.65 | 31.27 | 31.89 | 32.52 | 33.18 | 33.84 | 34.52 | 35.20 |
| SEIU018 | 29.17 | 29.75 | 30.35 | 30.94 | 31.56 | 32.19 | 32.82 | 33.47 | 34.13 | 34.82 | 35.52 | 36.24 | 36.96 |

**APPENDIX B-4 Pay Ranges**

EFFECTIVE THE PAY PERIOD NEXT FOLLOWING NOVEMBER 4, 2007

| GRADE | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 | Step 11 | Step 12 | Step 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SEIU005 | 16.46 | 16.79 | 17.13 | 17.48 | 17.85 | 18.19 | 18.56 | 18.92 | 19.29 | 19.68 | 20.06 | 20.49 | 20.87 |
| SEIU006 | 17.31 | 17.64 | 17.97 | 18.34 | 18.69 | 19.09 | 19.48 | 19.85 | 20.25 | 20.65 | 21.07 | 21.49 | 21.93 |
| SEIU007 | 17.72 | 18.09 | 18.44 | 18.81 | 19.17 | 19.56 | 19.95 | 20.34 | 20.77 | 21.17 | 21.60 | 22.03 | 22.47 |
| SEIU008 | 18.61 | 18.96 | 19.36 | 19.74 | 20.13 | 20.54 | 20.97 | 21.38 | 21.79 | 22.22 | 22.68 | 23.13 | 23.61 |
| SEIU009 | 19.55 | 19.94 | 20.33 | 20.76 | 21.15 | 21.58 | 22.01 | 22.44 | 22.90 | 23.35 | 23.84 | 24.29 | 24.79 |
| SEIU010 | 20.53 | 20.94 | 21.36 | 21.78 | 22.21 | 22.67 | 23.10 | 23.58 | 24.03 | 24.53 | 25.00 | 25.51 | 26.02 |
| SEIU011 | 21.54 | 21.98 | 22.41 | 22.86 | 23.32 | 23.78 | 24.26 | 24.75 | 25.24 | 25.76 | 26.26 | 26.78 | 27.33 |
| SEIU012 | 22.63 | 23.07 | 23.55 | 24.00 | 24.50 | 24.97 | 25.48 | 25.98 | 26.50 | 27.05 | 27.58 | 28.13 | 28.68 |
| SEIU013 | 23.75 | 24.24 | 24.71 | 25.22 | 25.72 | 26.22 | 26.75 | 27.29 | 27.84 | 28.39 | 28.96 | 29.53 | 30.12 |
| SEIU014 | 24.93 | 25.43 | 25.93 | 26.46 | 26.98 | 27.53 | 28.07 | 28.63 | 29.20 | 29.79 | 30.39 | 31.00 | 31.63 |
| SEIU015 | 26.19 | 26.72 | 27.25 | 27.81 | 28.36 | 28.92 | 29.49 | 30.08 | 30.68 | 31.30 | 31.93 | 32.56 | 33.22 |
| SEIU016 | 27.50 | 28.05 | 28.61 | 29.18 | 29.76 | 30.37 | 30.98 | 31.61 | 32.23 | 32.87 | 33.52 | 34.18 | 34.88 |
| SEIU017 | 28.87 | 29.45 | 30.04 | 30.64 | 31.25 | 31.88 | 32.52 | 33.17 | 33.82 | 34.51 | 35.19 | 35.90 | 36.61 |
| SEIU018 | 30.34 | 30.94 | 31.56 | 32.18 | 32.82 | 33.48 | 34.13 | 34.81 | 35.50 | 36.21 | 36.94 | 37.69 | 38.44 |

## APPENDIX C

### UNITS OF LAYOFF

STANFORD HOSPITAL

| Med Surg | Critical Care | HIMS (Med Rec.) |
|---|---|---|
| 87202 Nursing Float | 61512 B2 | |
| 61711 B1 | 70101 Emergency Services | 87003 Data Archives & Ware |
| 87203 CIRU Administration | 61532 IICU | 87004 Document Support |
| 61713 B3 | 61531 D1/CSU | 87005 Info Services |
| 61750 FGround | 60152 NICU | 87006 Coding & Data Report |
| 61753 F3 | 60142 E2/ICU | |
| 64421 CIRU Nursing | 73904 B2 Outpatient | **Ambulatory** |
| 61730 DGround | | 77402 Renal Acute |
| 61723 C3 | | 77601 Endoscopy |
| 78701 Cast Room | | 73902 Ambulatory Treatment |
| 61743 C2 | **OR** | |
| 73903 Bone Marrow O/P Treat. | 74201 Operating Room | **Dietary & Cafeteria** |
| 61733 E3 | 74202 Surgical Admission | 83401 Dietary |
| 61541 E1/CHU | 74301 Ambulatory Surgery Cntr | 83301 Cafeteria |
| | 74501 Anesthesia | |
| **Psych** | 74203 Post Anesthesia Recovery | |
| 63462 G2P | | |
| 61771 GCRC | | |
| 77704 CIRU-PT | | |
| 63472 H2 (NOB) | | |

NOTE: Except as provided above, each "cost center" represents a separate "unit of layoff"

**LUCILE PACKARD CHILDREN'S HOSPITAL**

| Perinatal | |
|---|---|
| F2 Antepartum/Postpartum | 63800 |
| Well Baby Nursery | 65300 |
| Labor & Delivery | 74000 |
| | |
| **NICU/IICN** | |
| IICN | 60510 |
| NICU | 60700 |
| | |
| **Pediatrics** | |
| PICU | 60500 |
| CVICU (new) | 60520 |
| 2 North – Med/Surg | 62000 |
| 3 West – Tx/Cardiac/ENT | 62010 |
| 3 East Med/Surg | 62020 |
| 3 North – 3 South / Med | 62030 |
| ECH – CPCU (El Camino) | 62040 |
| Nursing Float Personnel | 87300 |

NOTE:  Except as provided above, each "cost center" represents a separate "unit of layoff"

**SIDE LETTER OF AGREEMENT**
**BETWEEN**
**SHC/LPCH**
**AND**
**SEIU LOCAL 715**
**RE: PARKING**

The Employer and SEIU Local 715 agree that adequate parking systems, shuttle services, car pools and other transit options are in the best interest of Stanford and Lucile Packard Hospitals and Clinics and their employees. Issues concerning parking and transportation programs and systems may be placed on the agenda of the Management and Labor Committee.

The parties recognize that Stanford University is responsible for parking and transit programs, and the Employer will advise the Union of any changes in such programs when it is notified thereof by the University.

**SIDE LETTER OF AGREEMENT**
**BETWEEN**
**SHC/LPCH**
**AND**
**SEIU LOCAL 715**
**RE: UNION ACCESS**

The Parties agree that after a period of six (6) months, either side may from time to time request a meeting to discuss issues arising in connection with Article 24.1, and if they agree that changes are appropriate, may amend that Section if necessary.

E-1

**SIDE LETTER OF AGREEMENT
BETWEEN
SHC/LPCH
AND
SEIU LOCAL 715
RE: NORTH CAMPUS**

During the life of the January 20, 2006 – November 4, 2008 Agreement between the parties, the Employer agrees that no employee in the bargaining unit represented by SEIU, Local 715 will be required to transfer to the North Campus (Redwood City facilities) and no bargaining unit employee employed in a classification comparable to one created at the North Campus will be laid off as the result of the opening of the North Campus.

**Exhibit B**

IN ARBITRATION PROCEEDINGS PURSUANT TO THE CURRENT COLLECTIVE
BARGAINING AGREEMENT BETWEEN THE PARTIES

In the Matter of Arbitration    )
    )
between    )   OPINION AND DECISION
    )
STANFORD HOSPITAL AND CLINICS    )
    )   OF
    )
and    )
    )
    )   PAUL D. STAUDOHAR
SERVICE EMPLOYEES INTERNATIONAL)   Arbitrator
UNION, LOCAL 715    )
    )   FMCS Case No. 06-59192
    )
    )
Grievance of Anesthesia Techs;    )
Relief Pay in Higher Classifications    )
    )

FOLEY & LARDNER LLP
RECEIVED

JUL 0 3 2007

APPEARANCES:

FOR THE EMPLOYER

LAURENCE R. ARNOLD, ESQ.
SCOTT P. INCIARDI, ESQ.
Foley & Lardner LLP
One Maritime Plaza, Sixth Floor
San Francisco, California 94511

FOR THE UNION

VINCENT A. HARRINGTON, JR., ESQ.
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, California 94501

2

This is an arbitration to determine whether Anesthesia Technicians are entitled to receive a five percent pay differential when assigned the duty of carrying a Spectralink telephone. The Parties to this arbitration are STANFORD HOSPITAL AND CLINICS (hereinafter called "Employer") and SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715 (hereinafter called "Union").

The Arbitrator was appointed by letter of December 19, 2006, from Counsel for the Union with a copy to Counsel for the Employer. At the request of the Union, three Subpoenas were signed by the Arbitrator on April 16, 2007, regarding attendance of witnesses at the arbitration hearing. The hearing was conducted on April 24, 2007, at the Offices of Counsel for the Employer, 1530 Page Mill Road, Palo Alto, California. A transcript of the hearing was made by a Certified Shorthand Reporter. Testimony was received under oath from two Union witnesses and two Employer witnesses, who were submitted to full examination and cross-examination by Counsel. Five joint exhibits, no Union exhibits, and five Employer exhibits were introduced into the record. Post-hearing briefs were received by June 11, 2007.

## Case Background

The Employer is recognized as a worldwide leader in advanced patient care, particularly for treatment of rare and complex disorders. Anesthesia at its hospital is principally administered in the Main Operating Room, which is divided into 21 individual operating rooms. The Anesthesia Department is located in this area and constitutes the principal workshop, supply storage area, and home-base of Anesthesia Techs (hereinafter called ATs). The job duties of the ATs include assisting anesthesiologists; providing equipment, supplies, and materials; assisting with patient care; setting up operating

3

rooms; setting up and operating the Cell-Saver, a machine to recirculate the patient's own blood during the course of an operation; and responding to specific requests from anesthesiologists and nurses.

There is also a position called Lead Anesthesia Tech (Lead) which has existed in the past but is not at present filled. The Lead assists the department's manager in a variety of ways, including evaluating the performance of ATs, monitoring their work schedules, interviewing ATs, and making assignment changes. After being filled for approximately a year, since March 2007 the Lead position has been vacant, although it continues to exist and the Employer intends to fill it. The manager of the Anesthesia Department, since January 2007, is Diane Alejandro, who previously worked for the employer as an AT. In addition to her regular job duties, Ms. Alejandro handles functions formerly performed by the Lead.

There are several ways in which communications among ATs, and between ATs and other medical personnel, take place. These include conventional telephones, over-head pager, portable pager, call lights, and person-to-person contact. This case involves a Spectralink telephone, a portable device that essentially operates in the same fashion as a cellular telephone. On each of the three shifts a particular AT is assigned to carry a Spec-tralink. Assignments are made on a rotational basis, so all ATs handle the Spectralink at one time or another. Whereas in the past the Spectralink was assigned to an individual on a weekly basis, currently this is done on a daily basis so that a different AT carries it every day. In the Main Operating Room there are typically five or six ATs working the day shift, three or four on the evening shift, and two on the night shift. When the shifts change the AT handing over the Spectralink to the AT on the new shift provides a report of the status of various cases.

4

Prior to the advent of the Spectralink, one AT per shift carried a pager, which made work rather more difficult because once a page was received the AT had to locate a telephone to respond to the pager. When the pager was used and for about two to three years after the Spectralink superseded the pager, the AT who carried the phone received additional pay of five percent of base pay. These payments were made during the time that Robert Powell was the Anesthesia Department Manager. Mr. Powell was succeeded as manager by Alice Beltran. Ms. Beltran had no prior managerial experience and therefore was provided comprehensive training by Sheryl Michelson, the Employer's Manager of Perioperative Education.

During the course of this training Ms. Michelson and Ms. Beltran discovered discrepancies in the department's budget. They realized that some of the ATs were receiving the five percent differential under "relief in higher classification" (RHC). When Ms. Beltran contacted the Employer's Human Resource Department about the differential, she was told that the prior payment for RHC was in error and should be discontinued. Accordingly, Ms. Beltran informed the ATs that effective February 17, 2006, the five percent differential previously paid to those who carried the Spectralink phone was discontinued.

As a result, the Union filed a grievance on behalf of all affected ATs, claiming that elimination of the five percent pay differential was in violation of Article 9 of the collective bargaining agreement.

<u>Collective Bargaining Agreement and Provisions</u>

The following provisions of the Parties' negotiated agreement for 2006-2008 are particularly relevant:

5

## ARTICLE 2
## MANAGEMENT RIGHTS

***Except only as limited by express provisions of this Agreement,*** all of an employer's rights and prerogatives, whether previously exercised or unexercised and whether implied or expressed, will be retained and reserved by the Employer, and will remain within its exclusive direction and control. For purposes of illustration only and not to limit the foregoing in any way, management will have the right, ***subject only to said express limiting provisions of this Agreement:***

a)   to manage the hospitals, laboratories, clinics, warehouses and other facilities and operations in which employees covered by this Agreement work;

b)   to direct and assign the work force;

c)   to transfer, reassign, promote and demote employees;

d)   to establish standards of performance, health and safety and quality of service, and to evaluate employee performance;

e)   to maintain discipline, order and efficiency;

f)   to determine medical, patient care and operational standards, procedures and methods; to schedule work;

g)   to abolish, create, alter or combine job classifications;

h)   to introduce new or improved methods, equipment, facilities or operations;

i)   to determine efficient and effective staffing requirements;

j)   to determine the number and location of facilities and operations;

k)   to determine whether the whole or any part of an operation will continue to operate;

l)   to determine whether a vacancy exists and whether and when it will be filled;

m)   to require overtime work, when needed, consistent with employee health and safety;

n)   to transfer or subcontract work for legitimate business reasons but, except in emergencies, only after affording the Union a reasonable opportunity to meet and discuss with management effects of the proposed transfer or subcontracting;

o)   to select and hire employees;

p)   to determine qualifications for positions;

q)   to demote, suspend, warn, discharge or otherwise discipline employees;

r)   to lay off or relieve employees from duty for lack of work or other legitimate reasons;

s)   to rehire employees;

t)   to determine whether employees, both within and without the bargaining unit, will or will not perform certain functions, duties or tasks;

6

u)    to promulgate, eliminate or revise reasonable rules and regulations relating to the terms and conditions of employment and the manner of operations, provided only that they do not conflict with the express provisions of this Agreement.

The Employer may, in its discretion, continue any current policies and practices *which do not conflict with express written provisions of this Agreement.* (Jt. Exh. 1, emphasis in the original).

...

### ARTICLE 9
### TEMPORARY ASSIGNMENT

9.1    An employee temporarily assigned by the Employer to perform the typical duties of a position in a higher pay grade for four (4) consecutive hours or more will receive a differential of five percent (5%) for each grade above the grade of the employee's regular classification for all hours during which the employee is so assigned (e.g., if an employee in grade SEIU0006 is assigned to a position in SEIU0008 the employee will receive a differential of ten percent (10%)). As an exception, if an employee is assigned by the Employer to a position in a lead classification listed in Appendix A and to perform all of the duties thereof, the employee will be paid a lead premium of five percent (5%) for the actual hours worked in the lead position provided the lead position is in a classification in a higher wage range than the employee's regular classification or position.

...

### ARTICLE 26
### GRIEVANCE AND ARBITRATION PRECEDURE

...

26.7.3    The Arbitrator's authority will be limited to interpreting the specific provisions of this Agreement and will have no power to add to, subtract from, or to change any part of the terms or conditions of this Agreement. If the grievance is sustained in whole or in part, the remedy will not exceed restoring to the employee the pay, benefits, or rights lost as a result of a violation of the Agreement, less any compensation from any source, including, but not limited to, Workers' Compensation and Unemployment insurance benefits. The decision of the arbitrator, within the limits described herein, will be final and binding upon the parties and will be the exclusive remedy for the subject matter of the grievance.

...

26.7.10    The decision of the arbitrator on any issue properly before the arbitrator will be final and binding upon the Employer, the Union and all employees.

7

> The arbitrator's authority will be limited to determining whether the Employer has violated the provision(s) of this Agreement. The arbitrator will not have jurisdiction or authority to add to, amend, modify, nullify, or ignore in any way the provisions of this Agreement, and will not make any award that would, in effect, grant the Union or the employee(s) any matters that were not obtained in the negotiation process.
>
> ...

### Position of the Union

In its post-hearing brief, the Union cites the testimony of ATs Gerald Ashford and Paul Granados, to the effect that there was a long-standing pay practice providing a five percent differential to ATs who carried the Spectralink phone. The basis for the extra pay is said to be Article 9.1 of the agreement which refers to temporary assignment for work in a higher pay grade and performance of work in a lead classification.

The Union notes that in addition to one's regular duties as an AT, the person assigned to the Spectralink phone must immediately respond to these phone calls. If supplies are needed, for example, one would stop what he or she is doing, retrieve the item, and take it to the doctor. Also, immediate response is necessary to deal with cancellations, add-ons, and room changes. About 40-50 calls per shift would come through on the Spectralink phone. Although the Employer stopped paying the differential, the Union contends that the duties associated with the assignment did not change.

Similar to Mr. Ashford, Mr. Granados carried the Spectralink phone on all three shifts and the assignment was essentially the same on each. The Union notes that Granados, who is also a Shop Steward, received the differential whenever he was assigned to the Spectralink phone. As Granados was trained, the Spectralink phone took priority and he would go back to his regular work only when he had taken care of the call on the Spectralink.

The Union notes that although there is an assignment to carry Spectralink phones in other departments, the scope and extent of the duties in these other assignments is minimal

8

compared to the heavy load in the Main Operating Room. Other departments also typically have far simpler cases, which makes shifts easier at those locations.

Mr. Granados' testimony in his capacity as Shop Steward is cited by the Union to indicate that ATs told him that when the Lead position was filled it had no impact on their workload. Further, when Granados was at the staff meeting where the termination of the differential was announced, the reason given by the Employer was that differential pay was not placed within the new contract. Yet, says the Union, despite the Employer's unilateral act in rescinding the differential, the duties remain the same.

The testimony of Ashford and Granados is said to be corroborated by that of Ms. Alejandro, the current manager and former AT. She received the differential when she carried the Spectralink and got about the same volume of calls on that phone as the others did. She also corroborated that the additional Spectralink calls were on top of her regularly assigned duties.

A long-standing practice is said to have existed in which management approved the RHC pay for the Spectralink assignment, and that this occurred both before and after the negotiation of the current collective bargaining agreement. Yet, argues the Union, the Employer unilaterally changed the practice and withdrew the differential without obtaining the consent of the Union. There was never a proposal made at the bargaining table by the Employer to terminate or withdraw this benefit.

As a remedy, the Union requests that the five percent differential be reestablished and that the Employer make all adversely affected employees whole for wages and lost benefits. The Employer should also be directed to cease and desist from modifying this practice until the Union agrees to do so or the Employer obtains a modification of contract language through good faith bargaining.

9

### Position of the Employer

In its post-hearing brief, the Employer notes that carrying the Spectralink phone does not give an AT any authority over other ATs. The AT with the phone can only request another AT's assistance but cannot reassign or direct performance of a task. Compared to the previous practice of using pagers, which necessitated finding a telephone to respond to the page, the use of the Spectralink reduces the amount of time required by the AT to respond to messages.

The Employer contends that while the grievance was initially filed on behalf of all ATs, at the Step 2 hearing the Union indicated that its claim was limited to ATs carrying the Spectralink on the evening shift, and not on the day shift. Then, during the arbitration hearing the Union said its claim was limited to those ATs who carry the Spectralink while assigned to the Main Operating Room.

It is said to be undisputed that the ATs assigned to the Spectralink are not acting as Leads or performing the duties of any other position in a higher wage rate. As a result, they would not be entitled to RHC pay under Article 9 of the agreement. The Employer claims that the Union's own witnesses acknowledged that they were not working in any particular higher classification, nor did they claim to perform the duties of the Lead AT position. Yet, these are the only two ways that one would qualify for RHC pay under Article 9.

The Employer contends that the Union has not shown that the AT with the Spectralink experiences a significant workload burden beyond what would normally be expected for a regular AT. AT's generally are not given a set number of tasks to complete in a shift. Although the AT with the Spectralink can expect to have his or her work interrupted by phone requests, this is said to be true of any AT who is interrupted by a variety of other communication devices. Moreover, even if it were the case that the Spectralink increased

10

workload, it is said to be wholly irrelevant because the Parties did not agree to award RHC pay on the basis of performing additional burdensome tasks.

Past practice is said by the Employer to be not admissible when its purpose is to alter clear contract language. Because the Union has not identified any "position in a higher pay grade," the meaning of the language in Article 9 is argued to be not at issue. By emphasizing past practice the Union is trying to modify the agreement language to provide an additional basis for RHC pay. But the Arbitrator is said to have no power to make such a change, and the past practice evidence is not admissible.

The burden of demonstrating a binding past practice at variance with the agreement is argued to be a heavy one. The Employer contends that even if the Union could establish a binding past practice relating to the payment of RHC on the basis of ATs carrying Spectralinks, the vast majority of such evidence relates to the time when the predecessor (2002-2005) agreement was in effect. When that agreement expired, the Union had an opportunity to incorporate its supposed past practice into the agreement. Yet, although Article 9 was modified, there was no agreement to pay extra for carrying a Spectralink.

Even if the Union can establish that there was a past practice, the Employer claims that it is free to terminate any such practice and that indeed it did terminate the practice of the five percent differential shortly after the current agreement went into effect. The Employer contends that arbitrators have long recognized that either party may put an end to the practice by giving advance notification of its intention to do so.

<u>Opinion</u>

The Parties did not agree on a stipulated issue. According to the Union, the issue should be: "Whether the Employer violated Article 9 of the Agreement when it terminated the five percent differential pay to Anesthesia Techs who were assigned to carry the

11

Spectralink telephone beginning on or about February of 2006; and if so, what is the remedy?" (Tr., pp. 7-8). According to the Employer, the issue should be "Whether or not Anesthesia Techs are entitled to receive additional pay under Article 9 of the Collective Bargaining Agreement for carrying a Spectralink phone." (Tr., p. 8). These are both accurate and sound statements of issue and whichever is chosen would yield the same outcome. The Employer does not raise the point about remedy, but it is nonetheless implicit in the statement. So the issues amount to the same thing.

The Parties stipulated that all procedural issues have been complied with or waived and that the grievance is properly before the arbitrator for a final and binding decision (Tr., p. 7).

There is no doubt that for two or three years a past practice was in existence. Everyone acknowledges that a five percent differential wage was paid first to the AT who carried the pager and then later to the AT who carried the Spectralink phone. It is also not in dispute that Ms. Michelson and Ms. Beltran, in consultation with Human Resources, determined that it was inappropriate to provide this increment because it was not provided for in the agreement as RHC pay. The Employer unilaterally announced that it was terminating the differential in February 2006 without getting the Union's consent or approval.

It is generally accepted in arbitration that certain clear and long-standing practices can establish conditions of employment that are as binding as any written provision of the agreement. Past practices mutually accepted by the Parties can attain the status of contractual rights, especially when they are not repudiated by negotiated provisions in the agreement and were not changed during contract negotiations. The past practice in this case began under the 2002-2005 agreement. The agreement language pursuant to which

12

the five percent differential was paid to ATs is Article 9.

This article in the predecessor agreement provided as follows:

### ARTICLE 9
### TEMPORARY ASSIGNMENT

9.1    An employee temporarily assigned by the Employer to perform the typical
duties of a position in a higher pay range for a period of a full shift or more
will be paid in accordance with the higher pay range at a rate that provides
the employee with an increase for all hours worked performing such duties.
As an exception, if an employee is assigned by the Employer to a position in
a lead classification listed in Appendix A and to perform all of the duties
thereof, the employee will be paid a lead premium of five percent (5%) for
the actual hours worked in the lead position provided the lead position is in a
classification in a higher wage range than the employee's regular classification
or position.  (Jt. Exh. 2).

This language does not specifically reference what a "position in a higher pay range"

might be.  It also refers to a "position in a lead classification listed in Appendix A..."

Appendix A includes the position of Anesthesia Technician.  Although the position of Lead

(capitalized) AT has been around, off and on, for a period of 10-15 years, according to the

testimony of Ms. Michelson (Tr., p. 164), it is not without plausibility that an AT carrying

a pager/Spectralink was operating in a lead (lower case) role.

Comparing this previous language of Article 9 with that of the current 2006-2008

agreement shows some changes.  The "higher pay range" of the earlier agreement was

changed to "higher pay grade."  Whereas the old agreement provided payment for a "full

shift or more," the current agreement pays the differential after only "four consecutive

hours."  There are some other changes but none of any apparent significance.  Altogether,

the language remains much the same.

The five percent differential was paid to ATs under the predecessor agreement.  But it

was also paid, for a short time, under the current agreement.  (The current agreement became

effective on January 20, 2006; the differential was terminated unilaterally by the Employer

13

effective February 17, 2006). Therefore, the past practice can be said to have survived the negotiation of the current agreement and remained in existence, at least for a short time before repudiation by the Employer.

According to Elkouri and Elkouri's How Arbitration Works, a binding past practice must be unequivocal, clearly enunciated and acted upon, and readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both Parties (sixth edition, edited by Alan Miles Ruben, 2003, p. 608). The past practice in this case is clear: the AT who carries the Spectralink phone was paid a five percent differential. It was mutually accepted as a custom by the Employer and Union. The practice existed for a fairly lengthy period of time, at least a year.

There was considerable testimony over what the assignment of the Spectralink entails. Mr. Ashford testified that when he is carrying the phone he is still expected to carry out the normal duties of an AT (Tr., p. 22). So if you get a call while performing a normal duty, you have to stop that work and attend to the call. Ashford indicated that he received 40-50 calls per shift when carrying the Spectralink (Tr., p. 31). Similar call volumes were cited by Ms. Granados and Ms. Alejandro based on their experiences as an AT (Tr., pp. 62, 108).

But Ms. Alejandro and Ms. Michelson did not agree that the workload increased significantly. Ms. Alejandro testified that the workload was not increased (Tr., pp. 106-107). Ms. Michelson indicated that the workload "may or may not" increase (Tr., p, 161). The consensus through, factoring in the testimony of Mr. Ashford and Mr. Granados, who have been active ATs for some time, is that the workload clearly goes up. Ms. Michelson acknowledged that ATs assigned the Spectralink are expected to respond to the calls as well as perform the range of usual assignments in the unit (Tr., p. 185).

Mr. Granados testified that the reason given by the Employer for terminating the

14

differential pay was that it was not placed in the new contract, i.e., there is no language in the new contract providing for the differential (Tr., p. 81). The Employer seems to imply here that the differential was justified under the old contract but not under the new one. The problem with this reasoning is that the changes that occurred to Article 9 do not appear to address this issue. That is, if the differential was justified under the old agreement, it is no less justified under the new one.

The grievance of April 25, 2006 was filed on behalf of all ATs (Jt. Exh. 4). The Employer contends, however, that the Union limited the grievance to only those ATs carrying the Spectralink on the evening shift. In a letter from Brian Coffman, the Employer's Senior Employee/Labor Relations Specialist, to Union Shop Steward Lourdes Arafiles dated July 21, 2006, this point is made (Jt. Exh. 5, p. 2). Although the Union may have taken such a position at Step 2 grievance discussions, there is only the Employer's statement to that effect. For the scope of the original grievance to change so radically would seem to require evidence from the Union that it did so. At the arbitration hearing the Union made it clear that it is limiting the scope of the agreement to ATs who work in the Main Operating Room. That is the scope that is applicable here.

Summing up, the evidence shows the existence of a past practice for handling the Spectralink phone. The evidence is convincing that ATs who have this assignment have an increased responsibility and workload. The basis for paying the five percent differential is Article 9. The Employer terminated the long-standing past practice without the consultation and consent of the Union.

<u>Award</u>

After careful consideration of all written and oral evidence presented by the Parties, it is determined that the Employer violated Article 9 of the collective bargaining

15

agreement when it terminated the five percent differential to Anesthesia Techs who were assigned to carry the Spectralink telephone on shifts in the Main Operating Room. The remedy is restoration of the five percent differential and making whole of ATs in the Main Operating Room for lost wages. The differential will remain in effect unless and until altered by mutual agreement of the Parties. In accordance with the Union's request, the Arbitrator retains jurisdiction in the event of a dispute over remedy.

The grievance is sustained.

*Paul D. Staudohar*

Paul D. Staudohar
Arbitrator

July 2, 2007