EXHIBIT M

1 | **FOLEY & LARDNER LLP**
ONE MARITIME PLAZA, SIXTH FLOOR
SAN FRANCISCO, CA 94111-3409
2 | TELEPHONE:   415.434.4484
FACSIMILE:   415.434.4507

3

4

5

6

7

8 | **IN THE MATTER OF THE ARBITRATION BETWEEN**

9 | **-- o O o --**

10

11 | **STANFORD HOSPITAL AND CLINICS,**        ) **CASE NO: 06-59192**
                                              )
12 |                   **EMPLOYER,**           )
                                              )
13 |          **AND**                          )
                                              )
14 | **SERVICE EMPLOYEES INTERNATIONAL**       ) **EMPLOYER'S BRIEF TO THE**
     **UNION, LOCAL 715,**                     ) **ARBITRATOR**
15 |                                           )
16 |                   **UNION.**              )
                                              )
17 | **Grievance Of Anesthesia Techs; Relief**  )
     **Pay In Higher Classification**          ) **ARBITRATOR:  PAUL D. STAUDOHAR**
18 |                                           )

19 | ///

20 | ///

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

CA_431990.4

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.   RELEVANT CONTRACTUAL PROVISIONS ...................................................... 1

III.  STATEMENT OF FACTS .................................................................................... 4

    A.   The Parties And Their Collective Bargaining Agreement ........................... 4

    B.   The Anesthesia Department ........................................................................ 5

        1.   Operations Of The Anesthesia Department ...................................... 5

        2.   Anesthesia Techs ............................................................................. 7

        3.   Lead Anesthesia Tech ...................................................................... 8

        4.   Communication Within The Department ......................................... 10

            a.   The Spectralink Telephone............................................... 11

            b.   Other Communication Tools ............................................ 13

                (i)    "Land Line" Telephones ................................. 13

                (ii)   Overhead Pager .............................................. 14

                (iii)  Portable Pager ................................................ 15

                (iv)   Call Lights ...................................................... 15

                (v)    Person-To-Person Contact ............................. 15

            c.   The Lead Spectralink Telephone............................................ 16

    C.   Some Anesthesia Techs Were Erroneously Paid "RHC" Pay For Carrying Spectralink Phones Until The Error Was Discovered And Corrected ................................................................................................ 16

    D.   The Union Filed A Grievance Alleging That The Discontinuation Of Erroneously Paid "RHC" Pay Violated Article 9 Of The Agreement ........ 17

IV.   ARGUMENT....................................................................................................... 18

    A.   It Is Undisputed That The Anesthesia Techs Who Are Assigned To Carry Spectralink Telephones Are Not Acting As Leads Or Performing The Duties Of Any Other Position In A Higher Wage Rate, And Therefore They Are Not Entitled To RHC Pay Under The Agreement ................................................................................................ 18

        1.   Section 9 Of The Agreement Clearly Provides That RHC Pay Is Earned Only If An Employee Performs The Duties Of A

i

| | | | |
|---|---|---|---|
| | | | Higher Paid Position Or Acts As A Lead ........................................ 18 |
| | | 2. | The Union's Witnesses Admitted That They Were Neither Performing The Duties Of A Higher Paid Position Nor Acting As Leads ....................................................................................... 19 |
| | | 3. | There Is No Contractual Or Other Basis Upon Which The Union Can Claim That Anesthesia Techs Earn RHC Pay For Carrying Spectralinks .................................................................... 20 |
| | B. | | Extrinsic Evidence Is Not Admissible To Modify Clear Contract Language .............................................................................................. 23 |
| | C. | | To The Extent That Extrinsic Evidence At Variance With The Terms Of The Agreement Can Be Considered The Union Cannot Meet Its Burden Of Demonstrating A Binding Past Practice ..................................... 25 |
| | | 1. | The Union Has The Heavy Burden Of Establishing A Binding Past Practice By Clear And Convincing Evidence ........................... 25 |
| | | 2. | Arbitral Standards Applicable To Past Practice Evidence ............... 26 |
| | | 3. | The Union Has Not Met Its Burden Of Establishing A Binding Past Practice ...................................................................... 26 |
| | | | a. The Alleged Practice Is Not Unequivocal ............................ 26 |
| | | | b. The Alleged Practice Has Not Been Clearly Enunciated And Acted Upon ................................................ 28 |
| | | | c. The Alleged Practice Was Not Known To Or Accepted By The Employer ................................................. 28 |
| | | 4. | Any Past Practice Established Under The Predecessor Agreement Was Extinguished With The Adoption Of The Current Agreement ........................................................................ 30 |
| | | 5. | To The Extent That There Was A Past Practice, The Agreement Authorized The Employer To Terminate It ................... 31 |
| V. | | | CONCLUSION ................................................................................... 34 |

1    Stanford Hospital & Clinics respectfully submits its Brief to the Arbitrator within

2    the time agreed to by the Parties.

3    **I.    PRELIMINARY STATEMENT**

4    This Arbitration between Stanford Hospital & Clinics (the "Hospital") and Service

5    Employees International Union, Local 715 (the "Union") involves the application of a

6    contractual "relief in higher classification" ("RHC") provision to a particular task

7    assigned to a portion of a classification of employees known as anesthesia technicians.

8    As will be more fully explained below, anesthesia technicians (also referred to as

9    "anesthesia techs," and herein as "techs") are expected as part of their regular job duties

10   to carry a portable telephone known as a "Spectralink Phone" ("Spectralink").  The

11   Union contends that, although all of the techs carry a Spectralink by rotation, certain of

12   the techs, by virtue of performing this single task, are entitled to receive RHC pay on that

13   basis, even though it was conceded by every Union witness that the anesthesia techs

14   carrying the Spectralink do not function as Lead Anesthesia Techs, and not one witness

15   could identify a position in a higher classification in which the anesthesia tech carrying

16   the Spectralink might be working, so as to justify the payment of RHC pay pursuant to

17   the unambiguous language of the Agreement.

18   The parties were unable to agree upon a statement of the issue.  The Employer

19   contends that the issue is properly phrased as whether or not anesthesia techs are entitled

20   to receive additional pay under Article 9 of the Collective Bargaining Agreement for

21   carrying a Spectralink. Tr. 8:6-10.

22   **II.    RELEVANT CONTRACTUAL PROVISIONS**

23                             **ARTICLE 2**
24                       **MANAGEMENT RIGHTS**

25       **Except only as limited by the express provisions of this
         Agreement**, all of an employer's rights and prerogatives,
26       whether previously exercised or unexercised and whether
         implied or expressed, will be retained and reserved by the
27       Employer, and will remain within its exclusive direction and
28       control.  For purposes of illustration only and not to limit the

1

foregoing in any way, management will have the right, **subject only to said express limiting provisions of this Agreement**:

a) to manage the hospitals, laboratories, clinics, offices, warehouses and other facilities and operations in which employees covered by this Agreement work;

b) to direct and assign the work force;

c) to transfer, reassign, promote and demote employees;

d) to establish standards of performance, health and safety, and quality of service, and to evaluate employee performance;

e) to maintain discipline, order and efficiency;

f) to determine medical, patient care and operational standards, procedures and methods; to schedule work;

g) to abolish, create, alter or combine job classifications;

h) to introduce new or improved methods, equipment, facilities or operations;

i) to determine efficient and effective staffing requirements;

j) to determine the number and location of facilities and operations;

k) to determine whether the whole or any part of an operation will continue to operate;

l) to determine whether a vacancy exists and whether and when it will be filled;

m) to require overtime work, when needed, consistent with employee health and safety;

n) to transfer or subcontract work for legitimate business reasons but, except in emergencies, only after affording the Union a reasonable opportunity to meet and discuss with management effects of the proposed transfer or subcontracting;

o) to select and hire employees;

p) to determine qualifications for positions;

q) to demote, suspend, warn, discharge or otherwise discipline employees;

r) to lay off or relieve employees from duty for lack of work or other legitimate reasons;

s) to rehire employees;

t) to determine whether employees, both within and without the bargaining unit, will or will not perform certain functions, duties or tasks;

u) to promulgate, eliminate or revise reasonable rules

2

and regulations relating to the terms and conditions of employment and the manner of operations, provided only that they do not conflict with the express provisions of this Agreement.

The Employer may, in its discretion, continue any current policies and practices which do not conflict with express written provisions of this Agreement.

## ARTICLE 9
## Temporary Assignment

9.1  An employee temporarily assigned by the Employer to perform the typical duties of a position in a higher pay grade for four (4) consecutive hours or more will receive a differential of five percent (5%) for each grade above the grade of the employee's regular classification for all hours during which the employee is so assigned (e.g., if an employee in Grade SEIU0006 is assigned to a position in SEIU0008 the employee will receive a differential of ten percent (10%)).  As an exception if an employee is assigned by the Employer to a position in a lead classification listed in Appendix A and to perform all of the duties thereof, the employee will be paid a lead premium of five percent (5%) for the actual hours worked in the lead position provided the lead position is in a classification in a higher wage range than the employee's regular classification or position.

## ARTICLE 26
## GRIEVANCE AND ARBITRATION PROCEDURE

* * *

26.7.3  The arbitrator's authority will be limited to interpreting the specific provisions of this Agreement and will have no power to add to, subtract from, or to change any part of the terms or conditions of this Agreement.  If the grievance is sustained in whole in or in part, the remedy will not exceed restoring to the employee the pay, benefits, or rights lost as a result of a violation of the Agreement, less any compensation from any source, including, but not limited to, Workers' Compensation and Unemployment insurance benefits.  The decision of the arbitrator, within the limits described herein,

SFCA_431990.4

1

2

> will be final and binding upon the parties and will be the
> exclusive remedy for the subject matter of the grievance.

3

> * * *

4

5

6

7

8

9

10

> 26.7.10  The decision of the arbitrator on any issue properly
> before the arbitrator will be final and binding upon the
> Employer, the Union and all employees.  The arbitrators
> authority will be limited to determining whether the
> Employer has violated the provision(s) of this Agreement.
> The arbitrator will not have jurisdiction or authority to add to,
> amend, modify, nullify or ignore in any way the provisions of
> this Agreement, and will not make any award that would, in
> effect, grant the Union or the employee(s) any matters that
> were not obtained in the negotiation process.

11

Jt. Exh. 1 (emphasis in original).

12

**III.    STATEMENT OF FACTS**

13

**A.    The Parties And Their Collective Bargaining Agreement**

14

Stanford Hospital & Clinics, located in Stanford, California, is known worldwide

15

for advanced patient care provided by its physicians and staff, particularly for the

16

treatment of rare and complex disorders.  Service Employees International Union, Local

17

715 is the certified bargaining representative of a bargaining unit of workers employed by

18

Stanford Hospital & Clinics.  (The Employer and the Union are sometimes collectively

19

referred to as the "Parties.")  The Parties are signatory to a collective bargaining

20

agreement (the "Agreement") effective from January 20, 2006 through November 4,

21

2008. Jt. Exh. 1.  The Agreement succeeded a prior collective bargaining agreement,

22

which expired in November, 2005 (the "Predecessor Agreement").  Jt. Exh. 2.  Article 9

23

of the Agreement contains language on temporary assignment of employees.  That article

24

states in relevant part:

25

26

27

28

> An employee temporarily assigned by the Employer to
> perform the typical duties of a position in a higher pay grade
> for four (4) consecutive hours or more will receive a
> differential of five percent (5%) for each grade above the
> grade of the employee's regular classification for all hours

4

during which the employee is so assigned (e.g., if an employee in Grade SEIU0006 is assigned to a position in SEIU0008 the employee will receive a differential of ten percent (10%)). As an exception if an employee is assigned by the Employer to a position in a lead classification listed in Appendix A and to perform all of the duties thereof, the employee will be paid a lead premium of five percent (5%) for the actual hours worked in the lead position provided the lead position is in a classification in a higher wage range than the employee's regular classification or position.

Jt. Exh. 1, Art 9.1.  The premium payments called for in Article 9 are commonly referred to as "relief in higher classification" or "RHC" pay.[1]  Granados, Tr. 82:20-24; Michelson, Tr. 170:17-171:5.

## B.    The Anesthesia Department

As with any hospital, the care of patients at Stanford Hospital who are undergoing surgical or other invasive procedures often requires the use of anesthesia.  Accordingly, the Hospital maintains an Anesthesia Department within its main hospital building.  The physicians responsible for administering anesthesia are known as anesthesiologists.  The anesthesiologists are supported by staff known as anesthesia technicians (or anesthesia techs).  The techs are headed by a manager.  The Anesthesia Department's current manager is Dianne Alejandro, who assumed the position in January, 2007.  Alejandro, Tr. 112:11-13.

## 1.    Operations Of The Anesthesia Department

The work of the Anesthesia Department, and hence the techs, can take place in various locations in the Hospital.  The principal location where anesthesia is administered

---

[1] Article 9 of the Predecessor Agreement also contained a provision on temporary assignment of employees.  That provision was substantially similar to the one contained in the current Agreement, but provided that RHC pay for working in a position in a higher pay grade was earned only if the employee worked an entire shift in that position. Jt. Exh. 2, Art. 9.1.  Although Article 9 was reopened during the negotiation of the current Agreement and the language regarding working in a higher paying classification was changed, notably, the language pertaining to the criteria that must be met for an employee to be entitled to RHC pay for performing in a lead position was retained unchanged from the Predecessor Agreement by agreement of the parties.

1    is the "Main O.R."[2]  Although commonly referred to in the singular, the Main O.R.
2    actually comprises twenty-one (21) individual operating rooms in which medical
3    procedures may be carried out simultaneously.  Ashford, Tr. 21:23-22:5; Granados, Tr.
4    68:6-11.  Located within the Main O.R. is the "Main O.R. Anesthesia Workroom," which
5    is the principal workshop, supply storage area, and home-base of the techs.  Ashford, Tr.
6    15:8-18.  The workroom contains the techs' scheduling board, which reflects information
7    such as room assignments, room changes, and case cancellations, and is constantly
8    updated as cases and assignments develop.  Granados, Tr. 67:9-18, 70:7-13.

9         Recently, the Hospital opened a group of four (4) additional operating rooms
10   collectively known as the "O.R. Extension" with their own anesthesia workroom, where
11   techs may also be assigned.  Ashford, Tr. 35:2-12.  In addition to the Main O.R. and the
12   O.R. Extension, techs routinely work in a location known as the "Ambulatory Surgery
13   Center" (or "ASC").  Ashford, Tr. 35:21-24; Alejandro, Tr. 115:13-21.  The ASC handles
14   those surgeries that are outpatient in nature, and contains roughly twelve (12) operating
15   room.  Granados, Tr. 7-22.  Those cases tend to be less complex than O.R. cases, and
16   accordingly the rooms tend to turn over more quickly.  Alejandro, Tr. 150:3-14.  Finally,
17   techs may be given assignments known as "out of department" or "out of area"
18   assignments.  These are assignments that arise because a patient who is not located in
19   Main O.R., the O.R. Extension, or the ASC requires anesthesia services.  Alejandro, Tr.
20   116:6-117:3.  Out of department assignments may take a tech to any part of the Hospital.
21   Id.

22        Anesthesia services are needed in the hospital around the clock.  Therefore, techs
23   are assigned to work in the Main O.R. in three basic shifts: day shift, evening shift, and
24   night (or "graveyard") shift.  In the Main O.R. there are usually between five (5) and six
25   (6) techs working during the day shift, three (3) to four (4) on the evening shift, and two
26   (2) on the night shift.  Ashford, Tr. 58:16-19; Alejandro, Tr. 114:21-115:7.  Some techs
27   also work "mid-shifts" that overlap the day and evening shifts.  Alejandro, Tr. 115:13-19.

28   _____
[2] O.R. stands for "Operating Room."

## 2.    Anesthesia Techs

The job duties of the anesthesia tech position are set forth in the written job description associated with the position. Er. Exh. 1; Michelson, Tr. 157:23-158:14. The essential role of the tech was described by Sheryl Michelson, who is familiar with the position, supervises techs, and who wrote the job description. She stated,

> A. They are responsible for providing assistance to the anesthesiologists to provide care for the patients in and out of the operating room that require anesthesia. They are responsible for equipment, supplies, materials. They sometimes help with patient care by helping to hold a patient or position a patient.
>
> Q. Do they respond to physician and nurse requests?
>
> A. Yes, they do.

Michelson, Tr. 157:3-11.

The job duties of the tech were also described in more detail by Ms. Alejandro, the current manager, who also worked as a tech at the Hospital before being promoted to Manager, and Mr. Ashford, who is currently a tech. They testified that techs are expected to carry out the following non-exhaustive set of duties:

- Set up operating rooms pursuant to the specific requirements of different cases. Ashford, Tr. 16:8-9; Alejandro, Tr. 93:22-23. This involves switching on anesthesia-related machines and initiating tests of those machines, ensuring that the supply cart is properly stocked, and securing any additional equipment or supplies that may be required due to the particular nature of the case. Alejandro, Tr. 95:23-96:6.
- "Turn over" rooms between cases. Ashford, Tr. 16:8-9, 18:13-14; Alejandro, Tr. 93:25-94:2. This involves removal and disposal of used equipment and supplies, and replacement of what was used for the following case. Alejandro, Tr. 96:7-15.

///

7

1    • "Turn down" operating rooms when they are no longer in use. Alejandro, Tr.
2        94:4-5.

3    • Prepare and set up I.V. (intravenous) lines. Ashford, Tr. 16:10-12; Alejandro,
4        Tr. 93:21.

5    • Stock the Anesthesia Supply Cart and other carts. Ashford, Tr. 18:13-16;
6        Alejandro, Tr. 93:24.

7    • Set up and operate the "Cell-Saver" machine. Alejandro, Tr. 94:2-3.

8    • Check the Malignant Hyperthermia Cart, and complete the associated
9        compliance chart.[3] Ashford, Tr. 16:12-13.

10    • Respond to specific requests from anesthesiologists and nurses. Alejandro, Tr.
11        94:5-7.

12        ### 3.    Lead Anesthesia Tech

13        Although a position known as Lead Anesthesia Tech had existed in the past, it did

14    not exist under the Predecessor Agreement (i.e. between 2002 and 2005). Michelson, Tr.

15    164:10-23; Jt. Exh. 2, Appendix A. The Lead Anesthesia Tech ("Lead") position was re-

16    introduced in the current Agreement as of its effective date (January 20, 2006) (Jt. Exh. 1,

17    Appendix A), and was actually filled in March, 2006. It remained filled for

18    approximately a year (Alejandro, Tr. 112:4-12), but since March, 2007, the Lead position

19    has been vacant, although it still exists, and the Hospital intends to fill it. Alejandro, Tr.

20    111:19-112:3.

21        The duties of the Lead position are set forth in a written job description. Er. Exh.

22    3. The Lead is responsible for performing all the duties of the tech position. However,

23    although the Lead is not a supervisor, the person occupying the position is expected to

24    perform a variety of functions above and beyond those of the tech. Those unique duties

25    include the following:

26    ///

27
28    ──────────────
    [3] Malignant hyperthermia (erroneously spelled "hypothermia" in the transcript) is a
    condition wherein a patient undergoes a sudden and potentially dangerous increase in
    body temperature. Alejandro, Tr. 124:22-125:11.

- Oversee the Main O.R. Anesthesia Workroom. Alejandro, Tr. 113:3.
- Assist the manager in evaluating the performance of techs for the purpose of formal performance evaluations. Alejandro, Tr. 113:3-6.
- Monitor the techs to ensure that they take scheduled meal and rest periods on schedule, and ensure that they return from such breaks in a timely manner. Alejandro, Tr. 113:6-8; Michelson, Tr. 163:20-22.
- Change the techs' assignments in the absence of the Manager in response to changes in the schedule, sick calls, et cetera. Alejandro, Tr. 113:9-13.
- Call in additional techs or change the assignments of techs in the absence of the manager to compensate for unexpected absences. Alejandro, Tr. 113:14-17.
- Participate in the process of interviewing applicants for tech positions and assist in the evaluation of applicants. Alejandro, Tr. 114:2-6.
- Generally assist and work alongside the manager. Alejandro, Tr. 113:8; Michelson, Tr. 163:18-20.
- Authorize overtime as needed in the absence of the manager. Alejandro, Tr. 117:11-14.
- Complete an "EOC Ongoing Compliance Audit checklist – a form designed to ensure the Anesthesia Workroom's regulatory compliance in various areas – once per month. Alejandro, Tr. 117:15-118:23; Er. Exh. 4.
- Review the "gray-bar" (essentially a posted sheet that acts as a time card), note any discrepancies, and turn the gray-bar in to the manager. Alejandro, Tr. 119:4-20.
- Coach or counsel techs regarding observed performance problems. Alejandro, Tr. 120:5-16; Michelson, Tr. 163:23-24.
- Ensure that the techs are checking the malignant hyperthermia cart and completing the associated form. Alejandro, Tr. 122:13-124:18; Er. Exh. 5.
- Orient and train techs. Michelson, Tr. 163:24-165:1.

9

1      • Perform delegated duties as assigned by the Manager. Michelson, Tr. 164:5-7.

2      In the period prior to the effective date of the current Agreement, when the Lead

3   position did not exist, the tasks that were later reassigned to the Lead were performed by

4   the Manager. Michelson, Tr. 167:10-14. During the time after its recreation and when

5   the Lead position was occupied, in the event that the Lead was absent, the Manager

6   assumed the Lead's duties. Alejandro, Tr. 125:20-126:8; Michelson, Tr. 167:19-25.

7   After the Lead position became vacant, the Lead's duties reverted to the manager,

8   pending the hiring of a new Lead. Alejandro, Tr. 118:21-23; Michelson, Tr. 167:15-18.

9   Thus, during all relevant times – prior to the re-introduction of the Lead position, during

10  the time when there was a Lead, and after the Lead position became vacant – no tech has

11  been assigned, or has performed, any of the unique functions associated with the Lead

12  position.

13              **4.    Communication Within The Department**

14      As described above, techs may be assigned to work in various physical locations.

15  Techs may be assigned to work in the Main O.R., the O.R. Extension (once it was

16  created), the ASC, or out of department cases. Each tech is given an overall assignment

17  (i.e. to the Main O.R., to the ASC, etc.), which the tech learns by consulting a schedule in

18  the Main O.R. Workroom. Ashford, Tr. 17:19-19:6. From the schedule, the tech can also

19  learn, to an extent, what particular tasks he or she will need to perform during the shift

20  (depending on, for example, what procedures are scheduled in particular rooms).

21  Ashford, Tr. 51:10-22, 56:19-57:22. However, the job of a tech is inherently fluid and

22  dependant on events, which cannot be predicted in advance. Michelson, Tr. 152:10-16.

23  Cases may be canceled, their order and/or locations changed, or new cases may be added.

24  A need for particular equipment or services may arise unexpectedly, and sometimes

25  urgently. Granados, Tr. 63:7-11. In cases of changes to the schedule and location of

26  cases, information may come from the "control desk." Information regarding changes

27  and other needs may also come from anesthesiologists, nurses, supervisors, or other

28  techs, and is critical that such persons be able to quickly contact a tech should the need

10

1 | arise. Granados, Tr. 63:12-16. Accordingly, the Anesthesia Department has developed
2 | various means by which techs may be contacted during their shifts.

3 | ### a.    The Spectralink Telephone

4 | One of the principal means by which techs may be contacted during their shifts is
5 | by means of devices known as "Spectralink Phones." A Spectralink Phone
6 | ("Spectralink") is a portable telephone that can be worn on a person's belt, similar in
7 | appearance and operation to a cellular telephone. Ashford, Tr. 20:7-14; Michelson, Tr.
8 | 159:13-18. A Spectralink is also similar to an ordinary cellular telephone in that it is
9 | assigned a unique telephone number through which the carrier of the telephone can be
10 | contacted. Michelson, Tr. 160:8-9. When the Spectralink's number is dialed, it rings,
11 | whereupon the carrier can open the line and engage in a two-way conversation with the
12 | caller.

13 | Not every tech carries a Spectralink. Instead, a limited number of Spectralinks
14 | rotate among the techs. Alejandro, Tr. 101:24-102:20; Er. Exh. 2 (list of Spectralinks and
15 | other telephones currently in operation). One tech on every Main O.R. shift (day,
16 | evening, and night) is assigned to carry a Spectralink. Likewise, one of the techs
17 | assigned to the O.R. Extension, and one of the techs assigned to the ASC carries a
18 | Spectralink. Finally, the tech that is assigned to work out of department cases is given a
19 | Spectralink. Er. Exh. 2. Presently, the Spectralinks rotate among the techs on a daily
20 | basis (i.e. a different tech carries it every day). In the past, the Spectralinks rotated on a
21 | weekly basis.

22 | When a tech is carrying a Spectralink, he or she is expected to answer immediately
23 | when it rings. Granados, Tr. 63:17-21. The tech is also expected to give priority to
24 | requests received or tasks assigned via the Spectralink. Granados, Tr. 63:17-21. If a tech
25 | is assigned a task via the Spectralink, he or she is expected, if possible, to break away
26 | from whatever task he or she is doing and perform the task. However, it is recognized
27 | that there will be times when the tech carrying the Spectralink will be engaged in a task
28 | from which he or she cannot break away, or will be too busy to handle an additional task.

1   For example, Mr. Granados testified that when a tech is operating the Cell-Saver
2   machine, it is not possible to suspend the work in order to perform another task.
3   Granados, Tr. 65:11-13. Ms. Michelson indicated that it is common for techs (whether or
4   not they are carrying a Spectralink) to receive multiple, near-simultaneous, requests or
5   tasks from anesthesiologists or nurses. Michelson, Tr. 165:14-20. When a tech is too
6   busy to respond to a request received via the Spectralink, he or she is expected to seek
7   help from other techs. Among the techs, this is referred to as the "buddy system"
8   whereby when one tech is given a task and is too busy to carry it out, another tech will
9   voluntarily assume the task. Ashford, Tr. 44:11-45:2. The process of locating a tech for
10  assistance is facilitated by the Spectralink itself, which can be used for that purpose.
11  Granados, Tr. 65:11-66:22. A tech can use the Spectralink to contact other techs, or to
12  contact the control desk to seek assistance in locating a tech. Id. However, carrying the
13  Spectralink does not give a tech any authority over any other techs. Alejandro, Tr.
14  108:25-109:20. That is, the tech carrying the Spectralink cannot reassign or direct
15  another tech to perform the task, but rather may only request the other tech's assistance.
16  Ashford, Tr. 42:41:17-42:21; Granados, Tr. 66:17-22.

17       When a tech who is carrying a Spectralink receives a request via the Spectralink
18  and is too busy to perform the requested task, he or she has other options apart from
19  seeking out another tech for assistance. The tech can inform the requesting party that he
20  or she is too busy to respond immediately, and offer to complete the task at a later time.
21  If the requested task requires immediate attention and the tech is too busy to locate
22  another tech him or herself, the tech can ask that the requesting party find another tech.
23  Granados, Tr. 65:11-17. Also, as noted, the tech can contact the control desk for
24  assistance locating a tech.

25       The Spectralinks are a relatively recent innovation in the Hospital, having been
26  introduced two (2) to three (3) years prior to the hearing. Michelson, Tr. 161:13-19. The
27  Spectralinks replaced portable pagers, which techs had carried prior to the Spectralinks'
28  introduction. Michelson, Tr. 161:20-162:2. These belt-mounted pagers were used in

SFCA_431990.4

1  much the same way that the Spectralinks are now used.  A limited number of pagers

2  rotated among the techs working in different areas of the Hospital, and the tech assigned

3  to carry the pager would need to respond to pages in the same way that a tech must now

4  respond to the Spectralink.  The only material difference was that, when a tech received a

5  page, he or she would have to seek out the nearest telephone in order to respond to the

6  party who issued the page.  Depending on where within the Hospital the tech receiving

7  the page happened to be, locating a telephone could be inconvenient and time-consuming.

8  The introduction of the Spectralinks eliminated this step, reducing the amount of time

9  that techs had to spend responding to requests.[4]  Ashford, Tr. 49:16-50:22; Michelson, Tr.

10  162:3-18.

11  **b.    Other Communication Tools**

12  While the Spectralink represents a principal method for delivering messages to

13  techs, it is by no means the only method.  Rather, the Spectralink is part of an

14  overlapping web of communication tools, any one of which may be used to communicate

15  with techs.

16  **(i)    "Land Line" Telephones**

17  Both the Main O.R. Anesthesia Workroom and the O.R. Extension Anesthesia

18  Workroom contains a "land line" telephone – a traditional stationary telephone (as

19  opposed to a portable telephone).  Alejandro, Tr. 97:16-21.  Because techs are often

20  found in the workrooms, a party seeking to contact a tech will commonly use the land

21  line as the communication tool of first resort.  Ashford, Tr. 54:6-17.  When any tech is

22  present in the workroom and hears the land line ring, he or she is expected to suspend

23  whatever task he or she is working on and answer the telephone.  Ashford, Tr. 41:14-20;

24  Alejandro, Tr. 108:8-12.  Upon receiving a request via the land line telephone, the tech is

25  expected to respond in a manner identical to that described above in reference to the tech

26  carrying the Spectralink.  Michelson, Tr. 162:19-24.  Thus, the tech is expected to handle

27

---

28  [4] As will be explained below, portable pagers are still carried by techs who work in the ASC.

1 the task received, if possible.  If the tech is not able to handle the task him or herself, the

2 tech is expected to seek help from fellow techs, request permission to complete the task at

3 a later time, or ask the requesting party (or the control desk) to locate another tech.

4 Ashford, Tr. 41:14-43:2.

5                                    **(ii)    Overhead Pager**

6            Techs can also be contacted by means of "overhead page."  An overhead page is a

7 verbal message (typically a request for a tech to contact a particular person) delivered via

8 speakers mounted in various locations in the Hospital.

9            There was some dispute in the record regarding the extent to which an overhead

10 page can be heard inside operating rooms and the anesthesia workrooms (there was no

11 dispute that it could be heard, and was used, in outside areas such as hallways).  Mr.

12 Ashford and Mr. Granados claimed that the overhead page system could not be heard in

13 those locations.  Ashford, Tr. 26:21-27:1; Granados, Tr. 63:22-64:8.  However, Ms.

14 Alejandro, who has worked both as a tech and as the Manager of the techs testified that

15 overhead pages could be heard in the operating rooms, and that she has actually heard

16 overhead pages in such locations. Alejandro, Tr. 97:24-98:16.  Indeed, she knew that the

17 overhead page system could be used to deliver a message into a specific operating room.[5]

18 Id. Ms. Michelson also testified that overhead pages can be heard in the operating rooms,

19 and that she has actually been overhead paged while in an operating room.  Michelson,

20 Tr. 160:10-19.  Both Ms. Alejandro and Ms. Michelson testified that the overhead pager

21 can also be heard in the anesthesia workroom.  Alejandro, Tr. 98:17-22; Michelson, Tr.

22 160:20-161:1.  The testimony of Ms. Alejandro and Ms. Michelson, being far more

23 specific and reliable on this point, should be credited.

24            When an overhead page is issued, any tech who hears the page is expected to

25 suspend whatever activity he or she is engaged in and respond to the page, just as with

26

27 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[5] Ms. Alejandro clarified that, technically, the general overhead pager, and the overhead
pager used in the operating rooms constitute two (2) different pager systems.  Alejandro,
28 Tr. 143:3-22.  However, their function is identical: to deliver an audio message to
particular locations within the Hospital in order to locate an anesthesia tech.

1  the Spectralink. Alejandro, Tr. 108:20-24; Michelson, Tr. 162:19-24. As is the case with

2  the Spectralink, the tech is expected to handle the task assigned, find another tech and ask

3  that tech if (s)he will handle the task, request additional time, or ask that the requesting

4  party locate another tech.

<b>(iii)    Portable Pager</b>

6       While the use of portable pagers has been largely eliminated since the introduction

7  of the Spectralinks, techs who are assigned to work in the ASC are still given pagers.

8  Alejandro, Tr. 99:6-12, 142:16-22. The techs who carry pagers are expected to answer

9  pages and respond to requests in the same manner they would if carrying the Spectralink.

<b>(iv)    Call Lights</b>

11      The Anesthesia Department also maintains two (2) related systems by which techs

12  can be summoned from the workrooms to the operating rooms. These are the "call light"

13  and "ComTel" systems. Alejandro, Tr. 99:15-20. The call light system features a panel

14  of numbered lights in the Main O.R. Workroom, each of which is connected to a switch

15  in one of the operating rooms. When an anesthesiologist, nurse, or other person in the

16  operating room activates the switch, the corresponding numbered light in the workroom

17  is illuminated. Alejandro, Tr. 99:21-100:13. Any tech who observes an illuminated call

18  light is expected to contact the operating room in question and respond to any request in

19  the same manner in which he or she would respond to a Spectralink request. Alejandro,

20  Tr. 108:17-20, 148:20-22; Michelson, Tr. 163:4-6. The ComTel system is located in the

21  ASC and works in an identical fashion to the call light system, except that it also includes

22  audible bells that ring when a room's light is illuminated. Alejandro, Tr. 99:15-20.

<b>(v)    Person-To-Person Contact</b>

24      Notwithstanding all the above methods of communication, techs may also

25  encounter anesthesiologists or nurses within the O.R. and receive requests to perform

26  tasks in person. Michelson, Tr. 162:19-163:2. Under such circumstances, the same

27  procedure would apply – the tech would be expected to either perform the requested task,

28  ///

1 find another tech who willing and able to do so, request additional time, or ask that
2 another tech be located.

3                                  **c.    The Lead Spectralink Telephone**

4              When the Lead position was reintroduced under the current Agreement, a
5 Spectralink was designated specifically for the Lead's use. Michelson, Tr. 166:14-22.
6 The Lead receives calls on the Spectralink that are different in character than those that
7 the regular techs receive. For example, if techs have issues that they cannot resolve
8 amongst themselves, they would place a call to the Lead. Likewise, if an anesthesiologist
9 has a complaint about a tech, or the service received from a tech, he or she might place a
10 call to the Lead. Alejandro, Tr. 121:19-7; Michelson, Tr. 166:23-167:6. During the
11 period when the Lead position was occupied, if the Lead was absent, the Manager would
12 hold the Lead's Spectralink. Alejandro, Tr. 121:2-11. Since the lead anesthesia tech
13 position was vacated, the Manager has carried the Lead's Spectralink. Alejandro, Tr.
14 120:21-23. Thus, the Lead's Spectralink has never been carried by a tech. Alejandro, Tr.
15 126:20-127:3.

16      **C.    Some Anesthesia Techs Were Erroneously Paid "RHC" Pay For**
17             **Carrying Spectralink Phones Until The Error Was Discovered And**
18             **Corrected**

19              It is not disputed that, for an undetermined period of time prior to February 17,
20 2006, some techs assigned to the Main O.R. received additional pay amounting to five
21 percent (5%) of their base pay by virtue of the fact that they were assigned to carry a
22 Spectralink during their shift. Although the Union was unable to establish when techs in
23 the Main O.R. began to receive this additional pay, the record reflects that such payments
24 were made during the tenure of a former manager named Robert Powell. Mr. Powell was
25 involuntarily separated from his employment whereupon Alice Beltran, who was at the
26 time a perioperative charge coordinator with no experience in a supervisory or
27 management position, was appointed as the new Manager. Michelson, Tr. 186:22-187:5.
28 ///

1    Because Ms. Beltran had no prior experience in a management position, Ms.
2    Michelson had to attempt to orient and train her very quickly.  Part of this orientation and
3    training process involved teaching Ms. Beltran to check time-cards and manage her
4    department's budget.  Michelson, Tr. 175:25-176:9.  In the course of Ms. Beltran's
5    training, Ms. Michelson and Ms. Beltran discovered discrepancies in the Department's
6    budget.  Michelson, Tr. 168:14-169:1.  Upon investigation, they discovered that some
7    techs were receiving RHC pay.  They further discovered that it appeared the RHC was
8    being paid on the basis that the techs were purportedly performing the duties of a lead
9    position, although until January of 2006, no lead position existed, and the position, once
10   re-introduced was not filled until March, 2006.  Michelson, Tr. 171:17-21.  Ms. Beltran
11   contacted the Employer's Human Resources Department for guidance, whereupon she
12   was informed that the prior payment of "RHC" pay was in error and that it should be
13   discontinued.  Ms. Beltran announced the discontinuation of the improper "RHC"
14   payments to the techs effective February 17, 2006.

15          **D.    The Union Filed A Grievance Alleging That The Discontinuation Of**
16          **Erroneously Paid "RHC" Pay Violated Article 9 Of The Agreement**

17          On or around April 25, 2006, the Union filed a grievance on behalf of all affected
18   techs (the "Grievance").  The Grievance alleged that the Employer violated Section 9 of
19   the Agreement because it was no longer "paying 5% Relief in Higher Classification
20   Differential to Anesthesia Techs carrying the Spectra-Link Phone."  Jt. Exh. 4.  During
21   the "Step Two" hearing of the Grievance, the Union stated that its claim was limited to
22   techs carrying the Spectralink on the evening shift, and not on the day shift.  Jt. Exh. 5, p.
23   2.  The Employer denied the Grievance.  Jt. Exh. 5.  During the arbitration hearing,
24   counsel for the Union clarified that the Union's claim was limited to those techs who
25   carry the Spectralink while assigned the Main O.R.[6]  Tr. 57:21-58:3.

---

[6] The Union has never disclaimed its statement made at the Step Two hearing that its
27   claim is limited to evening shift techs.  Indeed, having expressly limited the scope of its
     grievance at the Step Two stage, the Union was precluded from expanding its scope at the
28   hearing, particularly because no prior notice of such an expansion was given.  Therefore,
     its claim is properly construed as being one limited to evening shift techs assigned to the

1  IV.  **ARGUMENT**

2      **A.    It Is Undisputed That The Anesthesia Techs Who Are Assigned To**

3          **Carry Spectralink Telephones Are Not Acting As Leads Or**

4          **Performing The Duties Of Any Other Position In A Higher Wage Rate,**

5          **And Therefore They Are Not Entitled To RHC Pay Under The**

6          **Agreement**

7      The Union has alleged that the Employer's discontinuation of the five percent

8  (5%) differential formerly paid to techs in the Main O.R. for carrying the Spectralink

9  violated Article 9 of the Agreement. The language contained in Article 9 is clear, and

10 provides that an employee may become entitled to RHC pay if, and only if, he or she

11 meets either of two (2) sets of criteria. The testimony offered by the Union itself (which

12 was, on this point, entirely consistent with the testimony of the Employer's witnesses)

13 conclusively established that the techs who carried the Spectralinks met neither of the

14 sets of contractual criteria. Indeed, the Union's witnesses did not even contend that the

15 techs carrying the Spectralink met either of those sets of criteria. Therefore, according to

16 the clear and unambiguous language of Article 9, they were not contractually entitled to

17 RHC pay, and the Employer did not violate Article 9, or any other provision of the

18 Agreement, by refusing to pay it.

19      **1.    Section 9 Of The Agreement Clearly Provides That RHC Pay Is**

20          **Earned Only If An Employee Performs The Duties Of A Higher**

21          **Paid Position Or Acts As A Lead**

22      Under Article 9 of the Agreement, there are two (2), and only two (2), possible

23 ways for an employee to become entitled to RHC pay. First, the employee may become

24 entitled to an RHC differential by virtue of being assigned by the Employer to perform

25 the typical duties of a position in a higher pay grade for four (4) or more consecutive

26 hours. Jt. Exh. 1, Art. 9; Michelson, Tr. 170:25-171:5. In order to qualify for this type of

27 RHC pay, the employee must perform all the typical duties of the higher-graded position.

28 _____

Main O.R. who carried the Spectralink.

1  An employee performing some, but not all, of another position's duties is not entitled to

2  RHC pay.  Second, an employee may become entitled to RHC pay by virtue of being

3  assigned by the Employer to perform all the duties of a position classified as a lead

4  position in Appendix A of the Agreement.  Jt. Exh. 1, Art. 9; Michelson, Tr. 170:17-21.

5  It would be insufficient for an employee to perform less than all of the duties of the lead

6  position to be entitled to RHC pay.  Furthermore, in order for this second method of

7  qualifying for RHC pay to apply, a lead position must actually exist and be listed in

8  Appendix A of the Agreement.  Michelson, Tr. 171:7-11.

9        **2.**    **The Union's Witnesses Admitted That They Were Neither**

10               **Performing The Duties Of A Higher Paid Position Nor Acting As**

11               **Leads**

12        While the Union claims that Main O.R. evening shift techs are entitled to RHC

13  pay, the Union's witnesses did not establish – and did not even claim – that they perform

14  the duties of a position in a higher pay grade such that they would be entitle to RHC pay

15  under Article 9.  Mr. Ashford did not claim that he performs any duties other than the

16  duties associated with the tech job position.  Ashford, Tr. 45:7-11.  Mr. Granados claimed

17  vaguely that he was told that he was "working in a higher class."  Granados, Tr. 84:8-25.

18  However, when challenged, he admitted that he was never told what higher-graded

19  position he was supposedly working in, and he never even attempted to identify any such

20  position.  Granados, Tr. 85:19-21.  He certainly did not give any testimony suggesting

21  that he performed any (much less all) of the duties of any position other than the tech

22  position.

23        Similarly, neither of the Union's witnesses testified, or claimed, that they

24  performed the duties of the Lead tech position.  As has been described in detail above, the

25  Lead performs a variety of duties not performed by techs, including participating in

26  hiring and orientation, assisting in the evaluation of techs, monitoring of the performance

27  of techs, counseling and coaching techs, authorizing overtime and meal/rest periods, and

28  changing the schedules and assignments of techs.  Neither of the Union's witnesses.

1   claimed to perform any, much less all, of these duties at any time. They admitted that

2   they did not, and could not, for example, require other techs to change their assignments

3   (although the lead could). Ashford, Tr. 42:41:17-42:21, 46:9-11; Granados, Tr. 17-22.[7]

4   Both Mr. Ashford and Mr. Granados admitted that they were never told that they were

5   acting as Lead Anesthesia Tech.[8] Ashford, Tr. 57:13-15; Granados, Tr. 85:22-23.

6   Indeed, Mr. Ashford, asked if he was ever told that he was performing the functions of

7   another position when he carried the Spectralink, responded, "No. You're functioning as

8   an anesthesia tech." Ashford, Tr. 45:7-11.

9         3.    **There Is No Contractual Or Other Basis Upon Which The Union**

10             **Can Claim That Anesthesia Techs Earn RHC Pay For Carrying**

11             **Spectralinks**

12       As demonstrated above, the Union failed to bring forward any evidence

13  whatsoever that its witnesses were performing the duties of a higher-graded position, or

14  of the Lead Anesthesia Tech position. It can therefore present no claim that the techs

15  qualify for RHC pay under either of the two contractually specified criteria. Indeed, the

16  Union does not appear to be taking that position. Rather, it appears to be contending that

17  the techs qualify for RHC on a third basis not stated in the contract – namely that they are

18  entitled to RHC pay solely by virtue of the fact that they are assigned to carry the

19  Spectralink, and even then, that only a select few of the techs who carry the Spectralink

20  are entitled to RHC pay. Any argument along these lines must fail.

21       The authority of the arbitrator begins and ends with the collective bargaining

22  agreement, "[f]or arbitration is a matter of contract." *United Steelworkers of America v.*

23  *Warrior And Gulf Navigation Company* ("*Warrior & Gulf*"), 363 U.S. 574, 582 (1960).

24  As the United States Supreme Court has stated, the arbitrator "does not sit to dispense his

25  own brand of industrial justice. . . his award is legitimate only so long as it draws its

---

26  [7] Ms. Michelson also confirmed that none of the techs were performing the functions of
27  the Lead Anesthesia Tech position. Michelson, Tr. 172:3-19.
    [8] Of course, prior to January, 2006, it would have been impossible for a tech to qualify
28  for RHC on the basis of acting as a lead, as no lead anesthesia tech position was listed in
    Appendix A as required by Article 9. Jt. Exh. 2, Art. 9 & Appendix A.

1  essence from the collective bargaining agreement." *United Steelworkers of America v.*
2  *Enterprise Wheel And Car Corporation* ("*Enterprise Wheel*"), 363 U.S. 593, 597 (1960).
3  Furthermore, the Parties have specifically agreed that the Arbitrator "will have no power
4  to add to, subtract from, or change" the terms of the Agreement.

5      There is no contractual basis for a finding that a tech is entitled to RHC pay for
6  carrying a Spectralink.[9] The Union is essentially urging the Arbitrator to create a third
7  basis upon which RHC pay may be awarded (although apparently only to techs working
8  in the Main O.R. on the evening shift). This, the Arbitrator has no power to do.

9      The Union presented evidence that those techs who are assigned to carry the
10 Spectralink have additional responsibilities, and experience an increased workload
11 compared to the other techs. Thus, the Union presented evidence that the tech carrying
12 the Spectralink must answer between forty (40) and fifty (50) calls on the Spectralink per
13 shift, and had the responsibility to update the schedule in the workroom based on
14 information received via the Spectralink, and check the malignant hyperthermia cart.
15 There was also evidence that the tech carrying the Spectralink would be more likely to
16 receive certain assignments such as operating the Cell-Saver machine. The Union's
17 witnesses testified that the person assigned the Spectralink was responsible for receiving
18 a report from the outgoing Spectralink-carrier, and for giving a similar report to the
19 incoming Spectralink-carrier when his or her shift came to an end.

20     Initially, it was not shown that those assigned to carry the Spectralink experience a
21 significant workload burden beyond what could normally be expected for a tech. The
22 Union did not address the fact that the techs are not given a set number of tasks to
23 complete in a shift. The nature of their job is to adapt and respond to an unpredictable
24 and ever-changing work environment. Michelson, Tr. 151:15-152:16. The tech carrying
25 the Spectralink can expect to have his or her work interrupted by requests coming over

26 ────────────────────
[9] The only way that a tech could become entitled to RHC pay solely by carrying a
27 Spectralink telephone would be if there were a higher-graded or lead position whose only
distinguishing characteristic was carrying a Spectralink. However, the Union presented
28 no evidence that there is such a position, and Ms. Michelson testified that, in fact, there is
no such position. Michelson, Tr. 172:23-173:3.

21

1    the Spectralink. However, there was ample evidence in the record that any tech may be

2    similarly interrupted by a variety of other communication devices, including overhead

3    page, land line telephone, call lights, or in-person requests. Because techs do not have a

4    set amount of tasks to accomplish in a shift, responding to the Spectralink does not cause

5    a tech to "fall behind" other techs. Michelson, Tr. 151:15-152:16. Furthermore, while

6    any particular request or task may (or may not) be directed first to the tech carrying the

7    Spectralink, it was demonstrated that the tech carrying the Spectralink has the ability to

8    ask other techs to take the assignment, and that this "buddy system" is recognized by the

9    other techs. The evidence also shows that the responsibility to update the schedule is not

10   unique to the tech carrying the Spectralink, and that all techs are responsible for updating

11   the schedule based on information learned in the course of a shift. Ashford, Tr. 43:3-13.

12   Finally, the remaining duties specifically associated with the Spectralink, such as giving

13   and receiving post-shift reports, and checking the malignant hyperthermia cart (which

14   Mr. Ashford conceded takes less than a minute (Ashford, Tr. 40:17-25)) do not appear to

15   constitute a substantial burden upon the tech carrying the Spectralink, and, in any event,

16   constitute shared duties, given that every tech must take a turn carrying the Spectralink.

17   Indeed, there is substantial evidence in the record that the introduction of the Spectralink

18   actually reduced the workload of the techs who previously carried pagers, by relieving

19   them of the burden of repeatedly having to seek out land line telephones in the Hospital

20   in order to respond to pages and other requests.[10]   Ashford, Tr. 49:16-50:22; Michelson,

21   Tr. 162:3-18.

22        While the Union has failed to show that carrying the Spectralink does place a

23   unique or substantial burden on the tech assigned to carry it, more fundamentally, even if

24   the Union could succeed in showing that carrying the Spectralink entailed an exceptional

25   _____

26   [10] Additionally, although the Union and its witnesses conceded that techs assigned to
     carry Spectralinks in the ASC did not receive RHC pay for doing so, there was evidence
     in the record that, because room-turnover in the ASC is much higher than in the O.R.s,
27   working in that area can actually involve as much, if not more, work and Spectralink
     traffic than working in an O.R. Ashford, Tr. 35:21-36:11; Granados, Tr. 87:19-88:9;
     Michelson, Tr.150:3-14; Thus, even if the payment of RHC were based on workload
28   (which it is not), the alleged practice has not been clear or consistent in that regard.

1    and significant additional workload for techs, it would be wholly irrelevant because the

2    Parties did not agree to award RHC pay based upon the performance of additional,

3    burdensome or difficult tasks. There is nothing in the language of Article 9 that even

4    suggests that the number or difficulty of assigned tasks is a consideration in whether an

5    employee is entitled to RHC pay.[11] The sole criteria are whether the employee is

6    performing all job duties of a higher-graded position or a lead position. Because it is

7    undisputed that neither of these criteria were met, the Grievance must be denied.

8    **B.    Extrinsic Evidence Is Not Admissible To Modify Clear Contract**

9    **Language**

10    Given that the tech who is assigned to carry a Spectralink clearly does not meet

11    the contractual standards that govern entitlement to RHC pay, the Union can be expected

12    to present arguments based on a supposed "past practice" of paying a differential based

13    on the carrying of the Spectralink. Any such arguments based on extrinsic evidence must

14    be dismissed, as extrinsic evidence cannot modify clear contractual language.

15    As noted above, the only proper role of the Arbitrator is to apply and interpret the

16    Agreement. The Arbitrator is not permitted to alter or add to the Agreement in the guise

17    of interpreting it. *Safeway Stores, Inc.*, 2000 WL 33321299 (Arb.) (Gangle, 2000) ("If

18    contract language is clear and unambiguous, the arbitrator's role is simply to apply to the

19    language to the facts of the case."); *Hughes Aircraft Company*, 105 LA 1019 (Richman

20    1995) (Past practice is a tool of contract interpretation, not contract creation. In the

21    absence of . . . ambiguity, there is no basis for the use of past practice."). Accordingly,

22    among the most well-established of arbitral principles is that "past practice" evidence is

23    not admissible when its purpose is to alter clear contract language. A frequently-quoted

24    articulation of the rule holding past practice inadmissible to modify clear contract

25    language states that:

26    _____

[11] To the contrary, Article 2 of the Agreement makes it clear that the Employer has the
27    right, subject only to the express limiting provisions of the Agreement, to "abolish,
     create, **alter** or combine job classifications," and "to introduce new methods." Jt. Exh. 1,
28    Art 2 (emphasis supplied). There is no express limiting provision of the Agreement that
     would prohibit the assignment of additional tasks to a job classification.

SFCA_431990.4

> Plain and unambiguous words are undisputed facts. The
> conduct of parties may be used to affix a meaning to words
> and phrases of uncertain meaning. Prior acts cannot be used
> to change the explicit terms of a contract. An arbitrator's
> function is not to rewrite the parties' contract. His function is
> limited to finding out what the parties intended under a
> particular clause. The intent of the parties is to be found in
> the words which they, themselves, employ to express their
> intent. When the language used is clear and explicit, the
> arbitrator is constrained to give effect to the thought
> expressed by the words used.

*Phelps Dodge Copper Products Corporation*, 16 LA 229 (Justin 1951). *And see T-M Manufacturing*, 110 LA 978 (Staudohar 1998) (quoting above language).

Subsequent arbitral decisions reflecting this principle are legion. *See e.g. West Communications, Inc.*, 115 LA 1418 (Reeves 2001) ("Obviously if contract language is clear and unequivocal then it is unambiguous and past practice would be inadmissible."); *Tubetech, Inc.*, 113 LA 1025 (Richard 1999) ("With regard to past practices which are in conflict with express terms of the agreement, it is axiomatic that the rights and obligations of the Company and the Union are to be determined by the written contract which they have executed."); *City Of Conneaut*, 112 LA 899 (Richard 1999) ("Arbitrators universally disapprove the use of past practices to vary the meaning of a provision of the Agreement which is clear and unambiguous, going so far as to find evidence of past practice to be wholly inadmissible where the contract language is clear and unambiguous."); *Robertshaw Controls Company*, 94 LA 641 (Sergent 1989) ("a past practice, no matter how well established it may be, cannot be relied upon to amend or modify language that is clear and unambiguous."); *Marine Corps Logistics Base*, 87 LA 47 (Gentile 1986) ("It is the responsibility of an Arbitrator to give effect to the intent of the Parties and when that intent is stated in clear and unambiguous terms, the Arbitrator need look no further to such matters as bargaining history and practice.").

Here, there is no material aspect of the language of Article 9 that could be considered ambiguous. The only aspect of the Article that is at issue is the language

1  defining the conditions precedent before RHC is earned – specifically the meaning of the
2  phrases ". . . perform the typical duties of a position in a higher pay grade . . ." and ". . .
3  to a position in a lead classification listed in Appendix A and to perform all of the duties
4  thereof . . ." There is nothing ambiguous about this language. In order to apply it one
5  need only determine the existence of, and the duties of the higher grade or lead position
6  in question, and determine whether the employee is performing those duties. However,
7  the Union has not identified any "position in a higher pay grade," the duties of which the
8  grievants might be performing, and therefore the meaning of that language (to the extent
9  it could be termed ambiguous) is not at issue. Furthermore, the job duties of the Lead
10 Anesthesia Tech position have been established, and the Union's witnesses did not even
11 claim to have performed them. Thus, the Union's only possible claim is that,
12 notwithstanding that the Parties did not agree during bargaining that employees would
13 receive RHC pay for carrying Spectralinks, such a term should be added to the
14 Agreement on the basis of the Parties' supposed past practice. It is abundantly clear that
15 this is an argument aimed not at interpreting the language of Article 9, but rather at
16 changing that language to add an additional basis upon which RHC pay must be granted.
17 The Arbitrator has no power to make such a change, and past practice evidence offered in
18 support of such a change is not admissible.

19       **C.    To The Extent That Extrinsic Evidence At Variance With The Terms**
20            **Of The Agreement Can Be Considered The Union Cannot Meet Its**
21            **Burden Of Demonstrating A Binding Past Practice**
22            **1.    The Union Has The Heavy Burden Of Establishing A Binding**
23                 **Past Practice By Clear And Convincing Evidence**

24       It is well-established that the burden of establishing a binding past practice rests
25 with the party asserting that the practice exists. *Corning, Inc.*, 122 LA 194 (Fullmer
26 2006); *Augusta Newsprint Company*, 122 LA 214 (Holley 2005). Furthermore, the
27 burden placed on the party seeking to establish a past practice is a heavy one. *City of*
28 *Dover*, 122 LA 772 (Bordone 2006) ("the heavy burden of proving the existence of [a]

SFCA_431990 4

1    past practice falls to its proponent."). A "clear and convincing" standard of proof applies
2    to such claims. *Robertshaw, supra*, 94 LA 641 ("since the Union is the party alleging the
3    existence of a binding past practice, it has the burden of proving it by evidence that is
4    clear and convincing.").

5        **2.    Arbitral Standards Applicable To Past Practice Evidence**

6      Arbitrators have developed established standards in order for a party to establish
7    that a binding past practice exists. The most common formulation of the standards is
8    that, "to be binding on both Parties, must be (1) unequivocal; (2) clearly enunciated and
9    acted upon; (3) readily ascertainable over a reasonable time as a fixed and established
10   practice accepted by both parties." *Corning, supra*, 122 LA 194; *Robertshaw, supra*, 94
11   LA 641. It has been stated that the most important characteristics of a binding past
12   practice are: 1) the longevity of the practice; 2) the consistency and predictability of the
13   practice; and 3) the awareness or recognition by the parties that it is part of their
14   unwritten agreement. *Kansas National Guard*, 115 LA 1359 (Wyman 2001).

15       **3.    The Union Has Not Met Its Burden Of Establishing A Binding**
16         **Past Practice**

17         **a.    The Alleged Practice Is Not Unequivocal**

18     The Union has not met its heavy burden of showing that the alleged practice is
19   unequivocal. It is by no means clear who, under the Union's alleged practice, is entitled
20   to RHC pay for carrying a Spectralink, and why. The Union's own position on this has
21   evidently changed over time. In the Grievance, the Union claimed that the Employer
22   violated the Agreement by failing to pay a differential to "Anesthesia Techs carrying the
23   Spectra-Link Phone." However, at the Step Two meeting, the Union claimed that only
24   those techs who carried the Spectralink on the evening shift were entitled to RHC pay for
25   doing so. At the hearing, the Union further refined its position, and now claims that only
26   those techs who work within the Main O.R. are entitled to RHC for carrying the
27   Spectralink. The Union's ever-evolving position reflects the fact that there was never any
28   ///

26

1　coherent (much less unequivocal) past practice with respect to whether techs were

2　entitled to differential pay for carrying the Spectralink.

3　　　The testimony of Gerald Ashford is revealing. He testified that although he

4　received extra pay for carrying the Spectralink in the Main O.R., he did not receive it

5　when he worked in the ASC or when he was assigned to out of department cases.[12]

6　Ashford, Tr. 27:18-22; 53:4-54:5. Furthermore, although Mr. Ashford testified that he

7　received extra pay when he carried the Spectralink in the Main O.R., he was curiously not

8　prompted to give any testimony on the practice beyond that vague statement. When did

9　the practice of paying the differential start? Who informed Mr. Ashford that he would be

10　receiving the differential and under what circumstances? Did he receive it every time he

11　carried a Spectralink in the main O.R.? The Union was content that Mr. Ashford remain

12　silent on all these issues. Given that the burden of proof rests with the Union, and that

13　the Union's burden is a heavy one, the Union's choice to let the record remain silent on

14　these issues works against it.

15　　　The most that the Union has established is that, for an undetermined period of

16　time, and for unknown reasons, some (but not all) techs who carried the Spectralink

17　erroneously received extra payments terms RHC pay. Having been unable to establish

18　that the practice existed at all with respect to three (3) of the four (4) environments in

19　which techs work, the Union has tried to limit its grievance to only those techs who work

20　in the Main O.R. – and even among those techs it is unclear how many of them actually

21　received the extra payments, as the Union conceded at the Step Two meeting that it was

22　seeking RHC pay only for techs working the evening shift. Thus, the record reflects that

23　there is no established unequivocal practice, and therefore the Union's claim must fail.

24　///

25

---

[12] Indeed, it is noteworthy that the Union's "clarification" that it was limiting its claim to
26　techs carrying the Spectralink telephone in the Main O.R. came shortly after Mr. Ashford
revealed that he never received a differential for carrying the telephone in the ASC or on
27　out of department cases. As of the opening of the hearing, the Union apparently believed
that it could establish that techs working in all locations except Labor & Delivery
28　received RHC pay for carrying a Spectralink, a claim that its own witnesses contradicted.
See Union's opening statement Tr. 9:12-19.

SFCA_431990.4

1
2

**b.    The Alleged Practice Has Not Been Clearly Enunciated
And Acted Upon**

3    The record reflects that there has never been any kind of a definite statement as to

4    when the Union's supposed RHC rule would apply.  As noted above, Mr. Ashford was

5    not even asked to define the parameters of the supposed RHC rule.  Mr. Granados' did

6    make some attempt to explain how he knew when he would receive RHC pay for

7    carrying the Spectralink, but his testimony was hopelessly muddled.  He claimed that he

8    was told by an unnamed manager that he was receiving RHC pay because he was

9    "functioning at a higher class."  Granados, Tr. 84:8-25, 85:19-21.  However, the record

10   makes clear that this was not the basis upon which he was paid RHC pay.  Mr. Granados

11   admitted that he was never informed what "higher class" he was working in, and did not

12   claim to have ever performed the functions of a higher-graded or a lead position.

13   Granados, Tr. 84:8-25, 85:19-21.  The real reason that he received additional pay was

14   because he was carrying the Spectralink, not because he was working in a higher

15   classification.  Thus, the Union's own witnesses could not articulate a consistent or

16   reasonable basis upon which they were paid RHC pay.

17   Additionally, it is noteworthy that, although the Union claims that there existed a

18   practice that was so unequivocal that it matured into a mutually binding rule, and that the

19   practice continued over a period of years, it could not produce a single written policy

20   statement, memorandum, note, e-mail, or even the most casual written reference to the

21   supposed policy.  Indeed, although the practice supposedly applied to the many techs

22   who have been assigned to work in the Main O.R., the Union could only produce two (2)

23   persons who could testify about it, and even those witnesses displayed only the vaguest

24   of understandings of the supposed practice.

25
26

**c.    The Alleged Practice Was Not Known To Or Accepted By
The Employer**

27   In order to be binding on the employer, a past practice must be known to and

28   accepted by the employer.  *Archer Daniels Midland Company*, 117 LA 1419 (Goldstein

SFCA_431990.4

2001) ("For there to be a past practice that would be binding on the Employer, the Union needs to prove that there has been a 'meeting of the minds' between the parties. Without this 'meeting of the minds', a past practice, no matter how long it has endured, cannot be found to exist."). Furthermore, the practice must be known to the employer at the institutional policy-making level.[13] It is insufficient that the practice be known only to a lower-level manager or supervisor. In *Montgomery Ward & Company*, 85 LA 913 (Caraway 1985) it was held that "[c]ertainly if the top Labor Relations Manager of the Company . . . did not know of the existence of this past practice, the essential element of knowledge and acquiescence is missing." *See also Texas Utilities Mining Company*, 94 LA 160 (Baroni 1990) ("more than the isolated acts of a few foremen is necessary for the creation of an established past practice."); *American Sand & Gravel Company*, 118 LA 535 (Szuter 2003) ("[t]he requisite knowledge must be attributable to the institutional level of the bargaining party and does not normally encompass first level supervision or shop stewards as having authority to establish the implicit consent needed for an agreed interpretation or an amendment to the agreement."). The Union has presented no evidence whatsoever that any person at the institutional level of the Employer, or even any person in a personnel policy-making position was aware of the alleged past practice. Indeed, as soon as the fact that techs were improperly receiving RHC pay was brought to the attention of the Employer's Human Resources Department, the techs' manager was instructed to correct this error immediately. Therefore, the Union's past practice argument must fail.

Furthermore, the Union has not even offered sufficient evidence that the alleged practice was known to the Employer's lower level managers in the Anesthesia Department. As noted above, the Union could not produce any document reflecting or referring to the alleged practice. Although Mr. Granados testified that a manager told him to mark "RHC" on his timecards when he carried the Spectralink, he did not even

---

[13] As one arbitrator put it, "what we are looking for is some 'smoking gun' in the evidence in which the Company can be said to have agreed either verbally or in writing" to the alleged past practice. *Corning, supra*, 122 LA 194.

1  provide the identity of this manager. Granados, 82:13-24. Mr. Granados was hired by

2  the Employer in April, 2004, and this statement was supposedly made in the context of

3  Mr. Granados' initial training. Mr. Ashford, although he presumably also went through

4  similar training on the Spectralink, did not claim that any such statement was made to

5  him. Neither claimed that any similar statement was made to them subsequently during

6  their employment. Therefore, the only item of evidence that the Union produced in

7  support of its claim that the Employer agreed that techs would receive RHC pay for

8  carrying the Spectralink was Mr. Granados' uncorroborated claim that a unknown

9  manager made a single statement three years ago.

10              **4.      Any Past Practice Established Under The Predecessor**

11                     **Agreement Was Extinguished With The Adoption Of The**

12                     **Current Agreement**

13           Even if the Union could establish that there existed a binding past practice relating

14  to the payment of RHC on the basis of techs carrying Spectralinks, the vast majority of

15  such evidence relates to the time when the Predecessor Agreement was in effect. When

16  the Predecessor Agreement expired, the Parties bargained for a new agreement, and the

17  Parties specifically bargained over the language of Article 9. At that time, the Union had

18  the opportunity, if it thought that techs, or any other employees, should receive additional

19  pay for carrying Spectralinks, and if it thought that the Parties had come to an

20  understanding based on past practice that techs were entitled to such payments, to

21  incorporate that supposed understanding into the Agreement. Yet, although the Parties

22  agreed to change certain aspects of Article 9, they did not agree to add a provision calling

23  for RHC pay based on carrying a Spectralink. Assuming the Union was aware of the

24  purported practice, there are only two possible explanations for its failure to incorporate

25  the practice into the Agreement – either the Union was not able to convince the Employer

26  to agree to such a provision, or the Union did not raise the issue at all. If the first case,

27  the parties extinguished the practice by considering and rejecting it as a basis for RHC

28  pay. If the second case, the Union deliberately declined to bring the practice to the

1  Employer's attention, which would be consistent with an awareness that the Employer

2  was not aware of the practice at the policy-making level and that, if it were, it would not

3  agree to the practice.[14]

4        Article 26.7.10 of the Agreement provides that the Arbitrator "will not make any

5  award that would, in effect, grant the Union or the employee(s) any matters that were not

6  obtained in the negotiation process." The Union had every opportunity to bargain for a

7  change to Article 9 that would have established the right of techs to receive RHC pay for

8  carrying the Spectralink, but was unable or unwilling to bargain for such a provision, or

9  was not even aware that RHC was being paid for such duties. Having failed to secure

10  that right through bargaining, the Union cannot now gain that right or benefit through the

11  guise of interpreting the Agreement through arbitration.

12        **5.  To The Extent That There Was A Past Practice, The Agreement**

13          **Authorized The Employer To Terminate It**

14        Even if the Union were permitted to introduce extrinsic past practice evidence in

15  the face of clear contract language to the contrary (which it may not), and even if the

16  Union could establish that there existed a binding past practice requiring the Employer to

17  pay techs RHC pay for carrying Spectralinks (which it cannot), the Employer was free to

18  terminate any such past practice, and the Employer did terminate the practice of paying

19  techs for carrying the Spectralink shortly after the current Agreement went into effect.

20        Arbitrators have recognized that, even where a past practice is established, either

21  party may put an end to the practice by giving advance notice that it intends to

22  discontinue the practice. *Moco Thermal Industries*, 106 LA 1182 (Hodgson 1996)

23  (holding that a past practice ceases to be binding where one party gives advance notice of

24

25  [14] Of course, it is also possible that the Union itself was unaware that some techs were
receiving extra pay for carrying Spectralinks. If that were the case – if the practice was

26  so vague and inconsistently applied that it was not even known to the Union – then it
cannot be that the practice was unequivocal, clearly enunciated and acted upon. It would

27  also mean that knowledge and acceptance of the alleged practice had not reached beyond
the level of regular employees and (possibly) their immediate supervisors, and had

28  certainly not reached the institutional policy making levels of either party, precluding any
"meeting of the minds" between them regarding the practice.

1  its discontinuation); *Franklin Electric Company, Inc.*, 108 LA 1020 (Brunner 1997)

2  (stating that company could have terminated a past practice had it given advance notice).

3  Nowhere is this more true than in a case where a past practice conflicts with contractual

4  language.  There is no dispute that the Employer gave clear notice that any RHC that had

5  been paid on the basis of techs carrying Spectralinks had been paid in error and that, from

6  that point forward, RHC would not be paid except as authorized by the Agreement.

7  Granados, Tr. 80:21-81:10.

8      Although the Employer had the right to terminate any past practice as a matter of

9  arbitral precedent, more importantly, the Agreement expressly gives the Employer the

10 sole discretion to discontinue any existing past practices.  Article 2 of the Agreement

11 comprises a statement reserving the Employer's inherent management rights.  Among the

12 Employer's expressly reserved rights, subject only to the express provisions of the

13 Agreement, is the right to do the following:

14          To abolish, create, alter, or combine job classification;

15          To introduce new or improved methods, equipment, facilities,
16          or operations;

17          To determine whether employees, both within and without the
18          bargaining unit will or will not perform certain functions,
             duties, or tasks;
19

20          To promulgate, eliminate or revise reasonable rules and
             regulations relating to the terms and conditions of
21          employment and the manner of operations, provided only that
             they do not conflict with the express provisions of this
22          Agreement.
23

24 Jt. Exh. 1, Art. 2.  Finally, Article 2 provides as follows:

25          The Employer may, in its discretion, continue any current
26          policies and practices **which do not conflict with express
             written provisions of this Agreement**.
27

28 Jt. Exh. 1, Art. 2 (emphasis in original).

32

1    Given that the Employer is entitled to continue, in its discretion, any existing

2  policies and practices that do not conflict with the provisions of the Agreement, two

3  necessary corollaries follow.  First, any policy or practice that conflicts with any

4  provision of the Agreement is void and cannot be continued consistent with the

5  Agreement, and specifically with Article 2.[15]  Second, if the Employer is vested with the

6  discretion to continue any policy or procedure not at variance with the provisions of the

7  Agreement, it must also be vested with the discretion to **discontinue** any such policy or

8  procedure.  No other construction of this language is reasonable, or even possible.  If the

9  Employer has "discretion" only to continue existing policies and practices, but not to

10  discontinue such policies and practices, then it has no option with respect to existing

11  policies and practices but to continue them, which is the very antithesis of discretion.

12  The Arbitrator must give effect to the language the Parties have agreed to, and has no

13  authority to "add to, subtract from, or change" any of the terms of the Parties'

14  Agreement.  Jt. Exh. 1, Art. 26.7.3.  Therefore, the Arbitrator must hold that, to the extent

15  that there existed a practice of paying RHC pay to some techs for carrying the

16  Spectralink, and to the extent that such a practice did not conflict with Section 9 of the

17  Agreement, the Agreement gives the Employer the discretion to discontinue any such

18  practice.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

_____

[15] As was demonstrated above, it is well-established that, as a matter of arbitral standards
27  of contractual interpretation, a supposed past practice at variance with clear contractual
language is invalid.  However, Article 2 provides that a policy or practice at variance
28  with any provision of the Agreement is also invalid as a matter of the express terms of the
Agreement.

33

1  V.    **CONCLUSION**

2         For the reasons that have been shown the Employer, Stanford Hospital & Clinics

3  respectfully submits that the Union has not met its burden and therefore the Grievance

4  must be DENIED.

5  DATE: JUNE 5, 2007                          FOLEY & LARDNER LLP
                                               LAURENCE R. ARNOLD
6                                              SCOTT P. INCIARDI

7

8                                      By: _____
                                            Laurence R. Arnold
9

10                                     By: _____
                                            Scott P. Inciardi
11

12                                          ATTORNEYS FOR THE EMPLOYER,
                                            STANFORD HOSPITAL & CLINICS
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34