**EXHIBIT N**

VINCENT A. HARRINGTON, JR., Bar No. 071119
WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501-1091
Telephone 510.337.1001
Fax 510.337.1023

FOLEY & LARDNER LLP
RECEIVED
JUN 1 2 2007

Attorneys for Service Employees International Union,
Local 715

IN ARBITRATION PROCEEDINGS

PURSUANT TO THE AGREEMENT BETWEEN THE PARTIES

In the Matter of a Controversy Between,   ) F.M.C.S. Case No. 06-59192
)
STANFORD HOSPITAL AND CLINICS,            )
)
      Employer,                          ) **UNION'S POST-HEARING BRIEF TO**
) **THE ARBITRATOR**
      and,                               )
)
SERVICE EMPLOYEES INTERNATIONAL           )
UNION, LOCAL 715,                         )
)
      Union.                             )
)
(Grievance of Anesthesia Techs-Relief Pay in )
Higher Class)                             )

      As the Union sees it, the question is whether the Employer violated Article 9 of the Agreement when it terminated the five percent differential pay to Anesthesia Techs who were assigned to carry the Spectralink telephone beginning on or about February of 2006; and if so, what is the remedy? See Tr. 7-8. The parties also authorized the arbitrator to fashion a formulation of the issue from the parties' presentations. Tr. 7. In the Employer's perspective, apparently, the question is whether the employees are "entitled" to such pay. Tr. 8.

      The parties stipulated that all prior steps of the grievance and arbitration procedures were met or waived and the matter is properly before the arbitrator for final decision. Tr. 7.

      Union witnesses Gerald Ashford and Paul Granados testified to the practices which pre-existed the Employer's termination of the long-standing pay practice under which the Anesthesia

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

Tech assigned to carry the Spectralink telephone during the shift was given a five percent pay differential. The basis for the pay is apparently found in Article 9.1 of the contract which talks about "temporary assignments" for the performance of work in a higher pay grade, and as well, the performance of a position in a "lead classification." In either case, the employees so assigned receive a five percent differential. That was what was indeed occurring prior to early 2006 when the Employer unilaterally stopped the practice.

Mr. Ashford testified that he had been employed as an Anesthesia Tech since June of 2002. Tr. 15. As with the other employees adversely affected, he works in what is referred to as the main operating room ("OR"). As Ashford testified, the Techs work out of the Anesthesia Workroom where the supplies are maintained, and where information is provided with respect to assignments in the various rooms within the OR. As he described it, the general work of an Anesthesia Tech is the set up and disassembly of anesthesia machines and equipment before and after the OR cases. Tr. 16. The Techs also troubleshoot and do minor repairs on instruments, they set up IVs for the patients. Id. Ashford works on the day shift, 6:45 a.m. to 3:15 in the afternoon. Tr. 17. On his day shift there are approximately 8 other Techs assigned. Id.

As Ashford testified, on a daily basis there is an assignment sheet posted on the manager's door which has the various OR assignments, including the Spectralink telephone assignment. Id. Associated with that specific assignment is the review and documentation of proper stocking of the hypothermia cart, and assuring that there is "equipment for OR staff." Tr. 18. On the day shift, Ashford testified that there is a supervisor present with whom he would have some interaction concerning supplies, or "an array of things." Id.

As Ashford testified, the Spectralink assignment is posted on the manager's door. This device is a cell-type telephone that is called by either a Resident or Anesthesiologist to more quickly communicate with the Tech during the shift. Tr. 20. If a Tech has the Spectralink telephone assignment on a given day, they would receive it in a "pass down" from the off-going person on the prior shift, and then there ensues a report from the off-going employee to the on-coming employee regarding the status of the various cases in the OR at that time. Tr. 21. The report would also include a summary of whether there is any specific equipment that has been

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

- 2 -

1  requested or will be needed in the early part of the shift, etc. Tr. 20-21. There is a half hour of
2  overlap between that off-going employee and the on-coming shift—one shift comes in at 6:45 a.m.,
3  and one shift leaves at 7:15 a.m. Compare Tr. 17 with Tr. 21.

4      There are 21 operating rooms in the main OR. Tr. 22. On a day when the Spectralink
5  telephone is assigned to Ashford, in addition to performing his regular duties as an Anesthesia
6  Tech, he must immediately respond to Spectralink telephone calls. Tr. 22. Thus, as Ashford said,
7  if the telephone does ring and response is needed, for supplies, for example, he would have to "stop
8  what he is doing," retrieve the item, "take it to that doctor and return to the tasks that you were then
9  performing." Id. In addition to receiving calls concerning items or additional supplies, the
10 employee carrying the telephone would receive calls from the Control Desk notifying him/her of
11 cancellations, add-ons and room changes. With respect to calls from the Control Desk, the
12 Spectralink telephone Tech would have to go back to the workroom and make those changes on the
13 OR schedule to make other staff aware. Other information is also needed to be recorded, such as
14 the identity of the patient, the patient's age, and other information relative to the patient's proper
15 care. Tr. 23.

16     As Ashford recalled it, the Spectralink telephone had been in existence for more than a year
17 prior to January of 2006. Tr. 25.

18     As Ashford recalled it, prior to the use of the Spectralink telephone, there was a pager
19 assignment given to a Tech on each shift which was similar in nature. Tr. 25-26. The nature of the
20 duty assignment was the same, and the pager duties, like the Spectralink telephone duties, had
21 priority over other regular duties to which the Tech may be assigned during that particular shift.
22 Tr. 26.

23     Ashford testified that the Techs do not rely upon an overhead paging system to
24 communicate among themselves concerning work issues. Tr. 26. In his view, the overhead page
25 cannot be heard in an individual OR, or in the workroom itself. Tr. 26-27. Prior to the early part
26 of 2006, employees would carry the Spectralink telephone, as with the pager, for a week at a time.
27 Tr. 27. During the time that he carried the pager, and as well, carried the Spectralink telephone,
28 prior to the challenged Employer action, Ashford received a five percent differential for the

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337 1001

- 3 -

duration of the shift in which he had either the pager or the telephone. Tr. 26-27. During his employment history of approximately five years, Ashford testified that he had carried the Spectralink telephone on all of the shifts, and that the assignment is essentially the same on each. Tr. 29-30. Finally, Ashford testified that he estimated that he would receive between 40 and 50 Spectralink telephone calls during the typical or customary shift that he worked. Tr. 31.

Finally, Ashford testified that although he became aware that the Employer stopped paying the differential for the Spectralink telephone assignment, the duties associated with the assignment did not change. Tr. 32-33.

On cross-examination of Ashford it was established that a month or so after the termination of the Spectralink differential, as he recalled it, the Employer hired a Lead Technician. Tr. 45. In his judgment, that individual did not begin receiving calls that would have otherwise gone to the Spectralink Tech on that shift. Tr. 45-46. The Lead carried a Spectralink telephone, but it was a different telephone, and it was not the one which the Anesthesiologists were calling or the Control Desk was calling. Tr. 46.

On cross-examination, counsel for the Hospital tried to create the false impression that the Techs are essentially hanging out in the workroom waiting for assignments, and that any one of them, therefore, could receive information about new cases, supplies needed, etc. On re-direct examination, it was established that this is not the case, and that it is with "very little" frequency that Techs would be found in the workroom during the shift. Tr. 52. Ashford testified unequivocally that people who needed the services of the Techs call the Spectralink telephone because it is a "more direct way" of contacting a live person. Tr. 52. It was also established that although a Spectralink telephone is used in several other assignments—the out of department assignment and the Ambulatory Surgery Center assignment—they are different telephones, with different numbers. The individual assigned to those telephones in those much smaller departments were never paid a differential. Tr. 53-54. Finally, the evidence showed that although the employer had a "Lead" Technician for a little less than a year, that individual's presence did not modify the duties associated with the caring of the Spectralink telephone assignment in the main OR. Tr. 55-

56.[1]

Paul Granados, an employee since April of 2004 also testified. Tr. 59. He was a shop steward beginning in February or March, 2006. Id. Granados testified that during his employment he had the Spectralink telephone assignment on all three shifts, although he was primarily an employee assigned to the day shift. Tr. 60-61. He agreed with Ashford that prior to February of 2006, he received a five percent differential for performing the assignment. Tr. 61. Consistent with Ashford's evidence, Granados testified that on any particular shift where he was given the Spectralink assignment, he had, as well, a regular assignment like all other employees on the shift. Tr. 62. It was his estimate that the call volume throughout a typical shift would be 50 to 60 calls on the day shift, 40 to 50 calls on the PM or evening shift. Tr. 62-63. He received a variety of theses type of calls as he testified at Tr. 63; he would receive them from nurses in the OR, Anesthesiologists in the OR, or from the Control Desk associated with the main OR. Tr. 63. As Granados understood it, and as he was trained, the Spectralink telephone took priority, he would answer each call as he got it, and then go back to his regular work. Tr. 63. He testified, consistent with Ashford, that the overhead page system does not work in the workroom. It also does not work in the main OR operating rooms themselves. Tr. 64. By contrast, the Spectralink telephone works in both of those locations.

Granados testified that one of the frequent assignments that could be given to an Anesthesia Tech in the main OR is the operation of what he described as the "cell saver" machine which essentially recirculates the patient's own blood during the course of the operation. Tr. 64-65. That machine requires constant observation, apparently, so if that assignment occurred concurrently with an assignment to carry the Spectralink telephone, additional difficulties were imposed on the employee with the Spectralink assignment. Thus, as he testified, that employees would have to make a variety of decisions to seek assistance from co-workers or supervisors, as well as continuing to perform his regular duties. Tr. 65-66. (See Granados' specific testimony at page 66

---

[1] After a caucus at the conclusion of Mr. Ashford's testimony, the Union clarified its position that its claim is directed to the differential which was historically paid to the Anesthesia Techs who carried the Spectralink telephone in the main OR, not in these smaller units. Tr. 57-58.

- 5 -

where he describes the variety of "prioritizing" decisions he would be required to make with regard to responding to Spectralink calls.)

Granados testified that one of the duties associated with carrying the Spectralink telephone is to record changes in the cases, the case schedules, the room switches, on the information board in the workroom. Tr. 67. Although the Tech can verbally advise employees of these changes, he is required, if he is carrying the Spectralink telephone, to also write them down. Id. Granados testified that until approximately April of 2006, the Spectralink assignment lasted for a week at a time—5 days in a month. Tr. 68. (According to his testimony and that of Ashford, it thereafter went to an assignment which was rotated on a daily basis.)

Granados concurred with Ashford's testimony that one of the duties associated with the carrying of the telephone was to make a report to the on-coming employee who would assume that function, covering the status of the main OR at the time of the shift change. Thus, room changes, cases being cancelled, the order of cases being switched, the addition of new cases, would all be communicated to the on-coming employee. Tr. 70.

Granados testified, as Ashford had, that although there is an assignment to carry a Spectralink telephone in the other departments, the scope and extent of the duties in those other assignments are minimal as compared to that which applies in the main OR. Thus, he testified that there were perhaps four or five cases in the "out of department" assignment. Tr. 71. (In fact, there are only four anesthesia machines set aside for "out of department" work, so only four cases could be run at any given time. Id.) Granados was also able to clarify that the OR extension assignment did not exist at the time of the Employer's unilateral rescission of the differential back in the early part of 2006. Tr. 71-72. Practices which have arisen there after the fact of the Employer's action, and the Union's grievance, have no relevance to the resolution of this dispute. In any event, it was Granados' testimony that there is a very low level of activity in the OR extension, with perhaps only "one room" running at a time. Tr. 72. Finally, with respect to the Ambulatory Surgery Center, again a location where the differential was never paid, although there is a Spectralink telephone assignment, it is the "simplicity of the cases" which makes it a much easier shift at that location. Tr. 72. The ASC has only 12 operating rooms, a little over half of the number in the

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091

- 6 -

main OR. Id.

During his testimony, Granados recited information that he had received from his co-workers when, in his capacity as shop steward, he began investigating the question of the impact of the hiring of a Lead Tech in the work of unit. As he succinctly testified, employees reported to him that although the Lead had been hired, she was having no impact on their workload, they continued to have the assignment with the Spectralink telephone, and the volume of the work had not changed. Tr. 77-78.

Granados was present in a staff meeting when he learned that the Employer was terminating the differential. Tr. 80. At that time, the reason given was that the "differential pay" was "not placed within the new contract." Tr. 81. Despite the Employer's unilateral act in rescinding the differential, the duties remain the same. Id. Finally, Granados testified that when he was trained about the use and application of the Spectralink telephone in the main OR, he was also told when he filled out his timecard to classify the pay as "RHC" meaning "relief at a higher class" for the hours that he had that assignment. Tr. 82. He would in fact make such a notation on the timecard, and it would be signed off by the manager. Tr. 82-83.

On cross-examination, Granados also clarified that at the time of the turnover of the telephone from the off-going shift, in addition to receiving information about the then current status in the OR, the on-coming Tech would receive information about things that were anticipated to be coming up in the shift, specific "set ups" for surgery cases, and it was the responsibility of the on-coming Tech with the Spectralink assignment to either do those set ups him or herself, or to note them on the board for others to follow up on. Tr. 86-87.

The essence of the testimony of the Union witnesses Ashford and Granados was corroborated by Diane Alejandro, at the time of her testimony employed as the Administrative Manager for OR anesthesia. Tr. 92. She had held that position since only January of 2007, but prior to that time, beginning in September of 2005, she worked as an Anesthesia Tech for the Employer. Tr. 93. Thus, she testified that when she carried the telephone as a bargaining unit employee she received a five percent differential. Tr. 129. She also testified that she received, she estimated, between 40 to 48 calls a day on the Spectralink telephone on the occasions that she held

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337-1001

- 7 -

1  it (5 to 6 calls per hour). Tr. 130. She also corroborated that she was told that her responsibility
2  was to directly deal with those calls as soon as possible after she received them on the Spectralink'
3  telephone. Tr. 131. She also testified that she had to exercise her judgment to prioritize the
4  various calls she received in order to accomplish them in an efficient way, but doing the most
5  important one first. Tr. 131-132. She also corroborated the testimony of the Union witnesses that
6  these additional Spectralink calls were on top of her regular assignment as described on the
7  assignment sheet. Tr. 132. Alejandro testified that in addition to the detail associated with the
8  malignant hypothermia cart check list, the person with the Spectralink telephone on the day shift
9  also was required to monitor and place orders for certain equipment which is stored in the general
10 work area, and which are apparently used on a regular basis. Tr. 133.

11        Alejandro corroborated the Union evidence that there was a "report" or "handoff" from
12 shift to shift associated with the Spectralink telephone. Tr. 135-136. See as well, her testimony at
13 Tr. 137-138.

14        As with the Union witnesses, Alejandro testified that she would also note her timecard with
15 the pay code RHC, a code that she understood triggered the payment of the five percent differential
16 for the assignment. Tr. 138. Finally, she testified, consistent again with the Union evidence, that
17 even after there was a Lead Tech hired, and even after the Lead Tech's Spectralink telephone was
18 implemented, the main OR Spectralink telephone continued to be used, and continued to be used in
19 the very same fashion that it had been used prior to February 2006, the date of the hiring of the
20 Lead. Tr. 139. Finally, Alejandro testified that she was employed after the time the Lead Tech
21 position was filled, but that the actual duties, the nature of the assignment, and the extent of the
22 assignment of carrying the telephone in the main OR did not change. Tr. 147-148.

23        The Employer's witness Sheryl Michelson provided testimony also supportive of the
24 Union's position. At Tr. 161, for example, she testified that the Spectralink telephone has been
25 employed for two or three years. She also testified, at this page and the succeeding page that
26 pagers were used previously to perform a similar function. She also testified at Tr. 164 that the
27 Lead position was filled for only about 13 or 14 months beginning January of 2006. Tr. 164. She
28 said that the Lead position has been filled, effectively, "on and off" over 10 or 15 years, but had

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337 1001

- 8 -

last been filled 3 years ago. Tr. 164-165. Interestingly, on direct examination she also testified to her familiarity with RHC pay, and offered a broader interpretation of its availability than might be taken from the contract language. At Tr. 170-171, she testified that one way it can be received is if you are appointed to "an acting position" in a class above your present level, and another situation would be if someone is asked "to do a job for a period of time that is significantly different than the present job that they are doing." Tr. 171.

This witness was also involved in the "discovery" of the fact that the Techs were receiving RHC pay for the Spectralink assignment. At Tr. 169, she testified that she herself had utilized the pay with individuals who have been "asked to take on unusual job responsibilities for a period of time." In reviewing budget issues with the former manager of the department, Ms. Michelson "discovered" that RHC pay had been paid (Tr. 168), and upon inquiring with Human Resources, they were advised to terminate the pay. Interestingly, the record does not reflect that they were advised to terminate the pay because it was not authorized by the Collective Bargaining Agreement, but because they could not offer the pay in a "position that does not exist." Tr. 171. (However, our records shows that the Lead position does exist, and has existed, from time to time. It is identified in the Labor Agreement in Appendix A, the first page after the signature page in Joint Exhibit 1.) This witness testified, as the Union witnesses had, that employee timecards are reviewed by supervisors and approved prior to being submitted for payroll purposes. Tr. 176-177. The witness also disclosed that this pay practice had been in effect over the administration of two different managers—Mr. Powell, and Ms. Beltran. Id.

Ms. Michelson testified that she had never been involved in the collective bargaining with the SEIU. Tr. 182.

The sum total of the facts shows clear evidence that the five percent differential was paid to the Anesthesia Tech who was assigned to carry first, the page, and then later, the Spectralink telephone in the main OR. There was such a person designated on the assignment sheet for each shift, of each day, in the department. Management clearly knew that the work was being performed, because management was making the assignment of the work. Further, we have clear evidence that management approved the RHC pay for this assignment through at least two

- 9 -

managers, and, both before, and after, the negotiation of Joint Exhibit 1. We have clear evidence from not only the Union witnesses, but also management witnesses, that the carrying of the Spectralink telephone in the main OR imposes additional, unusual, and significant job duties on that particular Tech during that particular period of assignment, as composed to those of other Techs. The Spectralink telephone assignee must not only do his or her regular job, but handle anywhere from 40 to 60 calls per shift above and beyond regular duties. The assigned Tech is further required to prioritize the telephone calls, make value judgments concerning the relative seriousness of the requests, and further, make and receive a report from co-workers concerning the status of the main OR at the time of shift change.

This record shows clearly a well-established, long-standing, open, notorious, and well understood practice affecting bargaining unit employees in the main OR. It also was a practice which had attached to if a substantial economic benefit—the five percent differential for all hours worked in the assignment. And, it was an assignment which was rotated through the Techs in the unit, so all employees in the affected classification were given an opportunity to earn the differential.

Our record also shows clearly that the employer unilaterally changed the practice and withdrew the differential without obtaining the consent of the Union, indeed without even notifying the Union that it was changing the practice.

Further, Employer witnesses have testified that the premium has been paid in situations which appear to have been beyond the "literal" language of the Article, in circumstances in which employees are asked to perform "unusual duties" over a period of time. Again, the work described in this record qualifies in this category as well.

It is clear that the Employer never put on the table in the negotiations which resulted in Joint Exhibit 1, any proposal to terminate or withdraw this benefit. And, it is clear that the benefit was withdrawn during the term of Joint Exhibit 1. Article 31 of the Agreement provides that the parties may "mutually agree to amend" or may mutually agree to "add to" the Agreement provided, however, that any such amendment or modification "must be in writing executed by the duly authorized representatives of each party." JX 1 at p. 74, Article 31.1. This negotiated provision

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda CA 94501-1091
510 337 1001

1  also states that any "verbal modification or amendment" is of no effect.

2  Article 28 of the Agreement, JX 1 at page 71, is a waiver clause which is a mutual waiver.
3  It applies to this dispute insofar as once the contract was executed and became effective, the Union
4  was not obligated to "bargain collectively" with respect to any subject or matter referred to, or
5  covered by the Agreement, or with respect to any matter not specifically referred to or covered
6  even though the party may not have known of the subject or the matter when the contract was
7  bargained. In other words, this is a broad protection afforded to the parties to the Agreement
8  preventing the other side from requiring a renegotiation of the contract.

9  When the Employer, on this record, unilaterally withdrew the five percent differential
10 which it had historically paid for years to the Anesthesia Tech in the main OR who was assigned to
11 carry the Spectralink telephone, it unilaterally violated the Agreement between the parties. It
12 unilaterally violated, as well, an operative binding past practice concerning the interpretation and
13 application of Article 9 to the specific circumstances of the carrying of this telephone. Clearly, the
14 parties had, over a number of years, both before and after the Agreement, understood that the
15 payment of a differential to these employees was appropriate, was authorized, and was justified
16 due to the special duties assigned to the Anesthesia Techs who were carrying the Spectralink
17 telephone during any particular shift. The Employer's claim that this management approved,
18 payroll authorized differential was a "mistake" is almost laughable under the circumstances of this
19 case.

20 The arbitrator should sustain the grievance in its entirety, order the Employer to re-establish
21 the previous practice with respect to the five percent differential which was associated with the
22 carrying of the Spectralink telephone in the main OR, and should compel the Employer to make all
23 adversely affected employees whole, for wages, and lost benefits, retroactive to the date that the
24 Employer unilaterally changed the practice. The Employer should be directed to cease and desist
25 from modifying this practice until or unless it has the mutual agreement of the Union to do so, or
26 ///
27 ///
28 ///

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337 1001

- 11 -

1 until such time as it obtains a modification of the contract language and/or the past practice through

2 good faith bargaining.

3 Dated: June 7, 2007

Respectfully submitted,

WEINBERG, ROGER & ROSENFELD
A Professional Corporation

By: _____
VINCENT A. HARRINGTON, JR.
Attorneys for Service Employees International
Union, Local 715

113881/459564

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

- 12 -