**EXHIBIT O**

IN ARBITRATION PROCEEDINGS PURSUANT TO THE CURRENT COLLECTIVE
BARGAINING AGREEMENT BETWEEN THE PARTIES

| | |
|---|---|
| In the Matter of Arbitration ) | |
| ) | |
| between ) | OPINION AND DECISION |
| ) | FOLEY & LARDNER LLP |
| STANFORD HOSPITAL AND CLINICS ) | RECEIVED |
| ) | OF |
| ) | JUL 0 3 2007 |
| and ) | |
| ) | |
| ) | |
| SERVICE EMPLOYEES INTERNATIONAL) | PAUL D. STAUDOHAR |
| UNION, LOCAL 715 ) | Arbitrator |
| ) | |
| ) | FMCS Case No. 06-59192 |
| ) | |
| Grievance of Anesthesia Techs; ) | |
| Relief Pay in Higher Classifications ) | |

APPEARANCES:

FOR THE EMPLOYER

LAURENCE R. ARNOLD, ESQ.
SCOTT P. INCIARDI, ESQ.
Foley & Lardner LLP
One Maritime Plaza, Sixth Floor
San Francisco, California 94511

FOR THE UNION

VINCENT A. HARRINGTON, JR., ESQ.
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, California 94501

2

This is an arbitration to determine whether Anesthesia Technicians are entitled to receive a five percent pay differential when assigned the duty of carrying a Spectralink telephone. The Parties to this arbitration are STANFORD HOSPITAL AND CLINICS (hereinafter called "Employer") and SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715 (hereinafter called "Union").

The Arbitrator was appointed by letter of December 19, 2006, from Counsel for the Union with a copy to Counsel for the Employer. At the request of the Union, three Subpoenas were signed by the Arbitrator on April 16, 2007, regarding attendance of witnesses at the arbitration hearing. The hearing was conducted on April 24, 2007, at the Offices of Counsel for the Employer, 1530 Page Mill Road, Palo Alto, California. A transcript of the hearing was made by a Certified Shorthand Reporter. Testimony was received under oath from two Union witnesses and two Employer witnesses, who were submitted to full examination and cross-examination by Counsel. Five joint exhibits, no Union exhibits, and five Employer exhibits were introduced into the record. Post-hearing briefs were received by June 11, 2007.

## Case Background

The Employer is recognized as a worldwide leader in advanced patient care, particularly for treatment of rare and complex disorders. Anesthesia at its hospital is principally administered in the Main Operating Room, which is divided into 21 individual operating rooms. The Anesthesia Department is located in this area and constitutes the principal workshop, supply storage area, and home-base of Anesthesia Techs (hereinafter called ATs). The job duties of the ATs include assisting anesthesiologists; providing equipment, supplies, and materials; assisting with patient care; setting up operating

3

rooms; setting up and operating the Cell-Saver, a machine to recirculate the patient's own blood during the course of an operation; and responding to specific requests from anesthesiologists and nurses.

There is also a position called Lead Anesthesia Tech (Lead) which has existed in the past but is not at present filled. The Lead assists the department's manager in a variety of ways, including evaluating the performance of ATs, monitoring their work schedules, interviewing ATs, and making assignment changes. After being filled for approximately a year, since March 2007 the Lead position has been vacant, although it continues to exist and the Employer intends to fill it. The manager of the Anesthesia Department, since January 2007, is Diane Alejandro, who previously worked for the employer as an AT. In addition to her regular job duties, Ms. Alejandro handles functions formerly performed by the Lead.

There are several ways in which communications among ATs, and between ATs and other medical personnel, take place. These include conventional telephones, over-head pager, portable pager, call lights, and person-to-person contact. This case involves a Spectralink telephone, a portable device that essentially operates in the same fashion as a cellular telephone. On each of the three shifts a particular AT is assigned to carry a Spectralink. Assignments are made on a rotational basis, so all ATs handle the Spectralink at one time or another. Whereas in the past the Spectralink was assigned to an individual on a weekly basis, currently this is done on a daily basis so that a different AT carries it every day. In the Main Operating Room there are typically five or six ATs working the day shift, three or four on the evening shift, and two on the night shift. When the shifts change the AT handing over the Spectralink to the AT on the new shift provides a report of the status of various cases.

4

Prior to the advent of the Spectralink, one AT per shift carried a pager, which made work rather more difficult because once a page was received the AT had to locate a telephone to respond to the pager. When the pager was used and for about two to three years after the Spectralink superseded the pager, the AT who carried the phone received additional pay of five percent of base pay. These payments were made during the time that Robert Powell was the Anesthesia Department Manager. Mr. Powell was succeeded as manager by Alice Beltran. Ms. Beltran had no prior managerial experience and therefore was provided comprehensive training by Sheryl Michelson, the Employer's Manager of Perioperative Education.

During the course of this training Ms. Michelson and Ms. Beltran discovered discrepancies in the department's budget. They realized that some of the ATs were receiving the five percent differential under "relief in higher classification" (RHC). When Ms. Beltran contacted the Employer's Human Resource Department about the differential, she was told that the prior payment for RHC was in error and should be discontinued. Accordingly, Ms. Beltran informed the ATs that effective February 17, 2006, the five percent differential previously paid to those who carried the Spectralink phone was discontinued.

As a result, the Union filed a grievance on behalf of all affected ATs, claiming that elimination of the five percent pay differential was in violation of Article 9 of the collective bargaining agreement.

Collective Bargaining Agreement and Provisions

The following provisions of the Parties' negotiated agreement for 2006-2008 are particularly relevant:

5

## ARTICLE 2
## MANAGEMENT RIGHTS

***Except only as limited by express provisions of this Agreement,*** all of an employer's rights and prerogatives, whether previously exercised or unexercised and whether implied or expressed, will be retained and reserved by the Employer, and will remain within its exclusive direction and control. For purposes of illustration only and not to limit the foregoing in any way, management will have the right, ***subject only to said express limiting provisions of this Agreement:***

a)    to manage the hospitals, laboratories, clinics, warehouses and other facilities and operations in which employees covered by this Agreement work;

b)    to direct and assign the work force;

c)    to transfer, reassign, promote and demote employees;

d)    to establish standards of performance, health and safety and quality of service, and to evaluate employee performance;

e)    to maintain discipline, order and efficiency;

f)    to determine medical, patient care and operational standards, procedures and methods; to schedule work;

g)    to abolish, create, alter or combine job classifications;

h)    to introduce new or improved methods, equipment, facilities or operations;

i)    to determine efficient and effective staffing requirements;

j)    to determine the number and location of facilities and operations;

k)    to determine whether the whole or any part of an operation will continue to operate;

l)    to determine whether a vacancy exists and whether and when it will be filled;

m)    to require overtime work, when needed, consistent with employee health and safety;

n)    to transfer or subcontract work for legitimate business reasons but, except in emergencies, only after affording the Union a reasonable opportunity to meet and discuss with management effects of the proposed transfer or subcontracting;

o)    to select and hire employees;

p)    to determine qualifications for positions;

q)    to demote, suspend, warn, discharge or otherwise discipline employees;

r)    to lay off or relieve employees from duty for lack of work or other legitimate reasons;

s)    to rehire employees;

t)    to determine whether employees, both within and without the bargaining unit, will or will not perform certain functions, duties or tasks;

6

u)      to promulgate, eliminate or revise reasonable rules and regulations
        relating to the terms and conditions of employment and the manner
        of operations, provided only that they do not conflict with the
        express provisions of this Agreement.

The Employer may, in its discretion, continue any current policies and practices
*which do not conflict with express written provisions of this Agreement.*
(Jt. Exh. 1, emphasis in the original).

...

## ARTICLE 9
## TEMPORARY ASSIGNMENT

9.1     An employee temporarily assigned by the Employer to perform the typical
        duties of a position in a higher pay grade for four (4) consecutive hours
        or more will receive a differential of five percent (5%) for each grade
        above the grade of the employee's regular classification for all hours
        during which the employee is so assigned (e.g., if an employee in grade
        SEIU0006 is assigned to a position in SEIU0008 the employee will receive
        a differential of ten percent (10%)).  As an exception, if an employee is
        assigned by the Employer to a position in a lead classification listed in
        Appendix A and to perform all of the duties thereof, the employee will be
        paid a lead premium of five percent (5%) for the actual hours worked in
        the lead position provided the lead position is in a classification in a higher
        wage range than the employee's regular classification or position.

...

## ARTICLE 26
## GRIEVANCE AND ARBITRATION PRECEDURE

...

26.7.3  The Arbitrator's authority will be limited to interpreting the specific
        provisions of this Agreement and will have no power to add to, subtract
        from, or to change any part  of the terms or conditions of this Agreement.
        If the grievance is sustained in whole or in part,  the remedy will not ex-
        ceed restoring to the employee the pay, benefits, or rights lost as a result
        of a violation of the Agreement, less any compensation from any source,
        including, but not limited to, Workers' Compensation and Unemployment
        insurance benefits.  The decision of the arbitrator, within the limits
        described herein, will be final and binding upon the parties and will be the
        exclusive remedy for the subject matter of the grievance.

...

26.7.10 The decision of the arbitrator on any issue properly before the arbitrator
        will be final and binding upon the Employer, the Union and all employees.

7

> The arbitrator's authority will be limited to determining whether the
> Employer has violated the provision(s) of this Agreement. The arbitrator
> will not have jurisdiction or authority to add to, amend, modify, nullify,
> or ignore in any way the provisions of this Agreement, and will not make
> any award that would, in effect, grant the Union or the employee(s) any
> matters that were not obtained in the negotiation process.
>
> ...

### Position of the Union

In its post-hearing brief, the Union cites the testimony of ATs Gerald Ashford and
Paul Granados, to the effect that there was a long-standing pay practice providing a five
percent differential to ATs who carried the Spectralink phone. The basis for the extra pay
is said to be Article 9.1 of the agreement which refers to temporary assignment for work in
a higher pay grade and performance of work in a lead classification.

The Union notes that in addition to one's regular duties as an AT, the person assigned
to the Spectralink phone must immediately respond to these phone calls. If supplies are
needed, for example, one would stop what he or she is doing, retrieve the item, and take it to
the doctor. Also, immediate response is necessary to deal with cancellations, add-ons, and
room changes. About 40-50 calls per shift would come through on the Spectralink phone.
Although the Employer stopped paying the differential, the Union contends that the duties
associated with the assignment did not change.

Similar to Mr. Ashford, Mr. Granados carried the Spectralink phone on all three shifts
and the assignment was essentially the same on each. The Union notes that Granados, who is
also a Shop Steward, received the differential whenever he was assigned to the Spectralink
phone. As Granados was trained, the Spectralink phone took priority and he would go back
to his regular work only when he had taken care of the call on the Spectralink.

The Union notes that although there is an assignment to carry Spectralink phones in
other departments, the scope and extent of the duties in these other assignments is minimal

8

compared to the heavy load in the Main Operating Room. Other departments also typically have far simpler cases, which makes shifts easier at those locations.

Mr. Granados' testimony in his capacity as Shop Steward is cited by the Union to indicate that ATs told him that when the Lead position was filled it had no impact on their workload. Further, when Granados was at the staff meeting where the termination of the differential was announced, the reason given by the Employer was that differential pay was not placed within the new contract. Yet, says the Union, despite the Employer's unilateral act in rescinding the differential, the duties remain the same.

The testimony of Ashford and Granados is said to be corroborated by that of Ms. Alejandro, the current manager and former AT. She received the differential when she carried the Spectralink and got about the same volume of calls on that phone as the others did. She also corroborated that the additional Spectralink calls were on top of her regularly assigned duties.

A long-standing practice is said to have existed in which management approved the RHC pay for the Spectralink assignment, and that this occurred both before and after the negotiation of the current collective bargaining agreement. Yet, argues the Union, the Employer unilaterally changed the practice and withdrew the differential without obtaining the consent of the Union. There was never a proposal made at the bargaining table by the Employer to terminate or withdraw this benefit.

As a remedy, the Union requests that the five percent differential be reestablished and that the Employer make all adversely affected employees whole for wages and lost benefits. The Employer should also be directed to cease and desist from modifying this practice until the Union agrees to do so or the Employer obtains a modification of contract language through good faith bargaining.

9

## Position of the Employer

In its post-hearing brief, the Employer notes that carrying the Spectralink phone does not give an AT any authority over other ATs. The AT with the phone can only request another AT's assistance but cannot reassign or direct performance of a task. Compared to the previous practice of using pagers, which necessitated finding a telephone to respond to the page, the use of the Spectralink reduces the amount of time required by the AT to respond to messages.

The Employer contends that while the grievance was initially filed on behalf of all ATs, at the Step 2 hearing the Union indicated that its claim was limited to ATs carrying the Spectralink on the evening shift, and not on the day shift. Then, during the arbitration hearing the Union said its claim was limited to those ATs who carry the Spectralink while assigned to the Main Operating Room.

It is said to be undisputed that the ATs assigned to the Spectralink are not acting as Leads or performing the duties of any other position in a higher wage rate. As a result, they would not be entitled to RHC pay under Article 9 of the agreement. The Employer claims that the Union's own witnesses acknowledged that they were not working in any particular higher classification, nor did they claim to perform the duties of the Lead AT position. Yet, these are the only two ways that one would qualify for RHC pay under Article 9.

The Employer contends that the Union has not shown that the AT with the Spectralink experiences a significant workload burden beyond what would normally be expected for a regular AT. AT's generally are not given a set number of tasks to complete in a shift. Although the AT with the Spectralink can expect to have his or her work interrupted by phone requests, this is said to be true of any AT who is interrupted by a variety of other communication devices. Moreover, even if it were the case that the Spectralink increased

10

workload, it is said to be wholly irrelevant because the Parties did not agree to award RHC pay on the basis of performing additional burdensome tasks.

Past practice is said by the Employer to be not admissible when its purpose is to alter clear contract language. Because the Union has not identified any "position in a higher pay grade," the meaning of the language in Article 9 is argued to be not at issue. By emphasizing past practice the Union is trying to modify the agreement language to provide an additional basis for RHC pay. But the Arbitrator is said to have no power to make such a change, and the past practice evidence is not admissible.

The burden of demonstrating a binding past practice at variance with the agreement is argued to be a heavy one. The Employer contends that even if the Union could establish a binding past practice relating to the payment of RHC on the basis of ATs carrying Spectralinks, the vast majority of such evidence relates to the time when the predecessor (2002-2005) agreement was in effect. When that agreement expired, the Union had an opportunity to incorporate its supposed past practice into the agreement. Yet, although Article 9 was modified, there was no agreement to pay extra for carrying a Spectralink.

Even if the Union can establish that there was a past practice, the Employer claims that it is free to terminate any such practice and that indeed it did terminate the practice of the five percent differential shortly after the current agreement went into effect. The Employer contends that arbitrators have long recognized that either party may put an end to the practice by giving advance notification of its intention to do so.

### Opinion

The Parties did not agree on a stipulated issue. According to the Union, the issue should be: "Whether the Employer violated Article 9 of the Agreement when it termi-nated the five percent differential pay to Anesthesia Techs who were assigned to carry the

11

Spectralink telephone beginning on or about February of 2006; and if so, what is the remedy?" (Tr., pp. 7-8). According to the Employer, the issue should be "Whether or not Anesthesia Techs are entitled to receive additional pay under Article 9 of the Collective Bargaining Agreement for carrying a Spectralink phone." (Tr., p. 8). These are both accurate and sound statements of issue and whichever is chosen would yield the same outcome. The Employer does not raise the point about remedy, but it is nonetheless implicit in the statement. So the issues amount to the same thing.

The Parties stipulated that all procedural issues have been complied with or waived and that the grievance is properly before the arbitrator for a final and binding decision (Tr., p. 7).

There is no doubt that for two or three years a past practice was in existence. Everyone acknowledges that a five percent differential wage was paid first to the AT who carried the pager and then later to the AT who carried the Spectralink phone. It is also not in dispute that Ms. Michelson and Ms. Beltran, in consultation with Human Resources, determined that it was inappropriate to provide this increment because it was not provided for in the agreement as RHC pay. The Employer unilaterally announced that it was terminating the differential in February 2006 without getting the Union's consent or approval.

It is generally accepted in arbitration that certain clear and long-standing practices can establish conditions of employment that are as binding as any written provision of the agreement. Past practices mutually accepted by the Parties can attain the status of contractual rights, especially when they are not repudiated by negotiated provisions in the agreement and were not changed during contract negotiations. The past practice in this case began under the 2002-2005 agreement. The agreement language pursuant to which

12

the five percent differential was paid to ATs is Article 9.

    This article in the predecessor agreement provided as follows:

### ARTICLE 9
### TEMPORARY ASSIGNMENT

9.1      An employee temporarily assigned by the Employer to perform the typical duties of a position in a higher pay range for a period of a full shift or more will be paid in accordance with the higher pay range at a rate that provides the employee with an increase for all hours worked performing such duties. As an exception, if an employee is assigned by the Employer to a position in a lead classification listed in Appendix A and to perform all of the duties thereof, the employee will be paid a lead premium of five percent (5%) for the actual hours worked in the lead position provided the lead position is in a classification in a higher wage range than the employee's regular classification or position. (Jt. Exh. 2).

    This language does not specifically reference what a "position in a higher pay range" might be. It also refers to a "position in a lead classification listed in Appendix A…" Appendix A includes the position of Anesthesia Technician. Although the position of Lead (capitalized) AT has been around, off and on, for a period of 10-15 years, according to the testimony of Ms. Michelson (Tr., p. 164), it is not without plausibility that an AT carrying a pager/Spectralink was operating in a lead (lower case) role.

    Comparing this previous language of Article 9 with that of the current 2006-2008 agreement shows some changes. The "higher pay range" of the earlier agreement was changed to "higher pay grade." Whereas the old agreement provided payment for a "full shift or more," the current agreement pays the differential after only "four consecutive hours." There are some other changes but none of any apparent significance. Altogether, the language remains much the same.

    The five percent differential was paid to ATs under the predecessor agreement. But it was also paid, for a short time, under the current agreement. (The current agreement became effective on January 20, 2006; the differential was terminated unilaterally by the Employer

13

effective February 17, 2006). Therefore, the past practice can be said to have survived the negotiation of the current agreement and remained in existence, at least for a short time before repudiation by the Employer.

According to Elkouri and Elkouri's How Arbitration Works, a binding past practice must be unequivocal, clearly enunciated and acted upon, and readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both Parties (sixth edition, edited by Alan Miles Ruben, 2003, p. 608). The past practice in this case is clear: the AT who carries the Spectralink phone was paid a five percent differential. It was mutually accepted as a custom by the Employer and Union. The practice existed for a fairly lengthy period of time, at least a year.

There was considerable testimony over what the assignment of the Spectralink entails. Mr. Ashford testified that when he is carrying the phone he is still expected to carry out the normal duties of an AT (Tr., p. 22). So if you get a call while performing a normal duty, you have to stop that work and attend to the call. Ashford indicated that he received 40-50 calls per shift when carrying the Spectralink (Tr., p. 31). Similar call volumes were cited by Ms. Granados and Ms. Alejandro based on their experiences as an AT (Tr., pp. 62, 108).

But Ms. Alejandro and Ms. Michelson did not agree that the workload increased significantly. Ms. Alejandro testified that the workload was not increased (Tr., pp. 106-107). Ms. Michelson indicated that the workload "may or may not" increase (Tr., p, 161). The consensus through, factoring in the testimony of Mr. Ashford and Mr. Granados, who have been active ATs for some time, is that the workload clearly goes up. Ms. Michelson acknowledged that ATs assigned the Spectralink are expected to respond to the calls as well as perform the range of usual assignments in the unit (Tr., p. 185).

Mr. Granados testified that the reason given by the Employer for terminating the

14

differential pay was that it was not placed in the new contract, i.e., there is no language in the new contract providing for the differential (Tr., p. 81). The Employer seems to imply here that the differential was justified under the old contract but not under the new one. The problem with this reasoning is that the changes that occurred to Article 9 do not appear to address this issue. That is, if the differential was justified under the old agreement, it is no less justified under the new one.

The grievance of April 25, 2006 was filed on behalf of all ATs (Jt. Exh. 4). The Employer contends, however, that the Union limited the grievance to only those ATs carrying the Spectralink on the evening shift. In a letter from Brian Coffman, the Employer's Senior Employee/Labor Relations Specialist, to Union Shop Steward Lourdes Arafiles dated July 21, 2006, this point is made (Jt. Exh. 5, p. 2). Although the Union may have taken such a position at Step 2 grievance discussions, there is only the Employer's statement to that effect. For the scope of the original grievance to change so radically would seem to require evidence from the Union that it did so. At the arbitration hearing the Union made it clear that it is limiting the scope of the agreement to ATs who work in the Main Operating Room. That is the scope that is applicable here.

Summing up, the evidence shows the existence of a past practice for handling the Spectralink phone. The evidence is convincing that ATs who have this assignment have an increased responsibility and workload. The basis for paying the five percent differential is Article 9. The Employer terminated the long-standing past practice without the consultation and consent of the Union.

<u>Award</u>

After careful consideration of all written and oral evidence presented by the Parties, it is determined that the Employer violated Article 9 of the collective bargaining

15

agreement when it terminated the five percent differential to Anesthesia Techs who were assigned to carry the Spectralink telephone on shifts in the Main Operating Room. The remedy is restoration of the five percent differential and making whole of ATs in the Main Operating Room for lost wages. The differential will remain in effect unless and until altered by mutual agreement of the Parties. In accordance with the Union's request, the Arbitrator retains jurisdiction in the event of a dispute over remedy.

The grievance is sustained.


Paul D. Staudohar
Arbitrator


July 2, 2007