1

2

3

4

5

6

7

8       **UNITED STATES DISTRICT COURT**

9       **NORTHERN DISTRICT OF CALIFORNIA**

10

11

12  STANFORD HOSPITAL & CLINICS AND          Case No:  C-07-CV-05158-JF
    LUCILE PACKARD CHILDREN'S
    HOSPITAL                                 [PROPOSED] ORDER GRANTING
13                                           STANFORD HOSPITAL AND
                   Petitioners,              CLINICS' AND LUCILE PACKARD
14                                           CHILDREN'S HOSPITALS'  MOTION
                                             FOR SUMMARY JUDGMENT OR, IN
15          v.                               THE ALTERNATIVE, SUMMARY
                                             ADJUDICATION OF CLAIMS OR
16  SERVICE EMPLOYEES INTERNATIONAL          DEFENSES
    UNION, LOCAL 715
17                                           [FED. R. CIV. P. 56]
                   Respondent.
18

19                                           Date:        August 29, 2008
                                             Time:        9:00 AM
20                                           Dept:        Ctrm. 3, 5th Floor

21                                           Judge:       Hon. Jeremy Fogel

22

23  ///

24  ///

25  ///

26  ///

27  ///

28

SFCA_1425610.2

The motion of Petitioners, Stanford Hospital And Clinics and Lucile Packard Children's Hospital (the "Hospitals") for summary judgment or, in the alternative adjudication of claims or defenses (the "Motion") came on regularly for hearing August 29, 2008, with Eileen R. Ridley of Foley & Lardner, LLP appearing as counsel for the Hospitals and Bruce Harland of Weinberg Roger & Rosenfeld appearing as counsel for Respondent, Service Employees International Union, Local 715 ("Local 715"). After full consideration of the papers in support and opposition to said motion, the evidence submitted by the parties, the oral argument presented by counsel, and the papers and files in the matter, and good cause appearing, the Court finds that there is no triable issue of any material fact and that the Hospitals are entitled to judgment as a matter of law under Rule 56 of the Federal Rules Of Civil Procedure for the reasons stated below.

## I.    THE AWARD IS INVALID BECAUSE IT DID NOT DRAW ITS ESSENCE FROM THE CBA AND DID NOT REPRESENT A PLAUSIBLE INTERPRETATION OF THE CBA

The undisputed facts show that the arbitration award at issue herein (the "Award") is invalid because it did not draw its essence from the collective bargaining agreement (the "CBA") and did not represent a plausible interpretation of the CBA.

The Court finds that the following facts are material and undisputed:

- At the time of the arbitration at issue here, Local 715 was, or at least purported to be, a labor organization, which represented a bargaining unit consisting of certain employees of the Hospitals, including employees in a job classification known as "anesthesia technician" (hereinafter "tech") [Declaration Of Laurie J. Quintel In Support Of Motions ("Quintel Decl.") ¶ 3.]

- The Hospitals' and Local 715's CBA is effective from January 20, 2006 through November 4, 2008. [Arnold Decl. ¶ 4 & Exh. B.]

- Article 2 of the CBA specifically reserves to the Hospitals the right to "direct and assign the work force," "to abolish, create, alter or combine job classifications," "to introduce

new or improved equipment, facilities or operations," and "to determine whether employees, both within and without the bargaining unit, will or will not perform certain functions, duties or tasks." [Arnold Decl. Exh. B.]

- Article 2 further states that the Hospitals "may, in [their] discretion, continue any current policies and practices which do not conflict with express written provisions of this Agreement." [Arnold Decl. Exh. B.]

- Article 18 of the CBA sets forth provisions governing "work rules" and states, in part, that "[t]he Employer has the right at its discretion to promulgate, alter, modify, amend, rescind, and enforce work rules which are not inconsistent with this Agreement." [Arnold Decl. Exh. B.] Article 18 defines "work rules" as "rules promulgated by the Employer, or a particular department or departments thereof, within its discretion, that regulate employees relative to and affecting their employment." [Arnold Decl. Exh. B.]

- Article 2 also provides that the decision whether or not to continue any existing policies or practices is within the Hospitals' sole and unlimited discretion. Specifically, Article 2 states, that The Hospitals "may, in [their] discretion, continue any current policies and *practices which do not conflict with express provisions of this Agreement*." [Arnold Decl. Exh. B (emphasis in original).]

- Article 9 of the CBA provides in relevant part as follows:

> An employee temporarily assigned by the Employer to perform the typical duties of a position in a higher pay grade for four (4) consecutive hours or more will receive a differential of five percent (5%) for each grade above the grade of the employee's regular classification for all hours during which the employee is so assigned (e.g., if an employee in Grade SEIU0006 is assigned to a position in SEIU0008 the employee will receive a differential of ten percent (10%)). As an exception if an employee is assigned by the Employer to a position in a lead classification listed in Appendix A and to perform all of the duties thereof, the employee will be paid a lead premium of five percent (5%) for the actual

hours worked in the lead position provided the lead position is in a classification in a higher wage range than the employee's regular classification or position.

- The additional payments called for in Article 9 of the CBA are commonly referred to as "relief in higher classification" or "RHC" pay.  [Quintel Decl. ¶ 5]

- Article 28 of the CBA is titled "waiver" and states in relevant part that "[t]he Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other will not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered by this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed the Agreement."  [Arnold Decl. Exh. B.]

- Article 26.7.3 of the CBA provides that, "[t]he arbitrator's authority will be limited to interpreting the specific provisions of this Agreement and will have no power to add to, subtract from, or to change any part of the terms or conditions of this Agreement."  [Arnold Decl. Exh. B.]

- Article 26.7.10 provides that "[t]he arbitrator's authority will be limited to determining whether the Employer has violated the provision(s) of this Agreement.  The arbitrator will not have jurisdiction or authority to add to, amend, modify, nullify, or ignore in any way the provisions of this Agreement, and will not make any award that would, in effect, grant the Union or the employee(s) any matters that were not obtained in the negotiation process."  [Arnold Decl. Exh. B.]

- On or around April 25, 2006, Local 715 filed a grievance pursuant to Article 26 of the CBA (the "Grievance").  [Quintel Decl. ¶ 6; Arnold Decl. ¶ 11 & Exh. E.]

- In the Grievance, Local 715 alleged that the Hospitals violated Article 9 of the CBA by refusing to pay RHC pay to certain techs who carried a device known as a "Spectralink," [Quintel Decl. ¶ 4; Arnold Decl. Exh. E.]

- When the parties were unable to resolve the Grievance, it was submitted to arbitration before Paul D. Staudohar (the "Arbitrator"), who had been selected by the parties to arbitrate the grievance. [Arnold Decl. ¶ 12.]

- A hearing was held before the Arbitrator on April 26, 2007 in Palo Alto, California. [Arnold Decl. ¶ 13 & Exh. L.]

- During the hearing, the Arbitrator heard the testimony of witnesses and received documentary evidence, including a complete copy of the CBA. [Arnold Decl. ¶ 14-16 & Exh. B-L.]

- On July 2, 2007, the Arbitrator issued the Award, which was titled "opinion and decision." [Arnold Decl. ¶ 19 & Exh. O.]

- The Arbitrator found that the parties had been unable to agree upon a statement of the issue, Local 715's statement of the issue being "Whether the Employer violated Article 9 of the Agreement when it terminated the five percent differential pay to Anesthesia Techs who were assigned to carry the Spectralink telephone beginning on or about February of 2006; and if so, what is the remedy?" and the Hospitals' being "Whether or not Anesthesia Techs are entitled to receive additional pay under Article 9 of the Collective Bargaining Agreement for carrying a Spectralink phone." [Arnold Decl. ¶ 19 & Exh. O p. 10-11.] The Arbitrator found, however, that these two statements were essentially equivalent. [Arnold Decl. ¶ 19 & Exh. O p. 10-11.]

- The Arbitrator upheld the Grievance. He found that there had existed an unwritten "past practice" whereby techs were paid a five percent differential for carrying a Spectralink,

-4-

based in part (in the Arbitrator's view) on the increased workload that carrying the Spectralink supposedly entailed.  [Arnold Decl. ¶ 19 & Exh. O p. 14-15.]

• The Arbitrator found that the Hospitals violated the CBA by eliminating the "past practice," without Local 715's "consultation and consent."  [Arnold Decl. ¶ 19 & Exh. O p. 14.]

• As a remedy, the Arbitrator ordered "restoration of the five percent differential and making whole of [techs] in the Main Operating Room for lost wages."  [Arnold Decl. ¶ 19 & Exh. O p. 15.]  He also stated that "[t]he differential will remain in effect unless and until altered by mutual agreement of the Parties."  [Arnold Decl. ¶ 19 & Exh. O p. 15.]

An arbitral award "is legitimate only so long as it draws its essence from the collective bargaining agreement."  *United Steelworkers Of America v. Enterprise Wheel And Car Corporation* ("*Enterprise Wheel*"), 363 U.S. 593, 597 (1960).  Courts are obliged to uphold an award only where the arbitrator's reasoning "represents a plausible interpretation of the contract in the context of the parties' conduct".  *Stead Motors Of Walnut Creek v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200, 1209 (9th Cir. 1989).  An award that conflicts with the contract cannot be a plausible interpretation of the contract.  *Pacific Motor Trucking Company v. Automotive Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983)

The Court finds, based upon the above-referenced undisputed material facts, that the Arbitrator's Award was invalid because the assignment of spectralinks fell within the scope of management rights defined by Article 2 of the CBA, and the Award therefore conflicts with and/or ignores Article 2 of the CBA.

The Arbitrator's finding that Techs must be paid RHC pay for carrying Spectralinks also conflicts and/or ignores Article 9 of the CBA, the language of which creates no such right.

The Arbitrator's reliance on a "past practice" violated the Article 2 of the CBA, which grants the Hospitals the discretion to continue or discontinue any existing policies or practices.

1    The Arbitrator's holding that the Hospitals were obligated to secure the agreement of

2  Local 715 before discontinuing the RHC pay at issue conflicted with and/or ignored Article 28 of

3  the CBA.

4    By issuing an award that is contrary to the CBA the Arbitrator exceeded his powers as set

5  forth in Article 26 of the CBA.

6    For the foregoing reasons, the Court FINDS that the Award was invalid as a matter of

7  law and ORDERS that judgment be entered in favor of the Hospitals and against Respondent.

8  The Court further ORDERS that the Award is hereby VACATED.

9  II.    **THE AWARD DECIDED ISSUES THAT WERE NOT SUBMITTED BY THE**

10        **PARTIES**

11    The undisputed facts show that the arbitration award at issue herein (the "Award") is

12  invalid because it improperly decided issues that were not submitted by the parties.

13    The Court finds that the following facts are material and undisputed:

14  •    At the time of the arbitration at issue here, Local 715 was, or at least purported to be, a

15        labor organization, which represented a bargaining unit consisting of certain employees

16        of the Hospitals, including employees in a job classification known as "anesthesia

17        technician" (hereinafter "tech")  [Quintel Decl. ¶ 3.]

18  •    The Hospitals' and Local 715's CBA is effective from January 20, 2006 through

19        November 4, 2008.  [Arnold Decl. ¶ 4 & Exh. B.]

20

21  •    Article 2 of the CBA specifically reserves to the Hospitals the right to "direct and assign

22        the work force," "to abolish, create, alter or combine job classifications," "to introduce

23        new or improved equipment, facilities or operations," and "to determine whether

24        employees, both within and without the bargaining unit, will or will not perform certain

25        functions, duties or tasks."  [Arnold Decl. Exh. B.]

26

27  •    Article 2 further states that the Hospitals "may, in [their] discretion, continue any current

28

-6-

policies and practices which do not conflict with express written provisions of this Agreement." [Arnold Decl. Exh. B.]

• Article 18 of the CBA sets forth provisions governing "work rules" and states, in part, that "[t]he Employer has the right at its discretion to promulgate, alter, modify, amend, rescind, and enforce work rules which are not inconsistent with this Agreement." [Arnold Decl. Exh. B.] Article 18 defines "work rules" as "rules promulgated by the Employer, or a particular department or departments thereof, within its discretion, that regulate employees relative to and affecting their employment." [Arnold Decl. Exh. B.]

• Article 2 also provides that the decision whether or not to continue any existing policies or practices is within the Hospitals' sole and unlimited discretion. Specifically, Article 2 states, that The Hospitals "may, in [their] discretion, continue any current policies and *practices which do not conflict with express provisions of this Agreement*." [Arnold Decl. Exh. B (emphasis in original).]

• Article 9 of the CBA provides in relevant part as follows:

> An employee temporarily assigned by the Employer to perform the typical duties of a position in a higher pay grade for four (4) consecutive hours or more will receive a differential of five percent (5%) for each grade above the grade of the employee's regular classification for all hours during which the employee is so assigned (e.g., if an employee in Grade SEIU0006 is assigned to a position in SEIU0008 the employee will receive a differential of ten percent (10%)). As an exception if an employee is assigned by the Employer to a position in a lead classification listed in Appendix A and to perform all of the duties thereof, the employee will be paid a lead premium of five percent (5%) for the actual hours worked in the lead position provided the lead position is in a classification in a higher wage range than the employee's regular classification or position.

• The additional payments called for in Article 9 of the CBA are commonly referred to as "relief in higher classification" or "RHC" pay. [Quintel Decl. ¶ 5]

-7-

SFCA_1425610.2

- Article 28 of the CBA is titled "waiver" and states in relevant part that "[t]he Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other will not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered by this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed the Agreement." [Arnold Decl. Exh. B.]

- Article 26.7.3 of the CBA provides that, "[t]he arbitrator's authority will be limited to interpreting the specific provisions of this Agreement and will have no power to add to, subtract from, or to change any part of the terms or conditions of this Agreement." [Arnold Decl. Exh. B.]

- Article 26.7.10 provides that "[t]he arbitrator's authority will be limited to determining whether the Employer has violated the provision(s) of this Agreement. The arbitrator will not have jurisdiction or authority to add to, amend, modify, nullify, or ignore in any way the provisions of this Agreement, and will not make any award that would, in effect, grant the Union or the employee(s) any matters that were not obtained in the negotiation process." [Arnold Decl. Exh. B.]

- On or around April 25, 2006, Local 715 filed a grievance pursuant to Article 26 of the CBA (the "Grievance"). [Quintel Decl. ¶ 6; Arnold Decl. ¶ 11 & Exh. E.]

- In the Grievance, Local 715 alleged that the Hospitals violated Article 9 of the CBA by refusing to pay RHC pay to certain techs who carried a device known as a "Spectralink," [Quintel Decl. ¶ 4; Arnold Decl. Exh. E.]

- When the parties were unable to resolve the Grievance, it was submitted to Paul D.

-8-

Staudohar (the "Arbitrator"), who had been selected by the parties to arbitrate the grievance.  [Arnold Decl. ¶ 12.]

• A hearing was held before the Arbitrator on April 26, 2007 in Palo Alto, California.  [Arnold Decl. ¶ 13 & Exh. L.]

• During the hearing, the Arbitrator heard the testimony of witnesses and received documentary evidence, including a complete copy of the CBA.  [Arnold Decl. ¶ 14-16 & Exh. B-L.]

• On July 2, 2007, the Arbitrator issued the Award, which was titled "opinion and decision."  [Arnold Decl. ¶ 19 & Exh. O.]

• The Arbitrator found that the parties had been unable to agree upon a statement of the issue, Local 715's statement of the issue being "Whether the Employer violated Article 9 of the Agreement when it terminated the five percent differential pay to Anesthesia Techs who were assigned to carry the Spectralink telephone beginning on or about February of 2006; and if so, what is the remedy?" and the Hospitals' being "Whether or not Anesthesia Techs are entitled to receive additional pay under Article 9 of the Collective Bargaining Agreement for carrying a Spectralink phone."  [Arnold Decl. ¶ 19 & Exh. O p. 10-11.]  The Arbitrator found, however, that these two statements were essentially equivalent.  [Arnold Decl. ¶ 19 & Exh. O p. 10-11.]

• The Arbitrator upheld the Grievance.  He found that there had existed an unwritten "past practice" whereby techs were paid a five percent differential for carrying a Spectralink, based in part (in the Arbitrator's view) on the increased workload that carrying the Spectralink supposedly entailed.  [Arnold Decl. ¶ 19 & Exh. O p. 14-15.]

• The Arbitrator found that the Hospitals violated the CBA by eliminating the "past practice," without Local 715's "consultation and consent."  [Arnold Decl. ¶ 19 & Exh. O

-9-

p. 14.]

- As a remedy, the Arbitrator ordered "restoration of the five percent differential and making whole of [techs] in the Main Operating Room for lost wages." [Arnold Decl. ¶ 19 & Exh. O p. 15.] He also stated that "[t]he differential will remain in effect unless and until altered by mutual agreement of the Parties." [Arnold Decl. ¶ 19 & Exh. O p. 15.]

An arbitrator is bound to decide only the issues submitted to him or her by the parties. *Schoenduve Corp. v. Lucent Technologies, Inc.*, 442 F.3d 727, 732 (9th Cir. 2006) ("[t]he scope of the arbitrator's authority is determined by the contract requiring arbitration as well as by the parties' definition of the issues to be submitted."). In this case, the undisputed facts show that the parties submitted only the issue of whether techs were entitled to additional pay under Article 9 of the CBA for carrying Spectralinks, or, in the alternative, whether the discontinuation of such pay violated Article 9. By considering whether the discontinuation of Spectralink RHC pay violated a "past practice" and whether the Hospitals were obliged to secure the consent of Local 716 before discontinuing Spectralink RHC, the Arbitrator improperly exceeded the issues submitted rendering his Award invalid. Therefore the Court ORDERS that judgment be entered in favor of the Hospitals and against Respondent and the Award is HEREBY VACATED.

## III.  **THE ARBITRATOR GRANTED RELIEF ON MATTERS THAT LAY BEYOND HIS JURISDICTION AS DEFINED IN THE CBA**

The undisputed facts show that the arbitration award at issue herein (the "Award") is invalid because it decided issues that were not substantively arbitrable under the CBA.

The Court finds that the following facts are material and undisputed:

- At the time of the arbitration at issue here, Local 715 was, or at least purported to be, a labor organization, which represented a bargaining unit consisting of certain employees of the Hospitals, including employees in a job classification known as "anesthesia technician" (hereinafter "tech") [Quintel Decl. ¶ 3.]

-10-

- The Hospitals' and Local 715's CBA is effective from January 20, 2006 through November 4, 2008.  [Arnold Decl. ¶ 4 & Exh. B.]

- Article 2 of the CBA specifically reserves to the Hospitals the right to "direct and assign the work force," "to abolish, create, alter or combine job classifications," "to introduce new or improved equipment, facilities or operations," and "to determine whether employees, both within and without the bargaining unit, will or will not perform certain functions, duties or tasks."  [Arnold Decl. Exh. B.]

- Article 2 further states that the Hospitals "may, in [their] discretion, continue any current policies and practices which do not conflict with express written provisions of this Agreement."  [Arnold Decl. Exh. B.]

- Article 18 of the CBA sets forth provisions governing "work rules" and states, in part, that "[t]he Employer has the right at its discretion to promulgate, alter, modify, amend, rescind, and enforce work rules which are not inconsistent with this Agreement."  [Arnold Decl. Exh. B.]  Article 18 defines "work rules" as "rules promulgated by the Employer, or a particular department or departments thereof, within its discretion, that regulate employees relative to and affecting their employment."  [Arnold Decl. Exh. B.]

- Article 2 also provides that the decision whether or not to continue any existing policies or practices is within the Hospitals' sole and unlimited discretion.  Specifically, Article 2 states, that The Hospitals "may, in [their] discretion, continue any current policies and *practices which do not conflict with express provisions of this Agreement*."  [Arnold Decl. Exh. B (emphasis in original).]

- Article 9 of the CBA provides in relevant part as follows:

  > An employee temporarily assigned by the Employer to perform the typical duties of a position in a higher pay grade for four (4) consecutive hours or more will receive a differential of five percent

-11-

SFCA_1425610.2

(5%) for each grade above the grade of the employee's regular classification for all hours during which the employee is so assigned (e.g., if an employee in Grade SEIU0006 is assigned to a position in SEIU0008 the employee will receive a differential of ten percent (10%)).  As an exception if an employee is assigned by the Employer to a position in a lead classification listed in Appendix A and to perform all of the duties thereof, the employee will be paid a lead premium of five percent (5%) for the actual hours worked in the lead position provided the lead position is in a classification in a higher wage range than the employee's regular classification or position.

- The additional payments called for in Article 9 of the CBA are commonly referred to as "relief in higher classification" or "RHC" pay.  [Quintel Decl. ¶ 5]

- Article 28 of the CBA is titled "waiver" and states in relevant part that "[t]he Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other will not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered by this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed the Agreement." [Arnold Decl. Exh. B.]

- Article 26.7.3 of the CBA provides that, "[t]he arbitrator's authority will be limited to interpreting the specific provisions of this Agreement and will have no power to add to, subtract from, or to change any part of the terms or conditions of this Agreement." [Arnold Decl. Exh. B.]

- Article 26.7.10 provides that "[t]he arbitrator's authority will be limited to determining whether the Employer has violated the provision(s) of this Agreement.  The arbitrator will not have jurisdiction or authority to add to, amend, modify, nullify, or ignore in any way the provisions of this Agreement, and will not make any award that would, in effect,

-12-

grant the Union or the employee(s) any matters that were not obtained in the negotiation process." [Arnold Decl. Exh. B.]

- On or around April 25, 2006, Local 715 filed a grievance pursuant to Article 26 of the CBA (the "Grievance"). [Quintel Decl. ¶ 6; Arnold Decl. ¶ 11 & Exh. E.]

- In the Grievance, Local 715 alleged that the Hospitals violated Article 9 of the CBA by refusing to pay RHC pay to certain techs who carried a device known as a "Spectralink," [Quintel Decl. ¶ 4; Arnold Decl. Exh. E.]

- When the parties were unable to resolve the Grievance, it was submitted to Paul D. Staudohar (the "Arbitrator"), who had been selected by the parties to arbitrate the grievance. [Arnold Decl. ¶ 12.]

- A hearing was held before the Arbitrator on April 26, 2007 in Palo Alto, California. [Arnold Decl. ¶ 13 & Exh. L.]

- During the hearing, the Arbitrator heard the testimony of witnesses and received documentary evidence, including a complete copy of the CBA. [Arnold Decl. ¶ 14-16 & Exh. B-L.]

- On July 2, 2007, the Arbitrator issued the Award, which was titled "opinion and decision." [Arnold Decl. ¶ 19 & Exh. O.]

- The Arbitrator found that the parties had been unable to agree upon a statement of the issue, Local 715's statement of the issue being "Whether the Employer violated Article 9 of the Agreement when it terminated the five percent differential pay to Anesthesia Techs who were assigned to carry the Spectralink telephone beginning on or about February of 2006; and if so, what is the remedy?" and the Hospitals' being "Whether or not Anesthesia Techs are entitled to receive additional pay under Article 9 of the Collective

SFCA_1425610.2

Bargaining Agreement for carrying a Spectralink phone." [Arnold Decl. ¶ 19 & Exh. O p. 10-11.] The Arbitrator found, however, that these two statements were essentially equivalent. [Arnold Decl. ¶ 19 & Exh. O p. 10-11.]

- The Arbitrator upheld the Grievance. He found that there had existed an unwritten "past practice" whereby techs were paid a five percent differential for carrying a Spectralink, based in part (in the Arbitrator's view) on the increased workload that carrying the Spectralink supposedly entailed. [Arnold Decl. ¶ 19 & Exh. O p. 14-15.]

- The Arbitrator found that the Hospitals violated the CBA by eliminating the "past practice," without Local 715's "consultation and consent." [Arnold Decl. ¶ 19 & Exh. O p. 14.]

- As a remedy, the Arbitrator ordered "restoration of the five percent differential and making whole of [techs] in the Main Operating Room for lost wages." [Arnold Decl. ¶ 19 & Exh. O p. 15.] He also stated that "[t]he differential will remain in effect unless and until altered by mutual agreement of the Parties." [Arnold Decl. ¶ 19 & Exh. O p. 15.]

An arbitrator has authority only to decide issues that are arbitrable in terms of the scope of issues made arbitrable under the parties agreement. *AT&T Technologies, Inc. v. Communications Workers Of America*, 475 U.S. 643, 656 (1986). In this case, the undisputed facts show that the Arbitrator was denied the jurisdiction to issue an award finding a violation based on the discontinuation of a purported unwritten past practice because the CBA grants the Hospitals the discretion to discontinue past practices. By issuing such an award, the Arbitrator exceeded the scope of issues that are arbitrable under the Agreement, rendering it invalid. Thus, the Court ORDERS that judgment be entered in favor of the Hospitals and the Award is HEREBY VACATED.

SFCA_1425610.2

**IV.    "LOCAL 715" HAS NO STANDING TO ENFORCE THE AGREEMENT BECAUSE IT HAS CEASED TO EXIST**

Local 715 ceased to exist on or around March 1, 2007.  Therefore, there is no party with standing to enforce the Award at issue herein.

The Court finds that the following facts are material and undisputed:

- In 1998, the National Labor Relations Board ("NLRB" or the "Board") issued an order (the "Certification") certifying Local 715 as the exclusive collective bargaining representative of a unit of Hospital employees (the "Bargaining Unit") as set forth in the Certification.  [Arnold Decl. Exh. A.]

- Thereafter, the Hospitals and Local 715 engaged in collective bargaining resulting in a series of collective bargaining agreements.  The current collective bargaining agreement (the "CBA") became effective on January 20, 2006, and is scheduled to expire on November 4, 2008.  [Arnold Decl. Exh. B.]

- Article 1 of The CBA contains a "Recognition Clause" which states that, pursuant to the Board's Certification, the Hospitals recognized Local 715 "as the sole and exclusive representative for the purpose of collective bargaining" with respect to Bargaining Unit employees.  [Arnold Decl. Exh. B.]

- Article 26 of the CBA contains a grievance and arbitration procedure through which alleged violations of the CBA may be challenged.  However, only Local 715 may appeal a grievance to arbitration.  [Arnold Decl. Exh. B.]

- Between February 18 and February 20, 2006, Local 715 entered into a "Servicing Agreement" with Service Employees International Union, United Healthcare Workers – West ("UHW").  [Arnold Decl. ¶ 36 & Exh. CC; Declaration of Scott P. Inciardi In Support of Motions ("Inciardi Decl.") Exh. EE.]

- The Servicing Agreement provided that UHW would provide certain "professional services" to Local 715 at no cost, including "Representation in the grievance procedure and at arbitration hearings," "Representation at labor-management meetings," and "Assistance to members appearing before the National Labor Relations Board on behalf of the Local 715 Chapter at the Stanford Facility." [Arnold Decl. Exh. CC.]

- The Servicing Agreement further provided that, Local 715 and UHW would take such steps as were necessary to enforce the agreement, including initiating proceedings before the NLRB, in the event that the Servicing Agreement was rejected by the Hospitals." [Arnold Decl. Exh. CC.]

- The Servicing Agreement was to be effective as of March 1, 2006. [Arnold Decl. Exh. CC.]

- On February 28, 2006, Greg Pullman, then Local 715's Staff Director, informed Laurie Quintel, the Hospitals' Director of Employee and Labor Relations, that she should work with an employee of UHW named Ella Hereth in connection with the settlement of grievances and unfair labor practice charges. [Quintel Decl. ¶ 9.]

- Around the same time, another UHW employee named Rachel Deutsch told Ms. Quintel that UHW would be taking over representation for the Hospitals. [Quintel Decl. ¶ 10.]

- Ms. Quintel sought clarification from Mr. Pullman, whereupon Mr. Pullman told Ms. Quintel that "Local 715 represents the workers covered by our agreement" but that "Local 715 has asked SEIU UHW to service this unit in many ways on a day-to-day basis." [Quintel Decl. ¶ 11-12 & Exh. B.]

- Between March and May, 2006, the functions that had formerly been carried out by Local 715 personnel were carried out exclusively by UHW employees. UHW employees filed grievances on UHW stationery, some of which referred to Bargaining Unit members as

-16-

SFCA_1425610.2

"members" of UHW.  [Quintel Decl. ¶ 15 & Exh. D.]  Ms. Hereth sent a letter to Ms. Quintel instructing to "direct all SEIU correspondence" to UHW employees at UHW's San Francisco office.  [Quintel Decl. ¶ 14 & Exh. C.]  On May 22, 2006, Jocelyn Olick, a UHW employee and purported servicing agent under the Servicing Agreement, stated in an e-mail that "I and Ella Hereth do not work for SEIU 715.  SEIU-UHW is doing the representation work here at Stanford Hospital."  [Quintel Decl. ¶ 20 & Exh. H.]  On the same day, Mr. Pullman stated in an e-mail that "Jocelyn Olick, Rachel Deutch and Ella Hereth out of the SEIU UHW San Francisco office are handling all representation matters for SEIU Local 715."  [Quintel Decl. ¶ 20 & Exh. H.]  Ms. Olick also purported to have authority to accept changes to the CBA.  [Quintel Decl. ¶ 21 & Exh. I.]

- On or around March 28, 2006, W. Daniel Boone of the law firm Weinberg Roger & Rosenfeld, which historically represented Local 715, wrote a letter to Laurence R. Arnold, an attorney who represents the Hospitals, which referred to "United Healthcare Workers – West (formerly SEIU, Local 715)."  [Arnold Decl. ¶ 26 & Exh. S.]

- In early April, 2006, UHW employee Phyllis Willett told Ms. Quintel that  when the Hospitals remitted union dues, they needed to provide the social security numbers of the relevant employees to help UHW identify them.  [Quintel Decl. ¶ 16.]

- Around April 17, 2006, Ms. Quintel received a letter from William A. Sokol of the Weinberg Firm in which he stated "I am writing on behalf of SEIU United Healthcare Workers West" and requested that the Hospitals provide information pertaining to Bargaining Unit employees, and the dues deducted from their paychecks.  [Quintel Decl. ¶ 17 & Exh. E.]

- In May and June, 2006, Hospitals informed Local 715 that they did not consent to any transfer of bargaining rights from Local 715 to UHW, and that the Hospitals would not deal with employees of UHW.  [Quintel Decl. ¶ 19 & Exh. G; Arnold Decl. ¶ 32 & Exh.

-17-

SFCA_1425610.2

1    Z.]

2

3    •    In June, 2006, Hospitals requested information from Local 715 regarding the

4    organization's status and the role of UHW.  [Arnold Decl. ¶ 32 & Exh. Z.]

5    •    On June 9, 2006 the Service Employees International Union ("SEIU" or the

6    "International") issued a document titled "Hearing Officers' Joint Report And

7    Recommendations" (the "Joint Report").  The Joint Report outlined a plan to reorganize

8    various SEIU Locals (the "SEIU Reorganization Plan").  The Joint Report noted, "Local

9    715 is the certified representative of employees at Stanford and Lucille (sic) Packard

10    Hospitals" but that "UHW is actually servicing employees in these facilities . . . pursuant

11    to servicing agreements."  [Inciardi Decl. Exh. T p. 16.]  The Joint Report concluded that,

12    in order to maximize local union strength, the jurisdiction of various local unions should

13    be changed.  With respect to government employee unions, the report recommended the

14    creation of new local unions, that would absorb "a substantial portion" of the membership

15    of existing local unions, including Local 715.  [Inciardi Decl. Exh. T p. 40.]  The Joint

16    Report also recommended that, "the affiliation of private healthcare units represented by

17    Locals 727, 715, and 2028 should be changed to UHW as soon as feasible."  [Inciardi

18    Decl. Exh. T p. 65.]

19

20    •    On June 11, 2006, Andrew L. Stern, International President of SEIU, issued a

21    memorandum to "Affected SEIU Local Unions in California" announcing that SEIU had

22    decided to adopt the recommendations outlined in the Joint Report.  The memorandum

23    confirmed that "Private Sector Hospital units currently represented by Locals 535, 707,

24    715, 2028, and 4988 will merge into UHW."  [Quintel Decl. ¶ 23 & Exh. K at p. 4.]

25    •    Hospitals received copies of the Servicing Agreement in mid August and reviewed it.

26    [Quintel Decl. ¶ 24-25 & Exh. L; Arnold Decl. ¶ 36-38 & Exh. CC-EE.]  The Hospitals

27    concluded, based upon the evidence that Local 715 had abdicated its representative duties

28

-18-

[PROPOSED] ORDER GRANTING STANFORD AND LPCH'S
MOTION FOR SUMMARY JUDGMENT/ADJUDICATION
CASE NO. C-07-CV-05158-JF

1    and assigned them to UHW, that the Servicing Agreement was invalid and rejected it.

2

•       Local 715 was informed of the Hospitals' rejection of the Servicing Agreement on or
3
around August 29, 2006, and was further informed that the Hospitals would not deal with
4
employees of UHW acting pursuant to the Servicing Agreement. [Arnold Decl. ¶ 38 &
5
Exh. EE.]
6

7    •       In September, 2006, Bargaining Unit employees were asked to ratify the reorganization

8    plan adopted by SEIU by means of a state-wide vote.  The balloting material distributed

9    to Bargaining Unit employees expressly stated that "Hospital workers at . . .

10   Stanford/Lucille Packard Children's Hospital . . . will change their affiliation to United

11   Healthcare Workers – West."  [Quintel Decl. ¶ 26-27 & Exh. M-N.]

12

•       On January 2, 2007, International President Stern issued an "Order Of Reorganization" to
13
various SEIU locals, including Local 715.  [Inciardi Decl. Exh. U.]  President Stern
14
ordered that all workers represented by Local 715, with certain exceptions, be
15
"reorganized into SEIU Local 521."  President Stern further ordered that "all . . .
16
Stanford/Lucille (sic) Packard Hospital workers be, and are hereby, reorganized into
17
SEIU Local UHW."  [Inciardi Decl. Exh. U.]  Such "reorganization" was to take place as
18
soon as practicable.
19

20   •       On January 31, 2007, Chief Shop Steward Robert W. Rutledge, stated in an e-mail that,

21   "SEIU 715 no longer exists and a service agreement between the former 715 and UHW

22   has been in place since March first of 2006."  [Quintel Decl. ¶ 28 & Exh. O.]  Copies of

23   the e-mail were sent to Ms. Olick and UHW employee Kim Tavaglione, neither of whom

24   objected to Mr. Rutledge's statement.

25

26   •       At a meeting with Ms. Quintel on or around February 2, 2007, Mr. Rutledge repeated his

27   assertion that Local 715 no longer existed.  He also stated that Local 715 no longer

28
-19-

represented employees at the Hospitals, and that they were now represented by UHW. [Quintel Decl. ¶ 29.]

• In late January, Local 715 prominently posted a statement on its website, located at http://www.SEIU715.org, that "We are in the process of transitioning to our new local 521. This web site will be taken down on Feb. 28. On March 1, our new Local's web site www.seiu521.org will have your chapter pages and other information." [Quintel Decl. ¶ 30 & Exh. P.]

• Beginning on or around March 1, visitors to Local 715's website could no longer access the former site, but were automatically redirected to the website of Service Employees International Union, Local 521 ("Local 521"), located at http://www.SEIU521.org. Local 521's website contained a prominent statement that five local unions, including Local 715 "have come together . . . by forming one larger, more powerful local." [Quintel Decl. ¶ 32 & Exh. R.] Another page referenced benefits available to "former SEIU Local 715 members." [Quintel Decl. ¶ 32 & Exh. R.]

• On or around March 5, 2007, Local 715's website contained the following statement: "Five locals (415, 535, 700, 715, and 817) have come together to cover the North Central region by forming one larger, more powerful local. On January 2, 2007, our new local received its charter. On March 1, 2007, the resources of all five locals were transferred to Local 521." [Quintel Decl. ¶ 40 & Exh. X.]

• As of March 2, 2007, UHW's website, located at http://SEIU-UHW.org, contained an assertion that UHW represented the Hospitals' employees. [Quintel Decl. ¶ 34 & Exh. S.] UHW has continued to claim to represent the Hospitals' employees on its website. [Inciardi Decl. ¶ 24 & 29-30 & Exh. C21-C22.]

• The dues deduction authorization forms, by which the individual bargaining unit

members authorized deduction and remittance of union dues, authorized remittance of dues specifically to Local 715, and to no other organization. [Quintel Decl. ¶ 35 & Exh. T.]

- In fact, although it was not known to the Hospitals at the time, the actual recipient of the dues being remitted to "Local 715" was Local 521. A document posted on the Local 521 Website titled "Dues Receipts of the year of 2007" showed that, in September, 2007, Local 521 received a payment of dues totaling $21,949 from an account designated "USW Hospitals" ("USW" being a commonly used acronym for "United Stanford Workers," the name given to the chapter of Local 715 that had been assigned to the SHC/LPCH Bargaining Unit). [Arnold Decl. ¶ 57 & Exh. WW.] This was the exact amount (rounded to the dollar) of the Hospitals' last dues remittance to "Local 715" for February, 2007, which was $21,949.35. [Quintel Decl. ¶ 38 & Exh. V.]

- On March 2, 2007, the Hospitals informed "Local 715" that, after the remittance of the dues for February, 2007, the Hospitals would no longer remit dues to "Local 715" absent clarification of its status and the identity of the organization that would be receiving the dues. [Quintel Decl. ¶ 36 & Exh. U.] The requested information was not provided, and after March 1, 2007, the Hospitals ceased remitting dues. [Quintel Decl. ¶ 37.] The Hospitals continued to deduct dues from Bargaining Unit employees' checks, but held the dues in a separate bank account established for that purpose, a procedure that continues to date. [Quintel Decl. ¶ 37.]

- On June 8, 2007, President Stern issued an "Order Of Emergency Trusteeship." [Inciardi Decl. Exh. Z.] That order stated that, because of the Hospitals' "position" that Local 715 had ceased to exist, and the transfer of the bulk of Local 715's former members and resources to Local 521, SEIU was placing "Local 715" under trusteeship, removing its officers, and appointing Bruce W. ("Rusty") Smith as trustee. The order confirmed that

-21-

SFCA_1425610.2

the SEIU's reorganization plan remained in place and that the remaining members of "Local 715" would be "united with other SEIU healthcare members in SEIU United Healthcare Workers – West."  [Inciardi Decl. Exh. Z.]

• Mr. Smith sent a letter to Ms. Quintel on June 14, 2007 informing her of the trusteeship, that the Servicing Agreement would "remain in full force and effect," and that UHW employees would continue to "service" the Hospitals.  [Quintel Decl. ¶ 48 & Exh. FF.]

• Around June 18, 2007, Mr. Arnold learned that Barbara J. Chisholm of the law firm Altshuler Berzon LLP (the "Altshuler Firm") was now representing "Local 715."  Mr. Arnold confirmed this in a conversation with Ms. Chisholm followed by a confirming letter.  [Arnold Decl. ¶ 40 & Exh. FF.]

• To date, the Hospitals have not received any notification that the Altshuler Firm no longer represents "Local 715."  [Quintel Decl. ¶ 57; Arnold Decl. ¶ 40.]

• Since the announcement of the Altshuler Firm's representation of "Local 715," the Hospitals continued to receive correspondence from Weinberg Firm attorneys purporting to act on "Local 715's" behalf in grievance and arbitration matters.  [Arnold Decl. ¶ 49, 55 & 65 & Exh. UU & EEE.]  Weinberg Firm attorneys also appeared in each arbitration hearing that was held after the appointment of the Altshuler Firm as counsel.  [Arnold Decl. ¶ 46 & 49 & Exh. LL.]

• The Hospitals were aware that the Weinberg Firm has historically acted as counsel to UHW and it had previously sent correspondence to the Hospitals representing UHW pursuant to the Servicing Agreement.[Quintel Decl. ¶ 17 & Exh. E.]  The Hospitals became concerned that when the Weinberg Firm acted on behalf of "Local 715," it was actually retained by UHW and acting under authority of the rejected Servicing Agreement.  However, when the Hospitals requested information from "Local 715" on

this issue "Local 715" and its purported attorneys either failed to respond or openly refused to respond.  [Arnold Decl. ¶ 49-53 & Exh. NN-RR.]  The Hospitals concluded that the Weinberg Firm was, in fact, representing UHW, and that its appearances on "Local 715's" behalf were made under authority of the rejected Servicing Agreement.  Therefore, the Hospitals refused to participate in arbitration proceedings with Weinberg attorneys absent assurances that the appearance was made directly on behalf of "Local 715" and not pursuant to the Servicing Agreement.  [Arnold Decl. ¶ 53 & Exh. RR.]  Neither the Weinberg Firm nor the Altshuler Firm provided the Hospitals with the requested assurance.

The undisputed facts set forth above demonstrate that on or around March 1, 2007, Local 715 was dissolved and that it no longer exists.  It is well-established that, where the NLRB certifies a union as the exclusive bargaining representative of an employer's workers pursuant to the NLRA, the employer is not only obligated to bargain with that union, but is prohibited from bargaining with any other union.  *Medo Photo Supply Corporation v. National Labor Relations Board*, 321 U.S. 678, 673-674 (1944); *Nevada Security Innovations, Ltd.*, 341 NLRB 953, 955 (2004).  Where the certified union has ceased to exist, the employer's bargaining obligation is at an end.  *Brooks v. National Labor Relations Board*, 348 U.S. 96, 98 (1954); *Pioneer Inn Associates v. National Labor Relations Board*, 578 F.2d 835, 839 (9th Cir. 1978).

Likewise, where an employer and the certified union negotiate a collective bargaining agreement providing for arbitration of disputes, and the union subsequently ceases to exist, the employer no longer has any obligation to arbitrate because only the union has standing to compel arbitration.  *Moruzzi v. Dynamics Corporation Of America*, 443 F.Supp. 332, 336-337 (S.D.N.Y. 1977); *Lorber Industries Of California v. Los Angles Printworks Corporation*, 803 F.2d 523, 525 (9th Cir. 1986) (The obligation to arbitrate "may not be invoked by one who is not a party to the agreement").  Where the certified union has ceased to exist, its former officials or representatives do not have standing to compel arbitration under its name.  *Moruzzi, supra*, 443 F.Supp. at 337.

-23-

1    Because Local 715 has ceased to exist, it lacks standing to enforce the Award at issue

2    herein.  Therefore the Court ORDERS that judgment shall be entered against Local 715 and in

3    favor of the Hospitals.

4

5        **IT IS ORDERED**, for the foregoing reasons, that the Hospitals' motion for summary

6    judgment or, in the alternative, summary adjudication of claims or defenses is **GRANTED** and

7    that judgment will be entered against Local 715 and in favor of the Hospitals.  **IT IS FURTHER**

8    **ORDERED** that the Award is **HEREBY VACATED**.

9

10   Dated:

11

12                                              _____
                                                HON. JEREMY FOGEL
13                                              JUDGE OF THE UNITED STATES
                                                DISTRICT COURT FOR THE NORTHERN
14                                              DISTRICT OF CALIFORNIA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING STANFORD AND LPCH'S
MOTION FOR SUMMARY JUDGMENT/ADJUDICATION
CASE NO. C-07-CV-05158-JF

SFCA_1425610.2